IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JOHN DOE, | * | |
| *Plaintiffs*, | * | |
| v. | * | No. 8:22-cv-00872-PX |
| UNIVERSITY OF MARYLAND, COLLEGE PARK ET AL., | * | |
| *Defendants*. | * | |

* * * * * * * * * * * *

**UNIVERSITY OF MARYLAND, COLLEGE PARK'S**
**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

Defendant, University of Maryland, College Park (the "University"), by undersigned counsel, submits this memorandum in support of its motion to dismiss.

## INTRODUCTION

Plaintiff John Doe was accused of sexually assaulting fellow student Jane Roe who invoked the University's Title IX process following the alleged assault. Following the Title IX hearing, Mr. Doe was found to be not responsible for sexual assault. He now sues the University under Title IX for failing to stop Ms. Roe and two other fellow students from making defamatory statements against him. In Count I, he asserts a claim for deliberate indifference to sexual harassment by the fellow students. In Count II, he asserts a claim for Title IX retaliation. Mr. Doe seeks compensatory, special, and punitive damages of not less than $1,000,000 against the defendants. He also seeks injunctive relief against the University requiring the University "to meaningfully address Doe's Title IX complaints." Compl. at 21.

Mr. Doe's claims against the University fail because he has not alleged facts that support a Title IX claim under either theory. Specifically, a third party's allegedly defamatory statements that the plaintiff committed a sexual assault are not covered by Title IX, and therefore a university has no liability under Title IX for not preventing or sanctioning such statements. Additionally, to the extent that Mr. Does seeks punitive damages or emotional distress damages from the University, those damages are not available under Title IX.

**FACTUAL ALLEGATIONS**

John Doe and Jane Roe were undergraduate students at the University at the time of the events alleged in the complaint. On October 27, 2020, Jane Roe filed a formal complaint with the University's Office of Civil Rights and Sexual Misconduct against plaintiff John Doe. Compl. ¶ 12. In her complaint, Ms. Roe alleged that she was sexually assaulted by Mr. Doe and another student, Jacob Poe. Compl. ¶ 13. After the sexual contact, Ms. Roe made statements to others from which it could be inferred that the sexual contact with Mr. Doe was consensual. Compl. ¶¶ 15-18. Additionally, after the alleged sexual assaults, Ms. Roe chose to sleep at Mr. Doe's apartment while, according to one witness, "hugging [Jacob Poe] like a koala." Compl. ¶ 19. The day following the alleged sexual assaults, Ms. Roe stayed at Mr. Doe's apartment, socializing with Mr. Doe and watching football games until the late afternoon or early evening. Compl. ¶ 20.

Throughout the Title IX process, Ms. Roe's mother engaged in witness intimidation and repeatedly harassed at least two student witnesses. Compl. ¶¶ 21-22. Ms. Roe's mother called one witness's family and threatened that if he were to testify, "he would have a

problem next." Compl. ¶ 22. The harassed witnesses contacted the University for relief from Ms. Roe's mother's harassment but the University took no meaningful steps to remedy the harassment or witness tampering. Compl. ¶¶ 23-24. The University took no action against Roe as a result of her mother's behavior and permitted Roe's mother to testify at the Title IX hearing. Compl. ¶ 25. Ms. Roe's mother also threatened Mr. Doe and Mr. Poe with physical violence on her social media account. Compl. ¶ 26.

Despite Ms. Roe's mother's threats and interference, Mr. Doe prevailed at the conclusion of the Title IX proceeding. Compl. ¶ 27. Ms. Roe told inconsistent stories during the Title IX proceeding, and witnesses testified to her demeanor after the alleged assaults indicating that she was enjoying the party at Mr. Doe's apartment. Compl. ¶¶ 28-31. Witnesses also testified that Ms. Roe lied about other sexual activities. Compl. ¶¶ 32-41. And, according to a University police report, Ms. Roe stated that she had a consensual sexual encounter with Mr. Doe. Compl. ¶ 41-42. Despite Ms. Roe's statement in the police report, the University refused to dismiss the matter. Compl. ¶ 44. Mr. Doe had to participate in a Title IX process at the University that spanned over ten months and cost him over $100,000 in legal fees. Compl. ¶ 45.

Following a hearing that occurred from August 16 to 20, 2021, a hearing officer, on September 1, 2021, found Mr. Doe and Mr. Poe not responsible for sexual assault. Compl. ¶ 48. The hearing officer found that DNA testing results of Ms. Roe's clothing contradicted Ms. Roe's claims and that her credibility was "significantly undermined" by her own contemporaneous statements and text messages. Compl. ¶¶ 50-53. Instead, the hearing officer found that the evidence corroborated Mr. Doe's claim that the sexual interaction

was consensual. Compl. ¶ 54. Ms. Roe did not appeal the determination and the case was closed on September 14, 2021. Compl. ¶ 57.

