IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| THE UNIVERSITY OF MARYLAND, | ) |
| COLLEGE PARK, a Maryland | ) |
| public university; | ) Civil Action No.: 8:22-cv-00872-PX |
| | ) |
| RACHEL SALEM, co-president of | ) |
| Preventing Sexual Assault, in | ) |
| her individual capacity; | ) |
| | ) |
| HAILEY CHAIKIN, co-president of | ) |
| Preventing Sexual Assault, in | ) |
| her individual capacity; | ) |
| | ) |
| GRACE KARMIOL, Title IX Coordinator, | ) |
| in her individual and official capacities; | ) |
| | ) |
| and | ) |
| | ) |
| ANGELA NASTASE, Deputy Title IX | ) |
| Coordinator, in her individual and | ) |
| official capacities, | ) |
| | ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT

Per Federal Rules of Civil Procedure 15(a)(1)(B), John Doe files this First Amended Complaint within 21 days of service of a motion under Rule 12(b). After John Doe was fully exonerated of horrendous and malicious false allegations, the University of Maryland repeatedly refused to protect his rights as a student. The

University allowed Doe to be publicly defamed as a rapist by students who worked closely with the University's Title IX office. When Doe submitted his complaints to the University alleging violations of University policy, including retaliation and sexual harassment, the University ignored his complaints. Left with no other option, Doe files this complaint against Defendants for gender-based discrimination resulting in numerous violations of Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 *et seq.*), violations of his right to equal protection, defamation, and intentional infliction of emotional distress. In support of this First Amended Complaint, John Doe states as follows:

**Parties**

1.     Plaintiff John Doe ("Doe"), [1] at all times relevant to this Complaint, was a resident of Maryland. Doe had been a student at the University of Maryland, College Park since fall of 2018. He graduated in May 2022.

2.     Defendant University of Maryland, College Park (the "University") is a public university and state government entity, with its principal place of business located in Maryland.

---

[1] "John Doe" is a pseudonym for Plaintiff's real name. Due to the nature of the allegations in this lawsuit, Doe is proceeding under a pseudonym to protect his privacy and due to a fear of retaliation. To protect the identity of his accuser as well as the co-respondent in the underlying matter, he is identifying her as "Jane Roe" and him as "Jacob Poe," respectively. In using a pseudonym, Doe relies upon the factors set out in *Co. Doe v. Pub. Citizen*, 749 F.3d 246 (4th Cir. 2014). Doe will promptly move this Court for an Order permitting pseudonymous treatment.

3.     Defendant Rachel Salem ("Salem") is, or at all times relevant to this Complaint was, a student at the University and the co-president of the University's Preventing Sexual Assault ("PSA") student organization and resides in Maryland.

4.     Defendant Hailey Chaikin ("Chaikin") is, or at all times relevant to this Complaint was, a student at the University and the co-president of the University's PSA student organization and resides in Maryland.

5.     Defendant Grace Karmiol ("Karmiol") is, or at all times relevant to this Complaint was, the Title IX Coordinator of the University and the Director of the Office for Civil Rights and Sexual Misconduct ("OCRSM"). She was responsible for the enforcement of Title IX on campus, including ensuring that such enforcement did not violate students' constitutional rights, until February 4, 2022, when she went on medical leave.

6.     Defendant Angela Nastase ("Nastase") is, or at all times relevant to this Complaint was, the Deputy Title IX Coordinator of the University and the Deputy Director of OCRSM. She was responsible for the lawful enforcement of Title IX after she assumed the role of Acting Director on February 4, 2022, when Defendant Karmiol went on medical leave.

<u>Jurisdiction and Venue</u>

7.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the laws of the United States including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88; and (ii) the state law claims are so closely related to

the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

8.      This Court has personal jurisdiction over the University and Defendants Karmiol and Nastase as these Defendants conduct business within Maryland. It has personal jurisdiction over the individual Defendants Salem and Chaikin, pursuant to Md. Courts Jud. Pro. Code Ann. § 6-103, because the tortious acts occurred in Maryland.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the University is located in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## Factual Background

### The University

10.     Doe enrolled and matriculated as an undergraduate student at the University in the fall semester of 2018. Doe pays and has paid tuition to the University since that time.

