IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 8:22-cv-00872-PX |
| | ) | |
| | ) | |
| THE UNIVERSITY OF MARYLAND, | ) | |
| COLLEGE PARK, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## JOHN DOE'S RESPONSE IN OPPOSITION TO
## UNIVERSITY DEFENDANTS' MOTION TO DISMISS

After an unequivocal exoneration of a false and malicious accusation, Doe was targeted by female students and ruthlessly harassed. The University of Maryland, College Park, through Defendants Karmiol and Nastase (collectively referred herein as "University Defendants") did nothing in response, even when the harassment escalated to an attempted physical assault. After the University's utter refusal to protect Doe, a male student, where at the same time going out of its way to protect female students, Doe filed the instant complaint,[1] alleging sex discrimination in violation of Title IX and the Equal Protection Clause. University Defendants now

---

[1] After amendments and corrections, Doe filed the operative version of the Complaint, the Corrected Amended Complaint, on August 11, 2022. ECF No. 52.

move to dismiss Doe's claims. For the below reasons, University Defendants' motion should be denied.

## RELEVANT FACTS

University Defendants, for the most part, recounted the facts alleged in the Complaint in their memorandum in support of their motion. *See* ECF No. 57-1, at 3-10. For instance, University Defendants recount the "harassment and retaliation" suffered by Mr. Doe and the University's abject failure to address any of it. *Id.* at 3-9. For the sake of brevity and efficiency, Doe will not provide an exhaustive recounting of the facts here.

Doe will, however, briefly detail the University's inaction to his formal complaints of harassment and retaliation and its refusal to enforce its own no-contact order against Roe, Doe's false accuser, as alleged in his amended complaint. ECF No. 52, ¶¶82, 104-105.

The University has a policy in place that prohibits harassment and retaliation and promises that such conduct will not be tolerated in any form. *Id.* at ¶11. During the underlying Title IX process, a no-contact order was in place to prevent Doe and Roe from contacting each other, even through third parties. *Id.* at ¶107. This no contact order was issued by the Office of Civil Rights and Sexual Misconduct ("OCRSM").

After being exonerated of sexual assault, Roe and Defendants Two and Three conspired to ruin Doe's life. *Id.* at ¶¶63, 70-75, 93. Defendants Two and Three were

the co-presidents of "Preventing Sexual Assault" at the University. *Id.* at ¶¶61-64. PSA is a chartered official University organization that works closely with OCRSM leadership, including coordinating the University's Title IX efforts. *Id.* at ¶¶65-66. PSA advertises on its website that it provides services to University students, including "leading many education and prevention programs...[and] creating space for survivors and students in the conversation with administration." *Id.* at ¶67.

The three female students told various students and student organizations that Doe was a "rapist" and "under investigation," even though they knew these statements to be false. ECF No. 52, ¶¶70-79; *see also* ECF No. 55, ¶22 (Defendant Three admitting that she knew Doe was not under investigation); ECF No. 61, ¶22 (Defendants Two admitting that she knew Doe was not under investigation).

The students harassed Doe because he was a male student accused of sexual assault. ECF. No. 52, ¶64. As a result of this harassment, Doe was excluded from the club lacrosse team, which includes all of the friends he made through that team who were a great part of his social curriculum at the University. *Id.* at ¶¶74-75. When Doe was removed from the team, Roe posted on social media that his removal from the team was a "huge W for [her] and other survivors." *Id.* at ¶75.

Doe reported all of these issues, through multiple complaints, to the University, beginning in early October 2021, and continuing through the date of filing the complaint. *Id.* at ¶81. The University failed to investigate any of his complaints. *Id.* at ¶82.

3

The University did initially agree, however, through Defendant Karmiol, to instruct PSA to cease and desist the harassment. *Id.* at ¶¶84-87. After providing this initial glimmer of hope to Doe, it later rescinded this assurance. *Id.* After agreeing to not use Doe's true name, Defendant Karmiol later stated, inexplicably, that in order to speak to PSA, she needed to use Doe's true name. *Id.* at ¶¶85-87. Using Doe's true name was unnecessary because even a general directive to PSA would have been effective. *Id.* at ¶88. Absent any action by the University, the harassment continued.

On or about January 24, 2022, Defendant Nastase met with Doe regarding one of his complaints of harassment and stated that Roe's complaint was in "good faith," despite the University previously finding that Roe destroyed her own credibility in the Title IX process. ECF No. 52, ¶¶90-91. Thus, the University took no action and the harassment continued. *Id.* at ¶92. The University failed to meaningfully respond to even just one of Doe's formal complaints. ECF No. 52, ¶95. That is, until the University advised that it would not take any action against any of the harassing students. *Id.* at ¶101.

Instead of taking any action on any of Doe's complaints, the University chose to elevate Doe's false accuser by providing her an "executive committee" position at PSA. *Id.* at ¶96. In her new position of authority at the University, Roe continued to repeat and further exaggerate her false allegations in the local media, and explicitly tied it to gender, stating that she was raped and that "No **girl** needs to wake up with her pants undone." *Id.* at ¶¶97-98 (emphasis added). In addition to countless other

contradictions and inconsistencies, Roe had never alleged in the Title IX process that she was "raped" or that she woke up with her pants undone. *Id.* at ¶99.

Finally, after repeated inaction, the harassment escalated to criminal behavior, when Roe confronted Doe in public and convinced her boyfriend to attempt to physically batter Doe. *Id.* at ¶¶102-103. Doe filed another formal complaint, bringing the assault to the school's attention. *Id.* at ¶104. And still, the University did nothing; Defendant Nastase refused to even investigate Doe's formal complaint and stated that Roe's harassment and assault did not violate the Title IX policy and did not constitute harassment or retaliation. *Id.* at ¶¶105-106. Defendant Nastase also found, without conducting any investigation, that Roe engaged in this behavior because she "perceived [Doe] as a perpetrator of a sexual offense against [her]." ECF No. 52, ¶106. Defendant Nastase referred the possible no-contact order violation to the Office of Student Conduct, which likewise took no action at all. *Id.* at ¶107.

Doe has suffered immense harm, which goes beyond emotional damages. *Id.* at ¶¶110-135. Rather, Doe suffered damages including but not limited to compensatory damages, reputational harm, emotional damages, and attorneys' fees. *Id.* at ¶¶110-135, 148-162.

## ARGUMENT

University Defendants moved for dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6) on all Title IX and Equal Protection claims. The motion relies on misunderstandings of Doe's claims and the law. The motion should be denied.