Following the hearing officer's determination, Ms. Roe began to harass and retaliate against Mr. Doe and falsely told third parties, including University student organization, Preventing Sexual Assault ("PSA"), that Doe was a rapist. Compl. ¶¶ 58-59. PSA is a chartered organization that sits on the Sexual Assault Prevention Committee at the University. Compl. ¶ 60. PSA works closely with the University's Office for Civil Rights and Sexual Misconduct ("OCRSM") leadership and meets to coordinate the University's Title IX efforts. Compl. ¶ 61. PSA advertises on its website that it provides services to the student body on behalf of the University, including but not limited to, "lead[ing] many education and prevention programs aimed at engaging the community as well as creating space for survivors and students in the conversation with administration." Compl. ¶ 62.

On or about February 2, 2022, Defendants Salem and Chaiken, PSA co-presidents, stated in a public forum that PSA is set apart from "other student organizations" because it has a special influence over OCRSM. Compl. ¶ 63. Defendants Salem and Chaikin further expressed their belief that it is "their job" to let students know "who the predators are on campus." Compl. ¶ 64.

At some unspecified time,[1] Ms. Salem and Ms. Chaiken undertook a campaign against Mr. Doe to ruin his life at the University. Compl. ¶ 65. They falsely told additional

[1] This allegation is set forth two paragraphs after the allegation that Defendants Salem and Chaikin made certain statements about PSA's status at a public meeting in February 2022, Compl. ¶ 63, but the allegations are not set forth in chronological order

student organizations at the University, of which Doe is a member, that Doe was a "rapist" and was "under investigation by the University" for sexual misconduct. Compl. ¶ 66. Over the course of the next several months, Ms. Salem and Ms. Chaikin repeated these false allegations to various students and student organizations, telling them not to associate with Doe. Compl. ¶ 67. Ms. Roe also continues to harass and retaliate against Mr. Doe by publicly defaming him as a rapist. Compl. ¶ 72. Consequently, Mr. Doe was socially ostracized and ousted from his student organizations, depriving him of educational benefits. Compl. ¶ 73. Specifically, on October 7, 2021, a student organization's activity that Mr. Doe had planned on participating in was canceled after Defendants Salem and Chaikin contacted the student organization and stated that Mr. Doe was under investigation, despite being fully exonerated a month prior. Compl. ¶ 74.

Beginning on or around October 8, 2021, Mr. Doe made multiple notices and formal complaints to OCRSM alleging retaliation and harassment by Ms. Roe and Defendants Salem and Chaikin.[2] Compl. ¶ 76. His complaints were "summarily dismissed or ignored by OCRSM without any investigation." Compl. ¶ 77.

On December 14, 2021, Mr. Doe's Title IX advisor had a phone conference with the University's Title IX Coordinator, Grace Karmiol, wherein Ms. Karmiol stated that she

---

because, several paragraphs later, the complaint alleges events occurring in early October, 2021, just a couple of weeks after the Title IX determination, Compl. ¶¶ 74, 76.

[2] Despite the allegation of multiple notices and formal complaints, the complaint alleges that the University dismissed Mr. Doe's singular formal complaint on January 24, 2022, Compl. ¶ 85, and that he filed a second formal complaint on February 10, 2022, Compl. ¶ 90. Mr. Doe alleges that, as of the date of the filing of this lawsuit, on April 11, 2022, the University had not yet taken action on the second complaint. Compl. ¶ 91.

would instruct PSA to cease and desist harassing Mr. Doe. Compl. ¶ 79. During that conversation, Mr. Doe's advisor advised that Mr. Doe did not want Ms. Karmiol to use his name when she spoke with PSA because he feared use of his name "could inflame the retaliation and harassment rather than quell it." Compl. ¶ 80. Initially, Ms. Karmiol stated that she could speak with PSA without using Mr. Doe's name. Compl. ¶ 81. Later, in January 2022, Ms. Karmiol stated in writing that she would not speak with PSA unless she could use Mr. Doe's true name. Compl. ¶ 82. Mr. Doe contends that use of his name was unnecessary because a general directive to PSA that it must not harass Title IX respondents would have remedied the harassment against Doe. Compl. ¶ 83.

Despite Mr. Doe's formal complaints, OCRSM has not acted to prevent any retaliation or harassment levied against Mr. Doe. Compl. ¶ 84. Instead, on January 24, 2022, the University formally dismissed Mr. Doe's OCRSM complaint. Compl. ¶ 85. Further, the Deputy Title IX coordinator stated in a meeting with Mr. Doe that Ms. Roe's complaint was in "good faith" despite the hearing officer's findings as to her credibility. Compl. ¶ 86.

Due to the University's inaction on Mr. Doe's formal complaint, Defendants Salem and Chaikin have continued to publicly defame Mr. Doe to other students including one of the University's club sports teams. Compl. ¶ 87. As a result of the defamation, Mr. Doe was removed from the club team where he had been a member since his freshman year. Compl. ¶ 88. When Mr. Doe was removed from the team, Ms. Roe stated on social media that the removal was a "huge W for me and other survivors." Compl. ¶ 89. This statement was provided to the University and no action was taken. Compl. ¶ 27.