11.     Through its Policy and Procedures on Sexual Harassment and Other Sexual Misconduct, the University promises it will prohibit sexual harassment, sexual misconduct, and retaliation. Notably, the University indicates and promises that this type of prohibited conduct will not be tolerated in any form.

12.     This policy is visible to all, including prospective and current students.

13.     The University also promises, and is required by law, not to discriminate on the basis of sex.

## The Underlying False Report

14.    On October 27, 2020, Jane Roe filed a formal complaint with the University's Office of Civil Rights and Sexual Misconduct against Doe.

15.    Roe's formal complaint contained obviously false allegations and was provably made in bad faith.

16.    Specifically, Roe falsely alleged that she was sexually assaulted by two students: John Doe and Jacob Poe.

17.    The investigation, however, uncovered that Roe was not sexually assaulted and that she fabricated evidence.

18.    After consensually engaging in sexual contact with John Doe, in which she performed oral sex on John Doe without ejaculation, Jane Roe told her friend "I just gave [John Doe] head" and "I have this thing where I like to make guys feel good."

19.    Shortly thereafter, Roe became sexually interested in Jacob Poe. Roe texted the same friend "good boy or will I get played?"; "As soon as I walked in, I was like 'oh shit'"; and "I feel like we… Vibed."

20.    After consensually engaging in sexual contact with Jacob Poe, she texted another student "I legit just kissed [Jacob Poe]," and "Like this isn't me u don't understand I just don't know how to handle someone wanting me bc no one has ever wanted that from me and I don't know what to do."

21.    Rather than being sexually assaulted, the investigation uncovered that Roe chose to sleep at John Doe's apartment on his couch, "hugging [Jacob Poe] like a koala" – in the words of one witness – until the next morning.

22.     The following day, after the alleged sexual assaults, Roe stayed at John Doe's apartment, socializing with John Doe one-on-one and watching football games. She went home in the late afternoon or early evening.

23.     Throughout the Title IX process at the University, Roe's mother engaged in witness intimidation.

24.     Specifically, Roe's mother repeatedly harassed at least two student witnesses. She called one witness's family to threaten him in an apparent attempt to prevent him from testifying. In making her threat, Roe's mother stated that if the witness were to testify "he would have a problem next."

25.     The harassed witnesses contacted the University for relief from Roe's mother's harassment.

26.     The University took no meaningful steps to remedy the harassment or witness tampering.

27.     The University also took no action against Roe as a result of this behavior. Instead, Roe's mother was permitted to testify as a witness in the Title IX process, including the hearing, providing only helpful, biased opinions regarding her daughter. She was not a fact witness to any of Roe's allegations.

28.     Roe's mother also threatened Doe and Jacob Poe with physical violence on her social media account.

29.     Roe's mother's threats and interference on her behalf ultimately could not save Roe's case, which was built on lies.

6

30.     Roe destroyed her own credibility throughout the Title IX process by alleging different iterations of her story at different times. For instance, she alleged that John Doe used force and that he did not use force; that she was both drunk and sober; that she said no "eight to ten times" and that she never said no; and that John Doe "forcibly removed her clothing" and that she removed her own clothing – to name a few.

31.     Incredibly, Roe also alleged that she did not leave the apartment where the assaults allegedly took place because she did not know how to leave or where the exit door was located. Putting aside the fact that any person would be able to figure out how to leave an apartment building, multiple witnesses testified that they offered to walk Roe home on multiple occasions and that she declined each time.

32.     In fact, after Roe was offered a walk home, one witness described Roe's demeanor after the alleged assaults as "very hyper and seemed like she was enjoying every moment."

33.     Each witness who observed Roe's demeanor after the alleged assault by Doe stated that her demeanor did not change in any way – she continued to dance, joke around, and have fun in the apartment, staying up until five or six o'clock in the morning until deciding to sleep on Doe's couch with Jacob Poe.

34.     Roe also alleged and swore to her own mother that she had never engaged in sexual relations with anyone; however, her own written statements contradict that assertion.

35.     For example, she wrote on a white board in her dorm room – titled "[Jane Roe]'s Quotes" – that she was a "cum dumpster" and that she was "the goodwill for men." Roe also tallied a number of men on a separate white board titled "[Jane Roe]'s To Do List."

36.     On this white board, she also wrote that she had a "fuck boy personality" and that she had passed the "WAP" challenge, a reference to a sexually promiscuous song by rapper Cardi B about "wet ass pussy."