## I.      Legal Standard

A motion under Rule 12(b)(6) tests whether the complaint states "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2008). To survive a 12(b)(6) motion, a complaint need only plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When a defendant brings a 12(b)(6) motion, the Court does not resolve factual disputes; rather, when a complaint states well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S., at 679. The Court is "required to accept all well-pleaded allegations of [Doe's] complaint as true and draw all reasonable factual inferences in his favor." *Massey v. Ojaniit*, 759 F.3d 343, 347 (4th Cir. 2014).

## II.     Doe plausibly alleged a Title IX deliberate indifference claim against the University.

Title IX states "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §1681. University Defendants correctly explain that the Supreme Court has long recognized an implied right of action under Title IX against fund recipients for their actions, not the actions of third parties. ECF No. 57-1, at ¶11 (*citing Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 641-42 (1999)). University Defendants also correctly explain that Title IX is Spending Clause legislation, and

recipients' liability is constrained to what is stated with a "clear voice" by Congress. ECF No. 57-1, at ¶12; *Davis*, 526 U.S., at 640.

Where University Defendants are wrong is in their attempt to cast the present case as falling outside of these limits on liability by incorrectly arguing that Doe is attempting to hold University Defendants liable for the actions of third parties or attempting to judicially expand the Title IX right of action. ECF No. 57-1, at ¶¶11-12. Neither is true. This case is about the University Defendants' own discriminatory actions. Congress clearly states, and the Courts clearly uphold, that the University, as a recipient of federal funds, cannot discriminate on the basis of sex. 20 U.S.C. §1681; *Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021) ("the text of Title IX prohibits all discrimination on the basis of sex"). Discrimination has long included deliberate indifference. *Davis*, 526 U.S. at 644-645 ("the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it") (internal quotations omitted).

To state a Title IX deliberate indifference claim, a plaintiff must plausibly allege four elements: (1) that the educational institution receives federal funds; (2) that the plaintiff was subjected to harassment based on [his] sex; (3) that the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity; and (4) that there is a basis for imputing liability to the institution." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 686 (4th Cir. 2018) (internal quotations omitted). University Defendants do not argue that the University does not receive federal funding, nor could they, as Doe has

properly alleged as such. ECF No. 52, at ¶114. Instead, University Defendants contest the remaining three elements as a matter of law; for the following reasons, their arguments are unavailing. The motion, as to Title IX's deliberate indifference, should be denied.

### a.   Doe alleged discrimination that was based on his sex.

Title IX protects against sex-based student-on-student harassment. *Davis*, 526 U.S. at 639. As one district court explained, the vast majority of cases involving student-on-student sexual harassment follow a similar pattern: harassment that involves some sort of sexual intent on the part of the harasser. *Doe v. Hamilton Cnty. Bd. of Educ.*, 329 F. Supp. 3d 543, 558 (E.D. Tenn. 2018). In cases where students harass other students because of sexual desire or similar purpose, the sexual nature of the harassment is apparent on its face. *Id.* But "<u>harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex</u>." *Id.* (emphasis added), *citing Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Indeed, the plain text of Title IX and its implementing regulations bar all discrimination (*i.e.*, harassment) on the basis of sex, not only where sexual harassment stems from sexual desire. *See* 20 U.S.C. §1681; 34 C.F.R. §106.30. Therefore, a plaintiff need only show "sex-specific conduct aimed to humiliate, ridicule, intimidate, or insult." *Doe v. Salisbury Univ.*, 107 F. Supp. 3d 481 (D. Md. 2015).

The question of whether conduct is "sex-specific" is highly factual in nature. *Hamilton*, 329 F. Supp. 3d, at 561. Further, applying the 12(b)(6) pleading standard

to the issue, it need only be "above the speculative level" that the conduct here was "sex-specific." *See Monroe v. City of Charlottesville, Va.*, 579 F.3d 380, 386 (4th Cir. 2009).

Here, construing all reasonable inferences in Doe's favor, and considering the unusual factual circumstances of this case, it is plausible that Doe was subjected to harassment that was based on his sex. Doe, a male, was found not responsible of sexual assault and was thereafter targeted and harassed by female students. ECF No. 52, at ¶¶58-80. Defendants Two and Three harassed Doe and defamed him to the club lacrosse team because he was a male accused of sexual assault. *Id.* at ¶64. There is no allegation that these female students harassed any female students. On the contrary, Defendants Two and Three (who are female) immediately believed Roe's false allegations, despite Roe's known inconsistencies (*Id.* at ¶¶76-78). It is therefore plausible (and in fact, likely) that they immediately believed Roe despite her credibility issues because she was female and decided to target Doe despite his exoneration because he was male. One plausible explanation for this discrepancy in behavior is that Doe and Roe were male and female, respectively.

Further, Roe evidenced the female students' targeting of Doe on the basis of sex by her statement to the media that "no **girl** needs to wake up with her pants undone." ECF No. 52, at ¶98 (emphasis added). Roe did not say "no *person*." She explicitly tied the issue of sexual assault to the sexes of the parties, which shows that at least her (and Defendants Two and Three's, as they conspired together) actions towards Doe were because he is a male, not because he was an accused student. This

"sex-specific language aimed to humiliate, ridicule, or intimidate" indicates that sexual harassment occurred. *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 695 (4th Cir. 2007). It is plausible, therefore, that the harassment to which Doe was subjected occurred on the basis of his sex.  *See Rouse v. Duke Univ.,* 869 F. Supp. 2d 674, 384-385 (M.D.N.C. 2012) (plaintiff stated Title IX claim where she was the victim of false accusations that she was the cause of her own rape and where the university did nothing to alleviate the hostile campus atmosphere).

In University Defendants' attempt to avoid this conclusion, they focus on Doe's status as an accused student, comparing his case to *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353 (S.D.N.Y. 2016), an out of circuit district court case from New York. *Nungesser,* however, is factually distinguishable from this case. Moreover, it is inconsistent in its reasoning.