Mr. Doe filed a second formal complaint regarding the actions of Ms. Roe and PSA on or about February 10, 2022. Compl. ¶ 90. As of the filing of this lawsuit two months later, the University had taken no action on this complaint or even arranged to meet with Mr. Doe, making it clear that it will not protect his rights. Compl. ¶ 91. Instead, the University provided Ms. Roe an "executive committee" position in PSA, allowing her greater access and authority with respect to the University's enforcement of Title IX. Compl. ¶ 92. In announcing this position on social media on or about February 17, 2022, Ms. Roe stated, for the first time, that she was "raped by two boys" at the University. Compl. ¶ 93. She stated to the news media that "No girl needs to wake up with her pants undone." Compl. ¶ 94. She had not made those statements during the Title IX process. Compl. ¶ 95. Ms. Roe also erroneously stated to the news media that "one of her assaulters was found innocent" when both of the accused young men had been found not responsible. Compl. ¶ 96.

Mr. Doe contacted the University again on March 25, 2022 to provide additional information about the ongoing harassment and retaliation levied against him by Ms. Roe and PSA. Compl. ¶ 97. On March 28, 2022, the Deputy Title IX Coordinator advised that the University had previously dismissed Mr. Doe's formal complaints and that the Title IX Office would take no action against Ms. Roe or PSA. Compl. ¶ 98.

## LEGAL STANDARD

Rule 12(b)(6) mandates dismissal if the pleadings fail to "contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)).

Although the well-pled factual allegations are accepted as true, the Court "need not accept the legal conclusions drawn from facts, and . . . need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citation omitted). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. The United States Supreme Court's decisions in *Twombly* and *Iqbal* "require that complaints in civil actions be alleged with greater specificity than previously required." *Walter v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). Courts "must determine whether it is plausible that the factual allegations in the complaint are enough to raise a right to relief above the speculative level." *Monroe v. Cty. of Charlottesville*, 579 F.3d 380, 386 (4th Cir. 2009) (quoting *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009) (internal quotation marks omitted.)

In *Twombly*, the Supreme Court articulated "[t]wo working principles" that the court must employ when ruling on Rule 12 (b)(6) motions to dismiss. *Iqbal*, 556 at 678. First, while a court must accept as true all the factual allegations contained in the complaint, legal conclusions drawn from those facts are not afforded such deference. *Id*. (stating that "[t]hreadbare recitals of the elements of a case of action, supported by mere conclusory statements, do not suffice" to plead a claim); *see also Wag More Dogs, LLC v. Cozart*, 608 F.3d 359, 365 (4th Cir. 2012) ("Although we are constrained to take the facts in the light most favorable we need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments."). Second, a complaint must be dismissed if it does not allege "a plausible claim for relief." *Iqbal*, 556 U.S. at 679.

## ARGUMENT

Title IX of the Education Amendments of 1972 provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. The Supreme Court has recognized a private right of action against fund recipients for Title IX violations *committed by the fund recipients*, not third parties. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 641-42 (1999). The rationale for limiting Title IX claims to the misconduct of the fund recipients is that Title IX was enacted by Congress pursuant to its authority under the Spending Clause. *Id.* at 639-40. In return for federal funds, the states and other educational institutions agree to comply with federally imposed conditions which must be stated "with a clear voice." *Id.*

The Supreme Court recently reaffirmed the concept that Spending Clause legislation like Title IX is not subject to judicial expansion because it is based on what amounts to a contract between the Federal Government and the recipient of funds. *See Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. ____, 142 S. Ct. 1562, 1570 (2022). In order to decide what constitutes the scope of liability or the availability of particular remedies in any particular case, the Court must "ask a simple question: Would a prospective funding recipient, at the time it 'engaged in the process of deciding whether [to] accept' federal dollars, have been aware that it would face such liability?" *Id.* at 1571.

Viewing the complaint through this lens reveals that it fails to state a viable claim under Title IX. Based on the plain language of the statute and settled caselaw, the University is not liable to an accused student who received a favorable result from the

University's Title IX process and whose real complaint is about the alleged defamatory statements made by the Title IX complainant and her fellow-student advocates. It is well established that allegedly defamatory statements that the plaintiff committed a sexual assault are not covered by Title IX, and therefore a university has no liability for not preventing or silencing such statements. Finding liability against the University in this case would constitute an expansion of Title IX liability in contravention of settled Supreme Court precedents.

## I. THE COMPLAINT FAILS TO ALLEGE FACTS THAT DEMONSTRATE THAT THE UNIVERSITY WAS DELIBERATELY INDIFFERENT TO SEXUAL HARASSMENT OF MR. DOE BY FELLOW STUDENTS.