37.     Roe wrote on the same white board – as one of her "quotes" – that when she gets in trouble, "I get help and then I lie."

38.     This bit of introspection was particularly apt. Having sworn to her mother that she had never engaged in any sexual contact, she risked getting in trouble with her mother if she admitted to consensually engaging in sexual contact. Consistent with her statement on the white board, she "got help and then she lied" about the encounter with John Doe.

39.     Witness statements also contradicted Roe's assertion that she was a virgin.

40.     Multiple witnesses testified to the fact that Roe engaged sexually with another male student the night before the alleged assaults.

41.     This male student, James Coe – who was not friends with either John Doe or Jacob Poe – testified during the Title IX process that he had sex with Roe the night before the alleged assaults, and that while he was having sex with Roe, she told him that "she was a virgin."

42.    Roe also repeatedly lied about her sexual relations with James Coe. When the Title IX investigator caught her in her lie that she had only kissed James Coe one time "and that was it," by confronting her with James Coe's testimony, Roe admitted that she had previously given oral sex to James Coe.

43.    If there was any remaining doubt as to John Doe's innocence, according to one police report, Roe reported she "had a consensual sexual encounter" with John Doe.

44.    John Doe uncovered Jane Roe's admission to the University police officer through a Public Information Act request.

45.    The University made no attempt to obtain any statements made by Jane Roe to any police officer, including statements to Prince George's County police officers, until after John Doe requested that it do so after he obtained such information himself.

46.    Despite this clear exculpatory evidence, the University refused to dismiss the matter.

47.    Thus, Doe was dragged through a Title IX process at the University that spanned over ten months and cost him over $100,000 in legal fees.

48.    A hearing took place from August 16, 2021 through August 20, 2021.

49.    Roe made incredulous, fantastical, and contradictory statements about the alleged assault both before and during the hearing.

50.    On September 1, 2021, the hearing officer rightly found John Doe and Jacob Poe not responsible.

51.     The hearing officer was an external, non-employee official retained by the University for the sole purpose of adjudicating this dispute.

52.     As part of the investigation, Roe submitted multiple photographs of clothing she allegedly wore the night of the incident which she claimed, on multiple occasions, was stained with semen from the incidents. The clothing itself was not submitted to the Title IX office; rather, Roe only submitted photographs of the stained clothing.

53.     The hearing officer ordered the clothing to be sent to a DNA laboratory. The results of the serology testing uncovered unequivocally that there was no semen on the clothing. It appeared, therefore, that Roe had fabricated one of the only pieces of physical evidence.

54.     The hearing officer stated that this forensic evidence "significantly contradicted" Roe's claims.

55.     In the written notice of determination, the hearing officer eviscerated Jane Roe's credibility, including, among other things, stating that Jane Roe's credibility was "significantly undermined" and that Roe's own contemporaneous statements and text messages "cast doubt on her credibility."

56.     Further, the hearing officer stated, "Although it is common for survivors of sexual assault to delay reporting and to initially minimize accounts of abuse because of fear, confusion, misplaced self-blame, and other factors, the reported comments by [Roe] after the alleged sexual assault, the documented text messages, and the witness accounts of her demeanor gave no indication that she had just been

sexually assaulted in the violent manner that [Roe] described, and corroborate [Doe's] version of events that their sexual interaction was consensual."

57.    The hearing officer also noted that Doe's credibility was "not undermined in a significant way," unlike Jane Roe's.

58.    The notice found that the evidence was clearly sufficient to establish by a preponderance of the evidence standard that Doe did not violate school policy against Jane Roe and stated that there was additional evidence not discussed in the notice which would have also corroborated Doe's account and contradicted Roe's.

59.    Jane Roe did not appeal the hearing officer's determination. The matter was closed on September 14, 2021.

60.    After his exoneration by OCRSM, Doe was never again accused of any wrongdoing and was never again investigated.

## The Harassment following the Exoneration

61.    Shortly after the hearing officer's determination, Jane Roe began to harass and retaliate against Doe.

62.    Jane Roe falsely told third parties that Doe was a rapist.

63.    Jane Roe also stated this false allegation to PSA and specifically to PSA's co-presidents, Defendants Salem and Chaikin.

64.    Over the course of the several months following Doe's exoneration, Defendants Salem and Chaikin repeated these false allegations to various students, telling them not to associate with Doe. Defendants Salem and Chaikin undertook these efforts because Doe was a male accused of sexual misconduct.