*Nungesser* is factually distinguishable for at least two pertinent reasons. First, while it is true that the plaintiff in *Nungesser* was also a male accused student who was found not responsible for sexual assault and was later subject to harassment by his false accuser, the motives for the harassers were very different, which is a relevant consideration. *Nungesser*, 169 F. Supp. 3d at 365-366; *see Hamilton*, 329 F. Supp. 3d at 561 (considering the harasser's motive as relevant in determining whether harassment was sex-based). In *Nungesser*, the court held that the plaintiff had plausibly alleged only that the accuser used the word "rapist" for the purposes of

revenge against the plaintiff for rebuffing her romantic interests,[2] and generally that "rapist" is not a gendered term. *Nungesser*, 169 F. Supp. 3d at 366-367. Therefore, the court concluded, the plaintiff did not show that the harassment was on the basis of his sex. *Id.*

Here, by contrast, there is no allegation that the harassers were motivated by personal animus. Instead, Roe's gendered statement ("no girl needs to wake up with her pants undone") and PSA's stated goal of letting students know "who the predators are on campus" (ECF No. 52, at ¶¶69-98) taken together, show a generalized goal of harassing Doe because he is a male accused of sexual assault. Thus, their harassment is not based on a personal animus but as a larger goal to oust men who are accused, rightly or wrongly, of sexual assault. Additionally, discovery will indeed likely reveal that PSA (an organization led by only females) targeted Doe on the basis of his sex.

---

[2] This Court, in an unpublished opinion, seemed to come to a contrary conclusion on the scope of whether harassment is sex-based if committed because of romantic interests. In a case styled *Luskin v. University of Maryland*, which also concerned a Title IX deliberate indifference claim, this Court held that the plaintiff had shown harassment "on the basis of sex" where the harasser "wanted a romantic relationship with Luskin and thus targeted her because of her sex." *Luskin v. University of Maryland*, No. 8:20-cv-02393, Slip. Op., at *14 (D. Md. July 29, 2022). By contrast, the *Nungesser* court held that a plaintiff had not alleged harassment on the basis of sex when he alleged that his harasser targeted him because he rebuffed her romantic interest in him. *Nungesser*, 169 F. Supp. 3d at 366-367. Therefore, it appears that this Court would disagree with the *Nungesser* court on whether harassment with a romantic intent constitutes harassment on the basis of sex. *Nungesser* construed "on the basis of sex" far too narrowly, and for this additional reason, it is not instructive here.

ECF No. 52, at ¶¶2-3 (alleging that Defendant Two and Three, female students, lead PSA).

Second, in *Nungesser*, the court found it relevant to the issue of whether the harassment was "sex-based" that the complaint did "not allege that [the accuser] ever attempted to touch [plaintiff], spoke to him, followed him, or otherwise interacted with him after the October 2013 hearing." *Nungesser*, 169 F. Supp. 3d at 366-367. Though the court considered these facts relevant to the issue of whether the conduct was sex-based, it is worth noting that none of these factors have anything to do with the issue of sex or gender. Insofar as they are relevant, however, Doe alleged consistent harassment and contact through third parties, including the lacrosse team, and an attempted physical assault by Roe's proxy, her boyfriend. ECF No. 52, at ¶¶61-80, 102-103. These facts distinguish this case from the facts in *Nungesser*.

The *Nungesser* court was also inconsistent in its analysis of whether harassment was sex-based. The court spoke at length about how the term "rapist" is not inherently gendered but then listed cases where non-gendered language did constitute sex-based harassment. *Nungesser*, 169 F. Supp. 3d, at 366 ("Cases in which a plaintiff has stated a claim based on peer harassment under Title IX typically include allegations of unwelcome sexual touching or the use of gendered slurs…"). For example, the court cited *Doe v. East Haven Bd. of Educ.*, 200 Fed. Appx. 46, 48 (2d Cir. 2006), and added an explanatory parenthetical which stated, "female student who reported being raped was verbally abused by other students who called her 'a slut' and 'a whore,' names that 'reflect[ed] sex-based stereotypes.'" *Nungesser*, 169 F.

Supp. 3d at 366. "Slut" and "whore" are as facially non-gendered as "rapist" and yet the *Nungesser* court inexplicably found otherwise.[3] Due to its inconsistent findings, as well as the fact that it is an out of circuit district court case that is not binding on this Court, *Nungesser* is not instructive here.

As other courts have found, "grounded in common sense and social experience,"[4] (*Hamilton*, 329 F. Supp. 3d at 561), these terms ("slut," "whore," "rapist") can be "verbal abuse that reflects sex-based stereotypes." *East Haven Bd. of Educ.*, 200 Fed. Appx., at 48. Roe and Defendants Two and Three did not call Doe an ungendered slur, they chose to call him a "rapist," knowing that the term as it was used in this context reflects "sex-based stereotypes" (*Id.*), and knowing that as a male, it was the ultimate insult. They made frequent contact with his friends and teammates to get him kicked off the team because he was male. ECF No. 52, at ¶¶64, 71-75. Accordingly, drawing all inferences in favor of Doe, it is plausible that "harassment would not have occurred but for [his] sex." *Id.* Therefore, University

_____

[3] The court also noted that the accuser's alleged conduct amounted to "sexually charged slander," and yet it had earlier found that her conduct was not sexual in nature. *Nungesser*, 169 F. Supp. 3d, at 367.

[4] It should be an unremarkable assertion that when terms like "slut" or "whore" are used, they are typically directed at females, whereas when the term "rapist" is used, it is typically directed at males in the overwhelming majority of cases. This reality informs the public's use of these facially non-gendered terms (and the sex stereotypes that support them) and adds a gendered subtext.

Defendants' arguments are unavailing and Doe has plausibly alleged harassment on the basis of his sex.

>    **b.    Doe alleged harassment that was sufficiently severe or pervasive as to have deprived Doe of educational opportunities.**

In the Fourth Circuit, in order to properly plead a Title IX deliberate indifference claim, a plaintiff must plausibly allege that he suffered harassment that was "sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity." *Feminist Majority*, 911 F.3d at 686. "Harassment reaches the sufficiently severe or pervasive level when it creates an environment that a reasonable person would find hostile or abusive and that the victim herself subjectively perceive[s] ... to be abusive." *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 696 (4th Cir. 2007) (internal quotations omitted). Relevant factors include "whether the harassment was frequent, severe, humiliating, or physically threatening, and whether it effectively deprived the victim of educational opportunities or benefits." *Id.* Doe has done so here.

Doe alleged the harassment was frequent. The harassment began before October 8, 2021, and continued persistently through graduation, seven months later. ECF No. 52, at ¶¶61-80. Doe alleged the harassment was severe. Throughout the seven months of harassment, Doe alleged he was subject to false allegations of rape, distributed by at least three students (Roe, Defendant Two, and Defendant Three). *Id.* The harassers distributed their false allegations to various students and student organizations with the intent of effectively destroying Doe's social life. *Id.* at ¶¶70-75.

14

Doe also alleged that the harassment was physically threatening. Roe and her boyfriend assaulted Doe, and nearly battered him. *Id.* at ¶¶102-103. A reasonable person would consider this conduct "severe or pervasive" because it was "frequent, severe, humiliating, or physically threatening." *Jennings.* 482 F.3d at 696-98.