Although the Supreme Court has recognized Title IX claims based on a school's deliberate indifference to student-on-student sexual harassment, such liability is based on the school's own intentional violations, not on theories of imputed liability. *Davis*, 526 U.S. at 641-42. To mount such a claim, the plaintiff must demonstrate the institution was "deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650 (emphasis added). "If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment. That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Id.* at 644–45. "Funding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly

unreasonable in light of the known circumstances." *Id*. at 648. In *Davis*, the Supreme Court emphasized that a court could, on a motion to dismiss, for summary judgment, or for a directed verdict, identify a response as not "clearly unreasonable" as a matter of law. *Id.* at 649. The complaint is devoid of facts that would meet the requirements set forth in *Davis*.

### A. The Complaint Fails to Allege that Mr. Doe Was Subjected to Sexual Harassment.

The first essential element of a Title IX claim is that the plaintiff "was subjected to harassment based on [his] sex." *Feminist Majority Foundation v. Hurley*, 911 F.3d 674, 686 (4th Cir. 2018) (internal citation and quotation marks omitted). Title IX does not guard against all forms of harassment because it was enacted to prevent *sex* discrimination which can take the form of sexual harassment or sexual assault. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281-82 (1998). In other words, the offensive conduct must be "gender-oriented." *Davis*, 526 U.S. at 651. That essential element is missing in this case because there is no allegation that Mr. Doe was targeted simply because he was male. Instead, the complaint alleges that Mr. Doe was the subject of harassment due to his alleged conduct towards Ms. Roe.

According to the complaint, Mr. Doe and Ms. Roe engaged in sexual activity that Mr. Doe deemed to be consensual and that Ms. Roe claimed was not consensual. Compl. ¶¶ 13, 54. Although Mr. Doe ultimately was found not responsible for sexual assault by the University's internal Title IX process, Ms. Roe continued to contend that the encounter was not consensual and constituted sexual assault, and it is alleged that she was supported

in her contentions by Defendants Salem and Chaikin. Whether or not those contentions were credible, they were based on Ms. Roe's interpretation, however flawed, that the interaction between them amounted to sexual assault — not based on Mr. Doe's status as a man. Therefore, to the extent that Ms. Roe and Defendants Salem and Chaikin acted on those contentions, their conduct did not constitute sexual harassment covered by Title IX. *See Cokerham v. Stokes Cty. Bd. of Educ*., 302 F. Supp. 2d 490, 497-98 (M.D.N.C. 2004) (granting a motion to dismiss where a student was made to wear a sign, but the "question put forth on the sign was completely gender-neutral and was therefore irrelevant to finding the harassment was based on sex"); *Higgins v. New Balance Athletic Shoe, Inc*., 194 F.3d 252, 258 (1st Cir. 1999) (explaining that "in same-sex harassment cases as in all sexual harassment cases, the plaintiff 'must always prove that the conduct at issue was not merely tinged with offensive sexual connotations,' but in fact constituted discrimination 'because of sex'") (quoting *Oncale v. Sundowner Offshore Serv., Inc.* 523 U.S. 75, 81 (1998)). Harassment, "even harassment between men and women is not automatically considered to be gender-based discrimination merely because the words have sexual content or connotations." *Nungesser v. Columbia University*, 244 F. Supp. 3d 345, 362 (S.D.N.Y. 2017) (citing *Oncale,* 523 U.S. at 81) ("*Nungesser II*").

*Nungesser v. Columbia University* is instructive because the material allegations in that case are so similar to the material allegations in this case. 169 F. Supp. 3d 353 (S.D.N.Y. 2016) ("*Nungesser I*"). Paul Nungesser, similar to Mr. Doe, was the respondent in a Title IX complaint made by a fellow student, Emma Sulkowicz, at Columbia University when both were sophomores. *Id.* at 359. Ms. Sulkowicz alleged that Mr.

Nungesser had raped her, and following Columbia's Title IX process, Mr. Nungesser was found "not responsible" for "non-consensual sexual intercourse." *Id.*

Following the "not responsible" finding, Ms. Sulkowicz continued to maintain that she had been raped and began speaking to journalists about the alleged rape. *Id.* at 360. Both the New York Post and a student blog published articles about the alleged rape without naming Mr. Nungesser, but both approached Mr. Nungesser for comment. *Id.* Ms. Sulkowicz also published an op-ed in Time Magazine entitled "My Rapist is Still on Campus." *Id.* Soon thereafter, Columbia's student newspaper identified Mr. Nungesser as Ms. Sulkowicz's rapist, and someone distributed flyers of a "rape list" that included Mr. Nungesser's name. *Id.* By their senior year, Ms. Sulkowicz undertook a performance art piece, entitled the Mattress Project, that involved her carrying a mattress around campus throughout her senior year for the purpose of "[g]et[ting] my rapist off campus." *Id.* The Mattress Project received widespread media attention both nationally and internationally, with many of the news articles linked to the Columbia Spectator article naming Mr. Nungesser. *Id.* at 360-61. A Columbia professor approved the Mattress Project as Ms. Sulkowicz's senior thesis and she received class credit for it. *Id.* at 360. Columbia also partially paid for the clean-up costs associated with a campus rally organized by Sulkowicz and other student activists that focused on a list of demands, including that Columbia re-open its investigation into Sulkowicz's complaint against Nungesser. *Id.* at 361.