65.    PSA is a chartered organization that sits on the Sexual Assault Prevention Committee at the University.

66.    PSA works closely with the OCRSM leadership and meets to coordinate the University's Title IX efforts.

67.    PSA advertises on its website that it provides services to the student body on behalf of the University, including, but not limited to, "lead[ing] many education and prevention programs aimed at engaging the community as well as creating space for survivors and students in the conversation with administration."

68.    On or about February 2, 2022, Defendants Salem and Chaikin, PSA co-presidents, stated in a public forum that PSA is set apart from "other student organizations" because it has a special influence over OCRSM.

69.    Defendants Salem and Chaikin further expressed their belief that it is "their job" to let students know "who the predators are on campus."

70.    In performing their so-called "job," Defendants Salem and Chaikin undertook a campaign against John Doe to ruin his life at the University.

71.    Defendants Salem and Chaikin falsely told students at the University that Doe was a rapist and was under investigation by the University for sexual misconduct.

72.    Doe was told on multiple occasions that both the PSA presidents, Defendants Salem and Chaikin, contacted the lacrosse team regarding the allegations against Doe and communicated that Doe was a rapist and under investigation.

12

73.     On or around October 8, 2021, Doe was told by the club lacrosse team president that an event that was being hosted by the lacrosse team at Doe's apartment was canceled because Jane Roe's "friends" had told them that he was a rapist and under investigation, despite being fully exonerated a month prior.

74.     On or around December 9, 2021, Defendants Salem and Chaikin contacted the club lacrosse team at the University and falsely stated that Doe was a rapist and under investigation. As a result, the club lacrosse team's president told Doe that he was prohibited from attending an event hosted by the team that month.

75.     Further, on or around January 31, 2022, Defendants Salem and Chaikin contacted the club lacrosse team again and stated that Doe was a rapist and under investigation. As a result, the club lacrosse team's president told Doe that the team needed to distance themselves and exclude Doe because of the contact from the PSA co-presidents. Thus, Doe was removed from the club lacrosse team.

76.     Given Defendants Salem and Chaikin's apparent "influence" in OCRSM as PSA co-presidents, they knew that Doe was found not responsible and was exonerated of Roe's false allegations.

77.     Also, given their relationship and influence over OCRSM, they knew OCRSM would protect them from any allegations of misconduct levied against them. They were right.

78.     Defendants Salem and Chaikin also likely knew of the specific falsehoods that Roe told during the underlying Title IX matter, which were exposed before and during the hearing process.

79.     At the very least, Defendants Salem and Chaikin knew that Doe was not under investigation for sexual misconduct.

80.     Jane Roe also continues to harass and retaliate against Doe by publicly defaming him as a rapist.

81.     Doe made multiple notices and formal complaints to OCRSM, alleging this retaliation and harassment perpetrated by Jane Roe and Defendants Salem and Chaikin, beginning on or around October 8, 2021, and continuing through the date of this complaint.

82.     Any formal complaints submitted by Doe were summarily dismissed  or ignored by OCRSM without any investigation.

83.     In Doe's early discussions with OCRSM, OCRSM indicated that they would instruct PSA and Defendants Salem and Chaikin to stop their defamatory actions; however, it later rescinded this assurance.

84.     Specifically, on December 14, 2021, Doe's Title IX advisor had a phone conference with the University's Title IX Coordinator, Defendant Karmiol, wherein Defendant Karmiol stated that she would instruct PSA to cease and desist harassing Doe.

85.     During this conversation, Doe's Title IX advisor advised that Doe did not want Defendant Karmiol to use his name when she spoke with PSA because use of his true name could inflame the retaliation and harassment rather than quell it.

86.     At that time, Defendant Karmiol stated that she could speak with PSA without using Doe's name and that she "understood" and "agreed" as to why he would

14

want to remain anonymous as well as that the behavior by PSA was not protected speech.

87.    On January 3, 2022, John Doe's advisor followed up with Defendant Karmiol regarding her promise to contact PSA. At that time, Defendant Karmiol stated in writing that she would not, in fact, speak with PSA unless she could use Doe's true name.

88.    Using Doe's name was unnecessary because a general directive to PSA that it must not harass Title IX respondents or male students would have remedied the harassment against Doe.