The harassment deprived Doe of educational opportunities in the form of the his exclusion from the club lacrosse team as well as the destruction of his social life and college experience. ECF No. 52, at ¶¶73-75, 109; *Jennings.* 482 F.3d at 696-98. Courts have found that the deprivation of educational opportunities includes "activities." *Jennings,* 482 F.3d at 699 (*citing Davis*, 526 U.S. at 650-651). The female students' campaign against Doe denied him of such here.

University Defendants argue that Doe has not alleged a deprivation of educational access because he did not allege "that he ever missed class, altered his study habits, or was otherwise unable to access educational opportunities as a result of [the alleged conduct]." ECF No. 57-1, at ¶21, *citing Roe v. St. John's Univ.,* No. 19CV4694PKCRER, 2021 WL 1224895, at *20 (E.D.N.Y. Mar. 31, 2021). This argument fails for three reasons.

First, as a factual matter, Doe alleged he was "unable to access educational opportunities" – the lacrosse team. ECF No. 52, at ¶¶75, 117. Second, a plaintiff need not specifically miss class or alter study habits to show the requisite harm. Indeed, there are "several circumstances" in which a plaintiff may show loss of educational access. *Jennings,* 482 F.3d at 699. These circumstances include "when the harassment (1) results in the **physical exclusion** of the victim from an educational

program or **activity**; (2) so undermines and **detracts** from the victim['s] **educational experience** as to effectively den[y him] equal access to an institution's resources and **opportunities**; or (3) has a **concrete, negative effect on [the victim's] ability to participate** in an educational program or **activity**." *Jennings,* 482 F.3d at 699 (internal quotations omitted; emphasis added) (*citing Davis*, 526 U.S. at 650-651).

Here, Doe was physically excluded from an educational program or activity – the lacrosse team. ECF No. 52, at ¶75. Moreover, the harassment and the exclusion he suffered destroyed his college experience, denying him the institution's "opportunities." ECF No. 52, at ¶109. Finally, the harassment had a concrete effect on Doe's ability to participate in the educational program or activity – he was permanently excluded from the lacrosse team. ECF No. 52, at ¶75. In sum, Doe's removal from the lacrosse team in his senior year was not insignificant. Doe had been a member of the lacrosse team since his freshman year. ECF. No. 52, at ¶¶ 75, 109, 117. The exclusion from the team meant the destruction of the social life he had built and the college experience he had hoped and paid for. *Id.* It deprived him of educational opportunities.

The third reason University Defendants' arguments fail is that the case on which University Defendants rely, *Roe v. St. John's University*, is factually distinguishable from the present matter. *St. John's Univ.,* No. 19CV4694PKCRER, 2021 WL 1224895, at *20 (E.D.N.Y. Mar. 31, 2021). In that case, the plaintiff's only "harm" relevant to his claim was a single tweet, which could not have been sufficiently severe or pervasive as to deprive him of educational opportunities. *Id.*

Here, Doe's harm includes the destruction of his social life and college experience, and his exclusion from the lacrosse team of which he had been a member since his freshman year. ECF No. 52, at ¶¶75, 117. University Defendants' reliance on this case as an analog to Doe's case is therefore misplaced.

Accordingly, Doe plausibly alleged that he suffered harassment that was sufficiently severe or pervasive so as to deprive him of educational opportunities.

### c. The University is liable because it was deliberately indifferent to the sexual harassment.

A school is "deliberately indifferent" when it behaves in a way that is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. While schools are generally afforded "flexibility" when it comes to how they choose to discipline students who harass other students, that "flexibility" ends when the school behaves in a way that is "clearly unreasonable in light of the known circumstances" because that behavior violates Title IX. *Davis*, 526 U.S. at 648.

Deliberate indifference is a "demanding test," but courts have consistently found that failures to appropriately initiate disciplinary proceedings may nevertheless meet the demanding test. *Cavalier v. Cath. Univ. of Am.*, 306 F. Supp. 3d 9, 29 (D.D.C. 2018) (denying motion to dismiss where university inexplicably delayed investigation for four months, initially refused to grant plaintiff a Title IX hearing on her allegation of rape against another student, and failed to provide clear notice to the accused student to have no contact with plaintiff); *Jennings*, 482 F.3d at 701 (a "[u]niversity's failure to take any action to remedy the [harassment] would

allow a rational jury to find deliberate indifference to ongoing discrimination"); *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000) ("Where a school… has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such [school] has failed to act reasonably in light of the known circumstances); *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1248 (10th Cir. 1999) (university's "complete refusal to investigate known [sexual harassment] claims…, if true, amounts to deliberate indifference").

In *Feminist Majority*, following plaintiff's criticism of the university's decision to allow fraternities on campus, plaintiffs were relentlessly harassed on a now-defunct social media platform called YikYak. *Feminist Majority,* 911 F.3d at 689-90. As a result of some of the posts on YikYak, which appeared to threaten physical violence, the university assigned the plaintiffs a police detail. *Id.* In response to the harassment, the university also organized "listening circles" where administrators would listen to students' reports of harassment. *Id.* The university took no action, however, on the actual threats and did not take any steps to punish the harassers.

Similarly, here, the University was clearly unreasonable when it failed to act to protect Doe in light of the known harassment launched against Doe by three of its female students. Doe alleged very similar behavior by the University Defendants as compared to *Feminist Majority*, except that University Defendants offered Doe no police detail or "listening circles." Almost immediately after Doe was exonerated of the false allegation of sexual assault, Roe and her co-conspirators began to harass Doe with false allegations of rape. ECF No. 52, at ¶¶61-62. They told students and

18

student organizations that Doe was a rapist and under investigation. ECF No. 52, at ¶¶63-80. Doe reported this harassment[5] on multiple occasions to the University Defendants. ECF No. 52, at ¶81. The University Defendants did nothing in response to any of Doe's complaints, even after the attempted physical assault and the blatant violation of the no-contact order by Roe. ECF No. 52, at ¶¶82, 104-105. Not an investigation, not a notice to any other student, nothing. Defendant Karmiol would not even speak to the harassers to tell them generally that they may not harass male students or respondents, which would have effectively been a restatement of the University's existing policy on harassment. ECF No. 52, at ¶¶11, 87. Further, and remarkably, without conducting any investigation whatsoever, Defendant Nastase made the factual determination that Roe likely took these actions not to harass or retaliate but because she "perceived [Doe] as a perpetrator of a sexual offense against [her]." ECF No. 52 at ¶106. And, she offered, without evidence, that Roe made her complaint against Doe in "good faith." ECF No. 52, at ¶91. Despite the no-contact order violation having been referred to Student Conduct, the University took no