Mr. Nungesser and his parents complained multiple times to Columbia about Ms. Sulkowicz's conduct, and Mr. Nungesser filed a formal complaint with Columbia. *Id.* at 362. Columbia declined to open an investigation, and stated that the conduct did not

constitute actionable retaliation under Columbia policy. *Id.* Thereafter, Nungesser filed a complaint alleging that Columbia was deliberately indifferent to gender-based harassment by Sulkowicz and that, as a result, his social and academic experience at Columbia suffered. *Id.* at 361-62.

The district court granted Columbia University's motion to dismiss for failure to state a claim, finding that the harassment outlined in the complaint did not state a viable claim for deliberate indifference under Title IX. As an initial matter, the court rejected the assumption that calling someone a rapist, falsely or not, is inherently gendered. *Id*. at 365. Sulkowicz's use of the word was based on a particular event involving a particular male; it was not used as a generic term to disparage men or Nungesser as a man. *Id.* at 365-66; *Nungesser II*, 244 F. Supp. 3d at 366-67 ("Nungesser cannot invoke Title IX to censor the use of the terms 'rapist' and 'rape' by an alleged victim of the crime—those are the English words that define the criminal and the crime."). Because the factual allegations demonstrated that Sulkowicz's activism towards Nungesser was based on his alleged conduct of committing rape, and not on his status as a male, Nungesser failed to make out a claim of gender discrimination. *See Nungesser I*, 169 F. Supp. 3d at 365-67 ("In this case, Sulkowicz's use of the word was based on a particular event involving a particular male; it was not used as a generic term to disparage men, or Nungesser as a man."). Therefore, the university was not subject to liability under Title IX for failing to prevent the harassment or failing to punish Sulkowicz.

The same analysis applies to this case. The identified harassment, statements by Ms. Roe and Defendants Salem and Chaikin, was related to a particular event involving a

particular male — the sexual encounter between Ms. Roe and Mr. Doe. The identified statements were not directed to disparage men generally or to disparage Mr. Doe simply because he was a man. The alleged conduct, thus, is completely different from the type of harassment that may support a Title IX claim. *See Hurley*, 911 F.3d at 680-83 (harassing conduct included rugby team chant that glorified violence against women, including rape and necrophilia, threats of physical violence against members of feminist student group, and referring to members as "femicunts, feminazis, cunts, bitches, hoes, and dikes"); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (2007) (en banc) (male soccer coach who continuously subjected his female players to sex-specific language that was aimed to humiliate, ridicule, or intimidate them engaged in sexual harassment).

In addition to failing to allege that Sulkowicz's actions were motivated by Nungesser's gender, Nungesser had failed to allege conduct approaching actionable sexual harassment. There was no allegation that Sulkowicz ever attempted to touch him or speak to him or otherwise interact with him after the Title IX hearing. *Nungesser I*, 169 F. Supp. 3d at 366. That also is true of this case. The complaint contains no allegation that Ms. Roe or any of the students attempted to touch or speak to or interact with Mr. Doe in a sexually overt manner or in any other manner based on Mr. Doe's status as a man. This case, thus, is distinguishable from cases that have found that there was a sexual or gender component to the harassing conduct due to unwelcome sexual touching or the use of gendered slurs. *See Davis*, 526 U.S. at 653 (where it was alleged that plaintiff was a victim of repeated acts of sexual harassment over a five-month period that included objectively offensive touching leading one of the harassers to ultimately plead guilty to criminal sexual misconduct);

*Jennings*, 482 F.3d at 695 (sexual harassment by male soccer coach included continuous bombardment of players with crude questions and comments about their sexual activities and constant comments about their breasts and butts); *Doe v. Bd. Of Ed. Of Prince George's Cty.,* 982 F. Supp. 2d 641, 651 (D. Md. 2013) (classmate "directed humping movements" at plaintiff in class, "exposed himself" to plaintiff in class, called plaintiff "gay" and "made sexual remarks to [plaintiff] in the bathroom"). Here, there is no allegation of sex-specific language or sex-specific actions directed at Mr. Doe.