89.    Despite Doe's formal complaints with OCRSM, it has not acted to prevent any retaliation or harassment levied against Doe.

90.    Instead, on January 24, 2022, the University formally dismissed Doe's OCRSM formal complaint filed on or around December 9, 2021.

91.    Further, and remarkably, Defendant Nastase stated in a meeting with Doe that Jane Roe's complaint was in "good faith," despite the hearing officer's clear statement that Jane Roe's credibility was "significantly undermined" and her allegations "significantly contradicted" by physical forensic evidence.

92.    Due to the University's inaction on Doe's formal complaints, Defendants Salem and Chaikin have continued to publicly defame Doe to other students, including but not limited to the University's club lacrosse team.

93.     When Doe was removed from the club lacrosse team, Roe stated on social media that the removal was a "huge W for me and other survivors." This statement was provided to the University and no action was taken.

94.     Doe filed an additional formal complaint regarding the actions of Roe and PSA on or about February 10, 2022.

95.     The University has taken no action on this complaint nor even arranged to meet with Doe, making it clear to Doe that the University will not protect his rights.

96.     Instead, the University provided Jane Roe an "executive committee" position in PSA, allowing her greater access and authority with respect to the University's enforcement of Title IX.

97.     In announcing this position on social media, on or about February 17, 2022, Jane Roe changed her story (yet again) regarding the alleged incidents with John Doe and Jacob Poe. She stated, for the first time, that she was "raped by two boys" at the University.

98.     She stated to the news media that "No girl needs to wake up with her pants undone."

99.     During the entire Title IX process, she never once alleged that she "woke up with her pants undone" or that she was "raped."

100.    Roe also erroneously stated to the news media that "one of her assaulters was found innocent." In truth, both of the young men that Jane Roe falsely accused were found not responsible.

101.    Doe contacted the University again on March 25, 2022 to provide – yet again – more information relating to the ongoing harassment and retaliation levied against him by Roe and PSA. On March 28, 2022, Defendant Nastase, acting as Acting Director of OCRSM, advised that the University had previously dismissed Doe's formal complaints, and that the Title IX Office would take no action against Jane Roe or PSA.

102.    After repeated inaction, the foreseeable happened. In the early morning hours of May 14, 2022, Jane Roe confronted John Doe at around 1:00 A.M., when he was with his friends sitting outside of a popular bar in College Park. Roe began to point and scream at Doe, calling him a rapist in public.

103.    Shortly thereafter, Roe convinced her boyfriend to follow Doe in a threatening manner and to physically assault Doe. When Doe was able, he ran to the police for protection and escaped the situation.

104.    On or about May 18, 2022, Doe reported Roe and her boyfriend's attempted assault to OCRSM.

105.    On or about May 25, 2022, OCRSM, through Defendant Nastase, indicated to Doe that Roe's conduct and her boyfriend's attempted physical assault did not violate the Title IX policy, did not constitute harassment, and did not constitute retaliation.

106.    Without any investigation, Defendant Nastase found that Roe likely took these actions not to harass or retaliate but because she "perceived [Doe] as a perpetrator of a sexual offense against Respondent."

107.    Defendant Nastase referred the matter to the Office of Student Conduct to determine whether Roe violated the "no contact order" that was in place. As of the date of this filing, the Office of Student Conduct has not followed up with Doe or taken any steps whatsoever on the matter.

108.    Through its willful inaction, the University has tacitly participated in the harassment against Doe.

109.    While Doe was able to graduate in May 2022, he suffered severe emotional distress as a result of the harassment he suffered and the University's consistent choice to not remedy the harassment. This experience stole Doe's college experience and made it impossible for him to equally access his education at the University.

<u>Causes of Action</u>

## COUNT I
## TITLE IX DELIBERATE INDIFFERENCE
### (Against the University)

110.    Doe incorporates by reference the above paragraphs.

111.    Title IX prohibits all discrimination on the basis of sex in education.

112.    This prohibition includes discrimination that takes the form of deliberate indifference to student-on-student sexual harassment.

113.    Deliberate indifference sexual harassment includes four elements: (1) that the educational institution receives federal funds; (2) that the plaintiff was subjected to harassment based on [his] sex; (3) that the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational

program or activity; and (4) that there is a basis for imputing liability to the institution.