_____

[5] University Defendants make a peculiar statement in their motion, where they argue that Doe did not state what harassment he reported to the University. ECF No. 57-1, at ¶22. They cite and quote paragraph 81 of the corrected amended complaint but omit the word "this" from their quote. *Compare* ECF 57-1, at ¶22 ("The amended complaint alleges only in conclusory fashion that 'Doe made multiple notices and formal complaints to OCRSM, alleging retaliation and harassment...'"), *with* ECF No. 52, at ¶81 ("Doe made multiple notices and formal complaints to OCRSM, alleging **this** retaliation and harassment") (emphasis added). Obviously, the word "this" signifies what "retaliation and harassment" Doe reported, referring to the preceding allegations.

action. ECF 52, at ¶107. At every juncture, where the University Defendants could have taken even small but effective steps to remedy the harassment, they chose to do nothing to protect its male student while protecting, and giving clear favor, to its female students.[6]

In sum, University Defendants cannot argue that any of the steps they took were reasonable, because they took no meaningful steps at all. University Defendants made a conscious decision not to remedy the harassment. The University was therefore deliberately indifferent. *Feminist Majority*, 911 F.3d at 691. The University Defendants' motion should be denied.

## III.    Doe alleged a Title IX retaliation claim against the University.

Doe alleged a straightforward retaliation claim against the University as recognized by the Fourth Circuit in *Feminist Majority.* 911 F.3d at 694. A retaliation plaintiff "[first] must allege that they engaged in protected activity under Title IX, and second, they must allege that — as a result of their protected activity — they suffered an adverse action attributable to the defendant educational institution." *Id.*

---

[6] University Defendants also argue that they were forced to dismiss Doe's allegations pursuant to 34 C.F.R. §106.45(b)(3)(i) because Doe did not allege sexual harassment. This argument fails because Doe did indeed allege sexual harassment (see *supra*), and because the regulations did not preclude the University from responding under its code of conduct to sexual harassment that does not, for whatever reason, trigger its duties under the regulations. *See* 34 C.F.R. § 106.44(a); "Questions and Answers Regarding the Department's Title IX Regulations," Department of Education Office for Civil Rights (January 15, 2021), available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-titleix-part1-20210115.pdf .

Far from alleging a "novel" cause of action, as University Defendants urge (ECF No. 57-1, at ¶25), the cause of action for retaliation under Title IX has been long recognized. *See Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 171-172 (2005). Here, Doe alleged that he participated in the protected activity of participating as a respondent in a Title IX matter. He also alleged he suffered an adverse action by the educational institution by alleging deliberate indifference to retaliatory harassment. Doe's allegations plainly meet the test as set forth in *Jackson* and *Feminist Majority*.

### a.   Doe participated in protected activity by participating in the underlying Title IX matter as a respondent.

First, Doe engaged in protected activity under Title IX by participating in the Title IX matter as a respondent. While courts have not explicitly defined what activity is "protected" under Title IX, the Supreme Court and the Fourth Circuit have offered instruction, and the Department of Education, which is entitled to deference, has made clear that a respondent participating in Title IX must be protected from retaliation.

In most retaliation cases, the protected activity is the filing of sexual harassment complaints. *See Jackson*, 544 U.S. at 171. As the Fourth Circuit has suggested, however, protected activity is not limited to the filing of sexual harassment complaints. *Feminist Majority*, 911 F.3d at 694 ("Those protected activities included advocating against and reporting sexual harassment, plus filing the OCR complaint"). This makes sense as the Title IX statute is "broadly worded" and a plaintiff may be the victim of retaliation even if he was not the subject of sexual

harassment himself. *Jackson*, 544 U.S. at 179. This rule reflects the broad protections afforded to victims of retaliation; without these protections, "Title IX's enforcement scheme would unravel" and discrimination would go unpunished. *Jackson*, 544 U.S. at 180.

While the courts have not been as clear, the Department of Education clearly establishes when activity is "protected" in its promulgated regulations. The regulations protect "any individual" who participates in the Title IX process from retaliation. 34 C.F.R. §106.71. This rule is entitled to deference by the Court. *Sierra Club v. United States Army Corps of Engineers*, 909 F.3d 635, 644 (4th Cir. 2018) ("When an agency's interpretation derives from notice-and-comment rulemaking, it will almost inevitably receive *Chevron* deference") (internal quotations omitted). *Chevron* deference is appropriate where, as here, "Congress has delegated authority to the agency generally to make rules and, second, the agency interpretation claiming deference was promulgated in the exercise of that authority." *Id., citing United States v. Mead Corp.*, 533 U.S. 218, 226-227 (2001).

Here, Congress, through 20 U.S.C. §1682, delegated to the Department of Education the authority to make rules implementing Title IX. During the previous presidential administration, the Department of Education exercised that authority and engaged in notice-and-comment rulemaking, and it published regulations that governed the Title IX process at educational institutions. *See* 34 C.F.R. §106. Its action was a valid exercise of the Department of Education's authority under Title IX and a reasonable interpretation of the statute, save one exception irrelevant to the

retaliation issue. *See Victim Rts. L. Ctr. v. Cardona*, 552 F. Supp. 3d 104, 135 (D. Mass. 2021). Therefore, the Department is entitled to deference.

The Department went to great lengths in its regulation to define retaliation for the purposes of Title IX. It states, in relevant part:

> No recipient or other person may intimidate, threaten, coerce, or discriminate against *any individual* for the purpose of interfering with any right or privilege secured by Title IX or this part, or because the individual has made a report or complaint, *testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part.* Intimidation, threats, coercion, or discrimination, including charges against an individual for code of conduct violations that *do not involve sex discrimination or sexual harassment*, but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or formal complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by Title IX or this part, *constitutes retaliation*.

34 C.F.R. §106.71(a) (emphasis added).

Retaliation, therefore, includes any adverse act taken against a person because he or she participated in the Title IX process. Indeed, the University promises in its own sexual misconduct policy that retaliation is prohibited in any form and will not be tolerated. ECF No. 52, at ¶11. Thus, participating in the Title IX process, even as a respondent, is a protected activity. *Id.* Because Doe participated in the Title IX process, he engaged in protected activity. ECF No. 52, at ¶¶14-60.