The *Nungesser I* court concluded that the Mattress Project, the campus rally, and Sulkowicz's statements that she wanted her rapist off campus are not the type of conduct that creates an actionable Title IX claim. *Nungesser I*, 169 F. Supp. 3d at 366. As the court observed, to extend Title IX to a claim like Nungesser's "simply because the term 'rapist' involves a sexual act would give every accused campus rapist the opportunity to sue under Title IX merely because the alleged criminal act complained of involved sex, as opposed to any other form of violence." *Nungesser II*, 244 F. Supp. 3d at 366-67. A number of other courts have agreed with *Nungesser* in similar cases. *See, e.g.*, *Doe v. Columbia Coll. of Chicago*, 299 F. Supp. 3d 939, 952 (N.D. Ill. Oct. 25, 2017) (finding plaintiff had not plausibly alleged gender-based harassment where "[a]ll of [plaintiff's] allegations suggest that Roe and her friends' alleged campaign of harassment targeted Doe and Doe alone, not because he is a male, but because Roe told her friends that Doe had sexually assaulted her and because they thus had personal animus towards Doe individually"), *aff'd*, *Doe v. Columbia Coll. of Chicago*, 933 F.3d 849 (7th Cir. 2019); *Roe v. St. John's University*, No. 19-CV-4694, 2021 U.S. Dist. LEXIS 63433, at *62 (E.D.N.Y. Mar. 31, 2021) (finding

student's "tweet" post on Twitter stating that Plaintiff had raped the student to be not on the basis of sex "because it was based on Plaintiff's alleged past conduct, not his gender" and therefore finding University did not violate Title IX in failing to investigate the tweet).

This Court should similarly conclude that the student conduct described in Mr. Doe's complaint does not plead actionable sexual harassment and therefore does not create an actionable Title IX claim. "Title IX does not require educational institutions to prevent defamation or to otherwise force its students to accept without challenge the results of its disciplinary processes." *Id.* at 372. "To hold otherwise would, in essence, create a new right of action under which all students accused of sexual assault could bring a Title IX claim against their educational institutions—so long as they could plausibly plead that the accusations were known to the institution and that the institution failed to silence their accusers—simply because the misconduct they were accused of has a sexual element." *Nungesser I*, 169 F. Supp. 3d at 367. Such judicial extension of Title IX is not permitted. *See Cummings*, 142 S. Ct. at 1570 (observing that, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously").

### B. The Alleged Harassment Was Not so Severe, Pervasive, and Objectively Offensive as to Have Deprived Mr. Doe of Educational Opportunities Provided by the University.

In addition to not being sex-based harassment, the harassment alleged by Mr. Doe was not so severe, pervasive, and objectively offensive as to require a Title IX response from the University. In *Davis*, the Supreme Court emphasized that Title IX places a burden on schools to address student-on-student harassment when the student is subject to harassment that is so severe, pervasive and objectively offensive that it effectively denies

the victim's access to an educational opportunity or benefit. *See Davis*, 526 U.S. at 652-53.

The alleged harassment in this case is comprised entirely of statements made by three students regarding Mr. Doe's alleged sexual assault of Ms. Roe. The complaint alleges that, over the course of several months, Defendants Salem and Chaikin falsely told various students and student organizations that Mr. Doe was a "rapist" who was "under investigation" for sexual misconduct. Compl. ¶¶ 66-67. The complaint also vaguely alleges that Ms. Roe continues to publicly defame him as a rapist. Compl. ¶ 72. As a result, Mr. Doe was socially ostracized and removed from some student organizations, Compl. ¶ 73; one student organization activity that Mr. Doe had planned on participating in was canceled, Compl. ¶ 74; and Mr. Doe was removed from membership in one club team, Compl. ¶ 88. That is not the type of severe, pervasive, and objectively offensive conduct that has been found to support a deliberate indifference claim for student-on-student harassment. *See Hurley* 911 F.3d at 680-83 (harassing conduct included over 700 threats of physical and sexual violence against members of feminist student group); *Davis*, 526 U.S. at 653 (where it was alleged that plaintiff was a victim of repeated acts of sexual harassment including criminal sexual misconduct).

Further, the types of harm Mr. Doe alleges, specifically ostracization from a student organization (a club sports team), Compl. ¶¶ 73-74, 87-88, and reputational harm, Compl. ¶ 105, is insufficient to state a Title IX claim, as Mr. Doe has not alleged facts showing he was effectively deprived of the University's educational opportunities. Mr. Doe "does not allege that he ever missed class, altered his study habits, or was otherwise unable to access

educational opportunities as a result of [the alleged conduct]." *Roe v. St. John's University*, No. 19-CV-4694, 2021 U.S. Dist. LEXIS 63433, at *62 (E.D.N.Y. Mar. 31, 2021) (quoting *Nungesser I*, 169 F. Supp. 3d at 369); *see also Nungesser I*, 169 F. Supp. 3d at 368 ("The Court does not suggest that Nungesser's senior year at Columbia was pleasant or easy. Title IX, however, sets a high bar before a private plaintiff may recover . . . . Nungesser's conclusory assertions that his academic performance suffered and that he was prevented from attending recruiting events, without more, do not suffice. There is no suggestion that his grades dropped, that he was delayed or prevented from graduating (to the contrary, he graduated on time in May 2015), or that he missed a single class as a result of these events."). Thus, his deliberate indifference claim also fails this prong of the test.