114.    The University receives federal funds.

115.    By slandering Doe as a "rapist," Roe in addition to Defendants Salem and Chaikin subjected Doe to harassment on the basis of his sex.

116.    The harassment has been sufficiently severe and pervasive in that it resulted in the loss of educational benefits in the form of Doe's student organization memberships and the destruction of his good name and reputation on campus.

117.    Specifically, Doe was told to disassociate from a student group of which he has been a member since his freshman year.

118.    There is a basis to impute liability to the University because the University had actual knowledge of the harassment and acted clearly unreasonably in light of the known circumstances.

119.    The University failed to act in a manner reasonably calculated to end the harassment, as required by law.

120.    Calling Doe a rapist is not protected speech and the University had several responsive options that would not violate the First Amendment.

121.    Among the many options, the University could have provided notice to all student organizations that Doe is innocent of any wrongdoing; it could have developed policies to prevent this type of harassment; and it could have publicly discouraged and denounced this type of harassment. Instead, it took no action to protect Doe.

122.    As a direct result of the University's deliberate indifference to the harassment he endured, Doe suffered and continues to suffer damages.

## COUNT II
### TITLE IX RETALIATION
### (Against the University)

123.    Doe incorporates by reference the above paragraphs.

124.    Title IX prohibits universities that receive federal funding from engaging in retaliation against students that participate in protected activity, including participating in the university's Title IX adjudicative process.

125.    Universities may be held liable for deliberate indifference to student-on-student retaliatory harassment, as a separate retaliation claim.

126.    The Fourth Circuit bars "deliberate indifference to student-on-student retaliatory harassment."

127.    Title IX retaliation claims involve two elements: (1) the plaintiff engaged in a protected activity under Title IX; and (2) as a result, the plaintiff suffered an adverse action.

128.    Doe engaged in a protected activity by participating in the underlying Title IX matter as a respondent.

129.    As a result of Doe's participation, he suffered retaliatory harassment by being slandered as a "rapist" as well as removed from the club team.

130.    The University constructively participated in the retaliation by repeatedly refusing to remedy the retaliation.

131.   The retaliatory harassment was a result of Doe's participation as a respondent in the Title IX matter.

132.   The University was deliberately indifferent to this retaliatory harassment because it acted clearly unreasonably in light of the known circumstances.

133.   The University is liable for such retaliation because it exercised substantial control over the retaliatory actors and over the context in which the retaliation occurred and had actual notice of its happening.

134.   Doe suffered an adverse action because he was asked to disassociate from a student organization due to his participation in a protected activity.

135.   As a direct result of the University's deliberate indifference to student-on-student retaliatory harassment, Doe suffered and continues to suffer damages.

## COUNT III
## DEFAMATION AND DEFAMATION *PER SE*
### (Against Defendants Rachel Salem and Hailey Chaikin)

136.   Doe incorporates by reference the above paragraphs.

137.   Defamation has four elements in Maryland: (1) that the defendant made a defamatory statement to a third person; (2) that the statement was false; (3) that the defendant was legally at fault in making the statement; and (4) that the plaintiff thereby suffered harm.

138.   Defendants Salem and Chaikin called Doe a rapist to third parties and falsely stated that Doe was under investigation for sexual misconduct.

139.    These are defamatory statements because they expose Doe to scorn, hatred, contempt, or ridicule.

140.    As Doe was found not responsible, calling him a rapist is provably false.

141.    Defendants Salem and Chaikin acted with actual malice in defaming Doe.

142.    Defendants Salem and Chaikin acted with reckless disregard for the truth because Doe was found not responsible, yet the Defendants called him a rapist, nonetheless.

143.    Defendants Salem and Chaikin intentionally defamed Doe by saying he was under investigation for sexual misconduct when they knew he was not.

144.    At the very least,  Defendants Salem and Chaikin acted with negligence in calling Doe a rapist because they should have known that Doe was found not responsible.

145.    As a result of Defendants Salem and Chaikin's defamatory statements, Doe suffered harm, including emotional harm as well as being excluded from educational benefits.

146.    Further, because calling someone a rapist is self-evident and imputes the commission of a crime, Defendants Salem and Chaikin's actions constituted defamation *per se*.