### b.   Doe was subjected to an adverse action as a result of his protected activity.

The Fourth Circuit affirms that "retaliatory harassment" may constitute an "adverse action" for purposes of a Title IX claim. *Feminist Majority*, 911 F.3d at 695

("retaliatory harassment can be a materially adverse action"). To be actionable, retaliatory harassment, a plaintiff must allege a retaliatory motive for the harassment. *Id.* at 696.

In *Feminist Majority*, the Fourth Circuit held that the plaintiffs were subject to retaliatory harassment where they were subjected to harassment after they were outspoken against sex discrimination, after the university made a statement against sexual assault, and after they filed OCR complaints. *Id.* The Fourth Circuit's reasoning suggests that close temporal proximity between the protected activity and the retaliatory harassment may sufficiently show the requisite retaliatory motive. *Feminist Majority*, 911 F.3d at 696. That being said, the Fourth Circuit did not explicitly require the plaintiffs to show any such temporal proximity and appeared to accept their allegations of harassment as sufficient to show retaliatory harassment. *Id.*

Here, insofar as Doe must or should show temporal proximity, Doe made this showing. He engaged in protected activity when he participated in the Title IX process as a respondent and was subject to an adverse action (*i.e.*, retaliatory harassment) very shortly thereafter. ECF No. 52, at ¶61. Indeed, almost immediately after he completed his participation in the Title IX process as a respondent, the retaliatory harassment began. *Id.*

Further, Doe alleged facts that plainly show the harassment would not have occurred but for his participation as a respondent. Indeed, given Defendant Two and Three's close ties with OCRSM, they knew of Doe's status as a respondent and that

he was found not responsible; they likely would have not known who he was absent his participation as a respondent. ECF 52, at ¶¶76-78. Indeed, they even admit to knowing that Doe was not under investigation in their Answers. ECF No. 55, at ¶22 (Defendant Three admitting that she knew Doe was not under investigation); ECF No. 61, at ¶22 (Defendant Two admitting that she knew Doe was not under investigation). Even if the Fourth Circuit explicitly required "but-for" causation in this context,[7] as University Defendants argue (ECF. No. 57-1, at ¶26), Doe has therefore plausibly alleged that the harassment would not have occurred but for his participation as a respondent, because the harassers would not have known his identity absent his participation in the Title IX process.[8] He has alleged retaliatory harassment as an "adverse action." *Feminist Majority*, 911 F.3d at 695.

––––––––––––––––––––

[7] The Fourth Circuit expressly did not decide whether "but-for" causation was required for a retaliation Title IX claim. *Feminist Majority*, 911 F.3d at 696 n.10 ("We need not resolve that issue today because the Complaint sufficiently alleges 'but-for' causation"). However, it later decided that "but-for" causation was required for a disciplinary discrimination claim. *Sheppard*, 993 F.3d at 236 (*citing Bostock v. Clayton Cnty., Georgia,* 140 S. Ct. 1731, 1739 (2020). Given the Fourth Circuit's citation to *Bostock*, at least one district court agreed that so long as sex was one (of many) "but-for" causes, that is sufficient for a Title IX claim. *Doe v. Virginia Polytechnic Inst.*, No. 7:19-CV-00249, 2022 WL 3334501, at *9 n.11 (W.D. Va. Aug. 11, 2022).

[8] University Defendants argue that the harassing students engaged in their behavior not because Doe was a respondent but because he allegedly committed sexual assault. Setting aside the fact that this is unlikely given they could not reasonably believe that Doe was guilty of sexual assault (ECF No. 52, at ¶¶76-78), this argument amounts to a factual dispute that is not appropriate at the motion to dismiss stage where The Court is "required to accept all well-pleaded allegations of [Doe's]

### c.   The University Defendants were deliberately indifferent to the retaliatory harassment.

The University is subject to liability for retaliation for largely the same reasons it is liable for deliberate indifference to sexual harassment, as explained *supra*. Doe made multiple reports of retaliation, as outlined in the corrected amended complaint. ECF No. 52, at ¶¶81, 104. The University, through Defendants Karmiol and Nastase, took no steps to remedy the retaliation. *Id.* at ¶¶82, 104-105. Liability is appropriate where the University exercises substantial control over the retaliatory harassers and takes "little to no action" to remedy the harassment. *Feminist Majority*, 911 F.3d at 696. That is exactly what happened here.

Just as the university in *Feminist Majority* exercised control over the student harassers and the university's internet network through which the harassment took place, the University here exercised control over the harassing students. *Feminist Majority*, 911 F.3d at 688-689. Indeed, the PSA co-presidents have explicitly stated that they have a close relationship with the University office in charge of Title IX complaints. ECF No. 52, at ¶¶65-67. And, as explained *supra*, the University took no steps to remedy the retaliation, despite receiving multiple formal complaints. ECF No. 52, at ¶¶82, 104-105. The University was therefore deliberately indifferent to the retaliatory harassment.

---

complaint as true and draw all reasonable factual inferences in his favor." *Massey v. Ojaniit*, 759 F.3d 343, 347 (4th Cir. 2014).

**IV.    Doe properly alleges damages beyond emotional damages.**

University Defendants argue that Doe has only alleged emotional damages, and therefore, his Title IX claim must be dismissed as to damages generally pursuant to *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1572, *reh'g denied*, 142 S. Ct. 2853 (2022).[9] ECF No. 57-1, at ¶27. Doe, however, properly alleged damages beyond emotional damages in his amended complaint. ECF No. 52, at ¶¶110-135, 148-162. Moreover, Doe did not bring emotional or punitive damages claims against the University under Title IX. ECF No. 52, at ¶¶110-135. Insofar as University Defendants' arguments are limited to emotional or punitive damages under Title IX, they argue against something that was never in the complaint. To the extent University Defendants ask for dismissal of all possible damages under Title IX, their argument fails because, taking his allegations as true, Doe has alleged damages, including damages outside of emotional harm. ECF No. 52, at ¶¶122, 135.

Further, it is entirely inappropriate for the University Defendants to seek to bar Doe from all damages under Title IX at this early stage in litigation; damages are

---

[9] University Defendants are correct that the Supreme Court recently held that emotional damages are unavailable under certain Spending Clause statutes. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1572, *reh'g denied*, 142 S. Ct. 2853 (2022). *Cummings* involved Title VI, and Title IX was not squarely before the Court. Neither the Supreme Court nor the Fourth Circuit have explicitly held that Title IX plaintiffs cannot receive emotional damages. Assuming, however, that this Court is inclined to hold that Title IX plaintiffs cannot recover for emotional harm, Doe has properly alleged other damages.