### C. The Complaint Does Not Allege Facts that Would Support a Finding that the University was Deliberately Indifferent.

The complaint also fails to demonstrate that the University acted with deliberate indifference to Mr. Doe's complaints, an additional and distinct element of a Title IX claim. In *Davis* the Court clarified the meaning of "deliberate indifference" and held that a school will be deemed to have responded with "deliberate indifference" to reports of harassment only where its response "is clearly unreasonable in light of the known circumstances." *Id.* at 648; *see also Gebser*, 524 U.S. at 288 (observing that Title IX does not permit recovery in damages where liability rests solely on vicarious liability or constructive notice). The *Davis* Court was quick to add that "[t]his is not a mere 'reasonableness' standard" and that, in appropriate cases, "there is no reason why courts, on a motion to dismiss, for summary

judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649.

The complaint is deficient in this respect. It fails to allege sufficient details about what exactly was conveyed to the University so that it can be inferred what were the circumstances known to the University. The complaint alleges only in conclusory fashion that "Doe made multiple notices and formal complaints to OCRSM, alleging retaliation and harassment perpetrated by Jane Doe and Defendants Salem and Chaikin, beginning on or around October 8, 2021, and continuing through the date of the Complaint." Compl. ¶ 76. Without including any of the details of his complaints to the University, Mr. Doe has failed to allege circumstances establishing that the University's response was clearly unreasonable. *See, e.g.*, *Maher v. Iowa State Univ.*, 915 F.3d 1210, 1213 (8th Cir. 2019) ("dissatisfaction with the school's response does not mean the school's response can be characterized as deliberate indifference"); *Butters v. James Madison Univ.*, 208 F. Supp. 3d 745, 755 (W.D. Va. 2016) ("A showing that [a school] did not employ the best practices or even that it was negligent is insufficient" to establish deliberate indifference); *see also S.G. ex rel. A.L. v. Bd. of Educ. of Harford County*, 819 F.3d 69, 76 (4th Cir. 2016) ("*Davis* sets the bar high for deliberate indifference."); *Doe v. Bd. of Educ. of P.G. County*, 605 F. App'x 159, 167 (4th Cir. 2015) ("An educational institution can be liable on a deliberate indifference theory only when its response to known harassment is 'clearly unreasonable.' To avoid liability, the institution is not required 'to remedy peer harassment' or 'to ensure that students conform their conduct to certain rules.'") (internal citations omitted).

Indeed, the facts that are included in the complaint suggest that the University response was not clearly unreasonable since Mr. Doe apparently was not complaining about sexual harassment that would be covered by Title IX. Although the complaint alleges that the University dismissed Mr. Doe's first formal complaint, it was required to do so as to Title IX if the allegations did not fall within the confines of Title IX. *See* 34 C.F.R. § 106.45(b)(3)(i) (providing that Title IX recipient must dismiss the formal complaint if the conduct alleged "would not constitute sexual harassment as defined in § 106.60 even if proved"). Moreover, it is alleged that the University offered to speak to PSA to try to remediate Mr. Doe's complaint, but that he would not permit the University official to use his name. Compl. ¶¶ 79-82. Those allegations do not demonstrate a "clearly unreasonable" response.

## II. THE COMPLAINT FAILS TO ALLEGE FACTS THAT DEMONSTRATE THAT THE UNIVERSITY RETALIATED AGAINST MR. DOE FOR PARTICIPATING IN PROTECTED ACTIVITY.

To adequately state a claim for Title IX retaliation, Mr. Doe must allege facts demonstrating that he engaged in protected activity under Title IX, and as a result of the protected activity, he suffered an adverse action attributable to the University. *Hurley*, 911 F.3d at 694. He has to allege that he suffered retaliation *because* he engaged in activity protected by Title IX. *Id.* at 693-94. The alleged facts do not satisfy these required elements.

Although Mr. Doe does allege that he engaged in a protected Title IX activity when he defended himself as a respondent to Ms. Roe's Title IX complaint, Compl. ¶ 117, the complaint includes no allegation that the University engaged in any adverse action against

Mr. Doe as a result of his defense of himself. In fact, the complaint alleges that the University responded to Mr. Doe's defense of himself by finding in his favor. Compl. ¶ 56. The only other University conduct described in the complaint is the University's handling of Mr. Doe's complaints about alleged defamatory statements by Ms. Roe and Defendants Salem and Chaikin. After Mr. Doe declined the University's offer to speak to Defendants Salem and Chaikin, Compl. ¶¶ 79-82, the University formally dismissed his first complaint on January 24, 2022. Compl. ¶ 85. Mr. Doe thereafter filed a second complaint, on February 10, 2022, that was still pending as of the time this lawsuit was filed on April 11, 2022. Compl. ¶¶ 90-91. Simply because Mr. Doe may disagree with the University's handling of his complaints, that disagreement does not convert the University's process into retaliatory conduct. *See Maher*, 915 F.3d at 1213 ("dissatisfaction with the school's response does not mean the school's response can be characterized as deliberate indifference"). Moreover, Mr. Doe does not allege that the University dismissed his first complaint or failed to act on his second complaint because he defended himself in the initial proceeding. That failure is fatal to Mr. Doe's claim because he has to allege facts from which it could be inferred that the University's actions were propelled by a retaliatory motive. *Hurley*, 911 F.3d at 696. Such facts are wholly missing from the complaint.