147.    Because the statements were defamatory *per se* and they acted with actual malice, Doe's damages are presumed and he is entitled to punitive damages.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Rachel Salem and Hailey Chaikin)

148.    Doe incorporates by reference the above paragraphs.

149.    Intentional infliction of emotional distress has four elements: (1) conduct that is intentional or reckless; (2) conduct that is extreme and outrageous; (3) a causal connection between the wrongful conduct and the emotional distress; and (4) severe emotional distress.

150.    Defendants Salem and Chaikin acted intentionally, or at the very least, recklessly, in falsely naming Doe as a rapist.

151.    Calling Doe a rapist, despite him being found not responsible on the basis of his accuser's exposed falsehoods, was both extreme and outrageous.

152.    This outrageous conduct resulted in Doe suffering severe emotional harm.

153.    As a direct result of Defendants Salem and Chaikin's intentional infliction of emotional distress, Doe suffered and continues to suffer damages.

## COUNT V
## VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
### (Against Defendants Karmiol and Nastase in their individual capacities)

154.    Doe incorporates by reference the above paragraphs.

155.    During the relevant time period, Defendants Karmiol and Nastase exercised the final authority of OCRSM.

156.    The University has a practice of investigating complaints by female students and ignoring complaints by male students.

157.   The University investigated Jane Roe's complaint against Doe but did not investigate Doe's complaint against Roe or Defendants Chaikin or Salem, evidencing a bias towards females and against males.

158.   Doe was treated differently from these female students by the University throughout the relevant time period because, among other things, his complaints were not investigated and the harassment he reported was not remedied.

159.   This differential treatment was caused by discrimination on the basis of sex.

160.   Such differential treatment on the basis of sex cannot be justified by intermediate scrutiny because, among other things, there is not legitimate governmental objective served by ignoring male students' claims of harassment.

161.   Doe requests compensatory and incidental damages, including emotional damages, jointly and severally, between Defendants Karmiol and Nastase.

<u>COUNT VI</u>
**VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION**
**(Against Defendants Karmiol and Nastase in their official capacities)**

162.   Doe incorporates by reference the above paragraphs.

163.   During the relevant time period, Defendants Karmiol and Nastase exercised the final authority of OCRSM.

164.   The University has a practice of investigating complaints by female students and ignoring complaints by male students.

165. The University investigated Jane Roe's complaint against Doe but did not investigate Doe's complaint against Roe or Defendants Chaikin or Salem, evidencing a bias towards females and against males.

166. Doe was treated differently from these female students by the University throughout the relevant time period because, among other things, his complaints were not investigated and the harassment he reported was not remedied.

167. This differential treatment was caused by discrimination on the basis of sex.

168. Such differential treatment on the basis of sex cannot be justified by intermediate scrutiny because, among other things, there is not legitimate governmental objective served by ignoring male students' claims of harassment.

## Jury Demand

169. Plaintiff John Doe demands a trial by jury.

## Prayer for Relief

WHEREFORE, Plaintiff, John Doe, demands judgment against Defendants University of Maryland, College Park, Rachel Salem, and Hailey Chaikin, as follows:

a. An award of compensatory, special, and punitive damages of not less than one million dollars ($1,000,000);

b. Injunctive relief prohibiting further defamatory statements from the individual Defendants and injunctive relief ordering the University to meaningfully address Doe's Title IX complaints, including enforcing the no contact orders against Jane Roe and investigating Doe's complaints;

c.  An award of Doe's costs associated with this action, including but not limited

to his reasonable attorneys' fees and expenses; and

d.  Such other and further relief as the Court deems just and appropriate.

Dated: June 21, 2022                         Respectfully submitted,


                                           */s/* Amy L. Bradley
                                           Amy L. Bradley, MD #1806050002
                                           BRIGLIA HUNDLEY, P.C.
                                           1921 Gallows Road, Suite 750
                                           Tysons Corner, Virginia 22182
                                           Phone: (703) 883-0880
                                           Fax: (703) 883-0899
                                           Email: abradley@brigliahundley.com


                                           Lindsay R. McKasson, *pro hac vice*
                                           Benjamin F. North, *pro hac vice*
                                           BINNALL LAW GROUP, PLLC
                                           717 King Street, Suite 200
                                           Alexandria, Virginia 22314
                                           Phone: (703) 888-1943
                                           Fax: (703) 888-1930
                                           Email: lindsay@binnall.com
                                                        ben@binnall.com


                                           *Counsel for Plaintiff John Doe*