27

a question for the jury and need not be pleaded with particularity. Indeed, general damages are not subject to the particularity pleading requirement under Fed. R. Civ. P. 9(g). *See Route Triple Seven Ltd. P'ship v. Total Hockey, Inc.,* 127 F. Supp. 3d 607, 613 (E.D. Va. 2015) (holding that attorney's fees need not be plead with particularity where "[it] is not an item of special damages; it is not an element of any claim"). Likewise, damages are not a required element of any Title IX claim and a plaintiff need not specifically plead damages; rather, the question of damages is to be decided by the jury. *See also Mercer v. Duke Univ.*, 401 F.3d 199, 200 (4th Cir. 2005) (noting that plaintiff succeeded on her Title IX claim but was only awarded nominal damages by a jury). Finally, even a nominal award of damages will subject the University Defendants to attorneys' fees, which again reaffirms that the question of damages is for a later day. 42 U.S.C. §1988. For all these reasons, University Defendants' attempt to preemptively bar Doe from damages under Title IX should be rejected.

## V.   Doe alleged Equal Protection claims against Defendants Karmiol and Nastase.

### a.   Defendants Karmiol and Nastase violated the Equal Protection Clause.

"Persons" who operate "under color of state law" may be held liable for violations of the Equal Protection Clause under 42 U.S.C. §1983. *Hogan v. Cherokee Cnty.*, 519 F. Supp. 3d 263 (W.D.N.C. 2021). There can be no dispute that Defendants Karmiol and Nastase are subject to §1983 because they are persons exercising state power who had "personal knowledge of and involvement in the alleged deprivation" of the plaintiff's rights. *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985); *see also*

*Feminist Majority*, 911 F.3d at 700 ("a victim of sex discrimination by a government official at an educational institution can pursue a § 1983 equal protection claim"). The only question is whether Doe has plausibly alleged an equal protection violation.

In the Fourth Circuit, a plaintiff may bring an equal protection claim based on a theory of deliberate indifference to student-on-student sexual harassment. *Feminist Majority*, 911 F.3d at 702. Doe's allegations meet this test. To state this claim, a plaintiff must plausibly allege three elements: (1) that he was "subjected to discriminatory peer harassment"; (2) "that the school administrator responded to the discriminatory peer harassment with deliberate indifference, i.e., in a manner clearly unreasonable in light of known circumstances"; and (3) "that the school administrator's deliberate indifference was motivated by a discriminatory intent." *Feminist Majority*, 911 F.3d at 702.

First, for reasons discussed *supra*, Doe alleged both that he was (1) subjected to discriminatory harassment and (2) the school administrators were deliberately indifferent in their response. *Feminist Majority*, 911 F.3d at 703 (referring to Title IX analysis when discussing equal protection claim). Both Defendants Karmiol and Nastase, who "exercised the final authority of OCRSM" (ECF No. 52, at ¶¶149, 157), refused to take any action in response to Doe's formal complaints throughout the relevant time period. ECF No. 52, at ¶¶82, 104-105. They were deliberately indifferent.

University Defendants argue that Defendant Karmiol offered to remedy the harassment; not so. While it is true that Defendant Karmiol offered at one point to

speak with Defendants Two and Three to request they stop the harassment and agreed to contact them knowing that Doe did not want to use his true name (which Defendant Karmiol "understood"), she later recanted and refused to make any directive unless she could use Doe's true name. ECF No. 52, at ¶84-87. Using Doe's true name was unnecessary because a general directive would have remedied the harassment; indeed, she could have simply restated the University's policy against harassment and retaliation. ECF No. 52, at ¶¶11, 88; *see Feminist Majority*, 911 F.3d at 691 (the University's proffered reason for failing to act lacked a "proper basis," and its failure to consider any other options constituted deliberate indifference). Thus, Defendant Karmiol's initial offer to help is negated by her later withdrawal of the offer and abject refusal to do anything to protect Doe. She was deliberately indifferent.

Further, with respect to Defendant Nastase, University Defendants state only in conclusory fashion that her actions (including, among other things, inexplicably finding without investigation that Roe's initial complaint was made in "good faith," which according to Nastase, inexplicably barred the University from disciplining Roe for her subsequent conduct, and stating that OCRSM would take no action against any of the harassers) do not amount to an equal protection violation. ECF No. 57-1, at ¶32. On the contrary, Defendant Nastase's actions are also deliberately indifferent because she took no meaningful action to address Doe's complaints. *Jennings*, 482 F.3d at 701 ("[u]niversity's failure to take any action to remedy the [harassment] would allow a rational jury to find deliberate indifference to ongoing discrimination").

She refused to even investigate any of Doe's complaints, while at the same time made factual determinations without investigation as to Roe's motive, tacitly approving her actions. ECF No. 52, ¶¶81, 104-107. Together, Doe has plausibly alleged that both administrators were deliberately indifferent in their actions.

Doe also alleged facts sufficient to show that Defendants Karmiol and Nastase's actions were motivated by discriminatory intent, the third element of the equal protection claim. The Fourth Circuit clearly states that allegations that the administrators "ratified the right of angry students to target [female or male] classmates with hateful, sexist, threatening harassment, free from any disciplinary consequences… [and where the administrator] made no effort to stop them" adequately plead the intent element of this claim. *Feminist Majority*, 911 F.3d at 703; *T.E. v. Grindle*, 599 F.3d 583, 589 (7th Cir. 2010) (jury could infer intent to discriminate from principal's failure to attempt to stop harassment and by her downplaying harassment).

Here, Doe alleged that Defendants Karmiol and Nastase made no attempt to stop the harassment against him, a male student. Indeed, Defendants Karmiol and Nastase made nonsensical determinations – all of which favored the female students at the expense of the male student – that they either could not speak to Defendant Two or Three without using Doe's real name (which was entirely unnecessary) or that they found, without investigation, that Roe's original complaint was made in "good faith" and therefore she could not be disciplined for subsequent harassment even including soliciting criminal assault. ECF No. 52, at ¶¶87-89, 101-106. They also

failed to sanction her for her clear violation of the no contact order. ECF No. 52, at ¶107. These determinations are without a logical basis. Therefore, it is plausible that these determinations are evidence of gender bias. *See Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) (treating "perplexing" statements and decisions by university personnel as evidence of sex bias); *see also Doe v. Univ. of Denver*, 1 F.4th 822, 836 (10th Cir. 2021) (denying summary judgment where university's action could be a result of anti-male bias prohibited by Title IX or anti-respondent bias not prohibited by Title IX, and leaving the question of which bias was operative to the jury).