To the extent Mr. Doe is asserting that the University acted with deliberate indifference in response to the allegedly retaliatory actions of third parties (e.g., Ms. Roe and Defendants Salem and Chaikin), that claim fails for the same reasons his discrimination

claim based on deliberate indifference fails.[3] The conduct described in Mr. Doe's complaint indicates that the alleged conduct (specifically, being slandered as a rapist and being asked to disassociate from a student organization) was based on Ms. Roe's, Defendant Salem's, and Defendant Chaikin's contentions that the interaction between Ms. Roe and Mr. Doe amounted to sexual assault — not based on Mr. Doe's participation in the University's Title IX proceeding. Mr. Doe actually alleges exactly this in his complaint. *See* Compl. ¶¶ 72-73 ("Jane Roe also continues to harass and retaliate against Doe *by publicly defaming him as a rapist*. *Consequently*, Doe was socially ostracized and ousted from his student organizations, depriving him of educational benefits.") (emphasis added). That alleged conduct does not constitute retaliation covered by Title IX.

Mr. Doe's contradictory and conclusory allegation that "as a result of his participation" in the Title IX process, he "suffered retaliatory harassment," Compl. ¶ 119, falls far short of the extensive allegations presented in *Hurley*, and is insufficient to demonstrate that the University was deliberately indifferent to Title IX retaliation. *See Hurley*, 911 F.3d at 680-96 (permitting, at motion to dismiss stage, claim of deliberate indifference to retaliatory harassment to go forward, along with other Title IX claims, where the allegations made it clear that the harassment was motivated by retaliation for a Title IX report of sexual harassment resulting in the suspension of college's rugby team, and where harassment included hundreds of threats of physical and sexual violence and

[3] Mr. Doe's assertion that the University constructively participated in Title IX retaliation is deficient on its face because Title IX liability cannot be premised on vicarious liability or constructive notice. *See Gebser*, 524 U.S. at 288.

was so extreme it prevented complainants from leaving their homes, attending classes, or participating in campus events).[4]

## III. EVEN IF THE COMPLAINT DID STATE A CAUSE OF ACTION UNDER TITLE IX, MR. DOE WOULD NOT BE ENTITLED TO RECOVER DAMAGES AGAINST THE UNIVERSITY.

The damages Mr. Doe alleges are confined to emotional injury and being excluded from a club athletic team and some student organization activities. Those are not damages recoverable under Title IX. *See Cummings*, 142 S. Ct. at 1576 (holding that "emotional distress damages are not recoverable under the Spending Clause antidiscrimination statutes"). Similarly, Mr. Doe's claim for punitive damages under Title IX fails because punitive damages are not allowed for private actions to enforce Title IX. *Mercer v. Duke University,* 50 F.App'x 643, 644 (4th Cir 2002).

## CONCLUSION

For all of the foregoing reasons, Defendant University of Maryland, College Park respectfully requests that the Court dismiss Counts I and II of the complaint with prejudice.

---

[4] Significantly, *Hurley* involved an extension of *Jackson v. Birmingham Bd. of Educ.*, which held that, although retaliation is not explicitly prohibited by Title IX, retaliating against someone for filing a complaint of sex discrimination is a form of sex discrimination. 544 U.S. 167, 173-75 (2005). As the dissent in *Hurley* recognized, the type of imputed Title IX retaliation claim, based on student conduct, at issue in *Hurley*, had "never been recognized by either the Supreme Court or any circuit court." 911 F.3d at 719. Given that *Hurley* involved Title IX complainants and harassment of an extreme nature, it has little application to this case involving a Title IX respondent and vague and conclusory allegations. Furthermore, this part of *Hurley*'s holding should be called into question following the Supreme Court's recent decision in *Cummings*, 142 S. Ct. at 1562. *Hurley* should not be extended to permit liability to a Title IX respondent under the circumstances of this case. To do so would stretch the foundational bounds of deliberate indifference outlined in *Davis* to a brand new type of claim.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Ann M. Sheridan
____________________________

ANN M. SHERIDAN
Federal Bar No. 11137
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 17th Floor
Baltimore, Maryland 21202
asheridan@oag.state.md.us
(410) 576-6559
(410) 576-6437 (facsimile)

June 6, 2022

Attorneys for Defendant