Accordingly, Doe alleged that he was subjected to discriminatory harassment, that Defendants Karmiol and Nastase were deliberately indifferent to that harassment, and that their actions were motivated by discriminatory animus. He properly alleged an equal protection violation.

> **b.  Defendants Karmiol and Nastase are not entitled to qualified immunity on Doe's individual capacity claim because Doe's constitutional right to equal protection in this context was clearly established.**

As University Defendants explain, qualified immunity shields public employees from personal damages liability unless they violate constitutional rights that are "clearly established." *Walker v. Prince George's Cnty.*, MD, 575 F.3d 426, 429 (4th Cir. 2009). When a defendant invokes qualified immunity, the court conducts a two-part analysis: first, a court "must decide whether the facts that a plaintiff has alleged… a violation of a constitutional right"; and second, a court must decide whether the right at issue was 'clearly established' at the time of [the] alleged

misconduct." *Id.*  The "clearly established" inquiry does not require "that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent [to deny immunity]." *Wilson v. Layne*, 526 U.S. 603, 615 (1999); *Feminist Majority*, 911 F.3d at 704 ("a right may be clearly established if a previously identified general constitutional rule obviously applies to the disputed conduct. Even under novel factual circumstances, a government official can still be on notice that [her] conduct violates established law ... so long as the law provided 'fair warning' that [her] conduct was unconstitutional") (internal citations omitted).

The burden of establishing qualified immunity rests with the official asserting it. *Durham v. Jones*, 737 F.3d 291, 299 (4th Cir. 2013). For reasons discussed in the preceding section, Doe has alleged a violation of a constitutional right. Therefore, the remaining question is whether that right was clearly established at the time of the University Defendants' conduct. It was. And, University Defendants cannot carry their burden to show otherwise.

Like this case, *Feminist Majority* concerned a university's deliberate indifference to discriminatory harassment and found that such deliberate indifference violates the Equal Protection Clause. 911 F.3d at 704. In *Feminist Majority*, the plaintiffs were subjected to repeated harassment and despite filing multiple complaints and pleading with the university to act, the university did nothing, which empowered the harassers to continue harassing. *Feminist Majority*, 911 F.3d at 689-690. Indeed, the administrator "responded to that harassment with

deliberate indifference, in that he had the authority to address and curtail the harassment but failed to do so over a period of months." *Id.* at 703. Defendants Karmiol and Nastase did the same thing here. ECF No. 52, at ¶¶82, 104-105.

In *Feminist Majority*, the Fourth Circuit granted qualified immunity to the administrator only because, at the time of his conduct, "controlling authority did not clearly establish the right to be free from a university administrator's deliberate indifference to student-on-student sexual harassment." *Feminist Majority*, 911 F.3d at 704. Here, Defendants Karmiol and Nastase have no such excuse. *Feminist Majority* was decided in 2018, years before University Defendants' own deliberate indifference to the harassment waged against Doe. Defendants Karmiol and Nastase, therefore, had "fair warning" that their own deliberate indifference would violate Doe's constitutional rights. *Id.*

While there are some factual differences between *Feminist Majority* and the instant case (which mostly relate to the predicate for the harassment, not the actions by the administrators), the qualified immunity analysis does not require "that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Wilson*, 526 U.S. at 615. Given the Fourth Circuit's binding precedent in *Feminist Majority*, Defendants Karmiol and Nastase were on notice for years that their deliberate indifference would violate Doe's equal protection rights and the unlawfulness of their action was apparent. *Id.* Therefore,

his rights were "clearly established." Defendants Karmiol and Nastase may not avail themselves of qualified immunity.

>    c.    **Defendants Karmiol and Nastase are not entitled to sovereign immunity on Doe's official capacity claim pursuant to *Ex parte Young*.**

University Defendants assert that Doe's constitutional claims against Defendants Karmiol and Nastase in their official capacities are claims against the state barred by sovereign immunity. ECF No. 57-1, at ¶¶33-34. While University Defendants are correct that sovereign immunity is generally retained by the state and generally protects against suit without its consent, University Defendants' focus on whether the State of Maryland has consented to suit is misplaced. ECF No. 57-1, at ¶¶33-34. Even if the State has not expressly consented to be sued, "[t]he long-standing doctrine of *Ex parte Young*…allows private citizens, in proper cases, to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution…" *Franks v. Ross*, 313 F.3d 184, 197 (4th Cir. 2002). "The rationalization behind this exception is that a state officer violating federal law is stripped of his official character and thereby loses the cloak of state immunity." *Living Lands, LLC v. Cline*, No. CV 3:20-0275, 2022 WL 796701, at *3 (S.D.W. Va. Mar. 15, 2022); *Ex parte Young*, 209 U.S. 123, 156 (1908) (state officials may be federally enjoined from prospective or continuing violations of the Constitution). That is exactly what Doe is doing here – petitioning the Court to enjoin State officials (Defendants Karmiol and Nastase) from engaging in future and continuing conduct that violates federal law.

The *Ex parte Young* analysis is simple. It applies in cases where "the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Franks,* 313 F.3d at 197. Here, Doe has alleged an ongoing violation of his federal rights – deliberate indifference to harassment, which violates both his rights under Title IX and under the Equal Protection Clause. ECF No. 52, at ¶¶82, 104-105. He seeks relief that is prospective, including enforcement of the University's Title IX policy and no contact orders. ECF No. 52, at ¶25. Therefore, the *Ex parte Young* doctrine applies, and Defendants Karmiol and Nastase cannot claim sovereign immunity against prospective injunctive relief.

## CONCLUSION

For the foregoing reasons, University Defendants' motion to dismiss should be denied.

Dated: September 6, 2022                     Respectfully submitted,

                                             /s/ Amy L. Bradley
                                             Amy L. Bradley (21417)
                                             BLANKINGSHIP & KEITH, PC
                                             4020 University Dr. Ste. 300
                                             Fairfax, Virginia 22030
                                             Phone: (703) 691-1235
                                             Fax: (703) 691-3913
                                             Email: abradley@bklawva.com


                                             Lindsay R. McKasson, *pro hac vice*
                                             Benjamin F. North, *pro hac vice*
                                             BINNALL LAW GROUP, PLLC

717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
Email: lindsay@binnall.com
   ben@binnall.com

*Counsel for Plaintiff John Doe*

## CERTIFICATE OF SERVICE

I certify that on September 6, 2022, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/ Amy L. Bradley
Amy L. Bradley (21417)

*Counsel for Plaintiff John Doe*