**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

JOHN DOE,                 *
                           *
       Plaintiff,         *
                           *          Civil Action No. 8:22-cv-00872-PX
    v.                    *
                           *
UNIVERSITY OF MARYLAND,   *
COLLEGE PARK, *et al.*,       *
                           *
       Defendants.      *
                           *
                         ***

## **MEMORANDUM OPINION**

Pending in this case is the Motion for Summary Judgment filed by Defendants University of Maryland, College Park (the "University"), Grace Karmiol ("Karmiol"), and Angela Nastase ("Nastase"). ECF No. 128. The motion is fully briefed, and no hearing is necessary. *See* D. Md. Loc. R. 105.6. For the reasons stated below, the motion is granted in part and denied in part.

## I.     Background

This case concerns the scope of a university's obligations under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.* In October 2020, University of Maryland student Jane Roe ("Roe") alleged that John Doe ("Doe"), the plaintiff here, and another student had sexually assaulted her in separate incidents on the same morning. Following an investigation, the University concluded that Doe was not responsible for any wrongdoing. Nevertheless, Roe and others embarked on a months-long public campaign to brand Doe a rapist and to exclude him from campus activities. Doe now asserts that the University's failure to address this hostile, sex-based campaign violated Title IX.

1

To situate Doe's allegations, the Court first summarizes the University's Title IX process relevant to Doe's claims and then discusses the facts pertinent to the present case construed most favorably to Doe as the nonmovant.

**A.     The Title IX Process**

The University's Policy and Procedures on Sexual Harassment and Other Sexual Misconduct (the "Policy") for the 2021–2022 academic year[1] describes in detail how the University receives, investigates, and adjudicates complaints of sexual harassment, retaliation, and other similar misconduct.  PA-1089–1144.  The University's Office of Civil Rights and Sexual Misconduct ("OCRSM" or "the Office") handles all complaints falling under the Policy.  During this academic year, Karmiol served as the Director of OCRSM and Nastase as Associate Director. Both supervised Title IX officers who reviewed complaints, and they themselves also performed that function.

The Policy defines the types of "Prohibited Conduct" within OCRSM's jurisdiction as conduct occurring "on the basis of sex" that, "if substantiated," would constitute sexual harassment in an education program or activity.  *See* 20 U.S.C. § 1681(a); PA-1118.  The Policy also identifies retaliation as "Prohibited Conduct," but treated it as distinct from sexual harassment or other forms of sexual misconduct.  PA-1100–01.  The Policy further defines "Sexual Harassment," for which the Office retained jurisdiction, as "conduct on the basis of sex that satisfies one or more of the following":

> **Hostile Environment:** Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's Education Program or Activity.

---

[1] The Policy has been amended several times.  Relevant here are the amendments approved August 14, 2020, May 10, 2021, and, most recently, on an interim basis by the President on August 23, 2021.  *See* PA-990–1144.  Because the August 23, 2021, version (PA-1089–1144) governed during the 2021–2022 academic year, the Court cites to that version throughout.

**Sexual Assault:** An offense classified as a sex offense under the uniform crime reporting system of the Federal Bureau of Investigation. Sex Offenses are any sexual acts directed against another person, without the Consent of the victim, including instances where the victim is incapable of giving Consent (Non-Consensual Sexual Penetration or Fondling); also, unlawful sexual intercourse (Incest or Statutory Rape).

**Non-Consensual Sexual Penetration**: Penetration, no matter how slight, of the genital or anal opening of the body of another person with any body part or object, or oral penetration by a sex organ of another person, without the Consent of the victim, including instances where the victim is incapable of giving Consent because of their age or because of their temporary or permanent mental or physical incapacity.

PA-1098.

The Policy also prohibits retaliatory acts in connection with the complaint resolution process. PA-1126. Retaliation, as defined by the Policy, is:

intimidating, threatening, coercing, or discriminating against, or otherwise taking an adverse action against an individual for the purpose of interfering with any right or privilege secured by law or University policy relating to Prohibited Conduct, or because an individual has made a report, filed a complaint, testified, assisted, participated or refused to participate in any manner in an investigation, proceeding, or hearing related to Prohibited Conduct.

PA-1100.

A student may submit to OCRSM a misconduct complaint "in person, by mail, or by electronic mail." PA-1096. The assigned Title IX Officer next reviews the complaint to "determine whether it should be dismissed or move into the resolution process." PA-1117. The Title IX Officer retains "ultimate discretion" to dismiss the complaint or initiate an investigation, taking into consideration the need to comply with anti-discrimination laws, the complainant's willingness to participate in an investigatory process, and the likelihood of future violence. *Id.* However, where the complaint allegations do not "constitute Prohibited Conduct" or "fall within the University's jurisdiction," the complaint must be dismissed. PA-1119; *see also* PA-196–202 (Nastase confirming that "conduct on the basis of sex" is an "essential element" of any claim

reviewable by OCRSM).  If jurisdiction exists, the Title IX Officer initiates the investigation and resolution process, which may conclude informally or proceed to a formal hearing and adjudication.  PA-1118–28.

**B.     Roe's Sexual Assault Complaint and Doe's Exoneration**

On October 27, 2020, Roe filed a formal complaint with OCRSM, alleging that, on the morning of October 4, 2020, two men sexually assaulted her in separate incidents, one of whom she identified as Doe.  PA-982–83.  Over the next nine months, OCRSM extensively investigated the allegations, conducting roughly thirty interviews, ordering forensic DNA analysis, and issuing a lengthy final report.  *Id.*  On September 2, 2021, after a five-day evidentiary hearing, the appointed adjudicator determined in a written decision that Doe was not responsible for any wrongdoing.  PA-940; PA-936.

Six days later, on September 8, 2021, Roe privately messaged the student-run organization Preventing Sexual Assault ("PSA") through Instagram about Doe.  PA-604.  Although the PSA's stated purpose is to assist all survivors of sexual assault, in practice, it focused on supporting only female survivors.  For instance, PSA's annual march, termed the "SlutWalk," aimed to raise awareness of sexual violence against women.  PA-353.  At the event, PSA members carried signs proclaiming, "Don't tell us how to dress," "Pussy grabs back," and "Tell men not to rape."  PA-001–4.  PSA leadership likewise highlighted their female-centered support: "when a woman comes to [PSA] with a story of sexual assault, we believe them," and they advocate for her accordingly. PA-328.

Roe's Instagram post to PSA detailed that she had been raped by two men, and "left bruised and bloodied due to [her] injuries," PA-604, but that in her view, OCRSM had botched her Title IX case.  *Id.*; PA-324–26.  In response, PSA Co-Presidents, Defendants Two and Three

(collectively "PSA Defendants"), urged Roe to tell her story on campus, particularly by participating in PSA's annual "Real Talk" event.  PA-606.

Doe, for his part, had recently returned to campus for his senior year after an extended absence due to both the COVID-19 pandemic and the investigation into Roe's allegations.  Doe also returned to the University's Club Lacrosse team where he had been an active member in his freshman year.  DA-068.  The Club Lacrosse team is a student-run organization that practices and competes in a recreational league and organizes social events around its sporting events.  DA-071; DA-076.

On October 7, Doe learned that Roe had been publicly spreading the word on campus that Doe had raped Roe and was currently under investigation.  Evidently those same rumors made their way to the Club Lacrosse President, Benjamin Abraham ("Abraham"), who in turn told Doe that because of "the investigation" that Doe "is under," the Club's "pregame" social event at Doe's house would be canceled.  DA-089; DA-027.  The following day, Doe's attorney emailed Karmiol stating, "[Roe] is continuing to harass and retaliate against [Doe] by spreading her false allegations around campus.  [Doe] was informed by his friends that [Roe] and her friends had approached them and defamed him, even going so far as to falsely tell them that he was 'under investigation' and a 'rapist.'"  DA-021.  Doe's counsel asked OCRSM to investigate and charge Roe for retaliation and for making materially false statements, and to provide Doe an official letter confirming that Doe had been found not responsible for any campus misconduct.  DA-021–22.

Karmiol replied by email twelve minutes later.  DA-021.  She agreed that "[t]he behaviors you cited are concerning," and confirmed that although the University ordinarily requires the student to initiate a complaint, OCRSM would treat counsel's email as Doe's formal complaint and schedule an intake interview with him.  *Id.*  Karmiol also provided Doe with the requested

letter, which stated that Doe was not under investigation and that he had "never been found to be in violation" of the Policy.  DA-097.  Doe, in turn, forwarded the letter to Abraham, who replied, "Good stuff . . . I appreciate it."  DA-090.

OCRSM staff next attempted to contact Doe several times between October 15 and November 29, to schedule his intake interview on his complaint.  Doe never responded.  DA-019; DA-038–39.  OCRSM staff eventually informed Doe that he had until December 2 to pursue his complaint or it would be dismissed.  DA-019.  Doe, in response, formally withdrew the complaint.  As Doe later attested: "I really hoped that once I had proven my innocence in the investigation that this [w]hole thing would be over with, and I would be able to enjoy my senior year like a normal college student . . . ."  PA-844.

On November 10, Roe spoke at PSA's Real Talk event.  PA-345.  In her prepared remarks, Roe repeatedly identified Doe by name as one of her "rapists."  PA-621–23.  She described the alleged violent assaults in detail, criticized the University's handling of her Title IX case, and told the audience: "Nothing about that night had me asking to be held down and raped repeatedly."  *Id.*  Roe explained that her purpose in speaking was "simply [to] hold[] our rapists accountable for their actions."  *Id.*  Roe concluded, "With the help of PSA, I am standing up to my rapists and I am standing up to this administration . . . ."  *Id*.

### C.    Doe Pursues First Formal Complaint

After the Real Talk event, Roe and the PSA Defendants set their sights on having Doe removed from Club Lacrosse.  On December 8, 2021, one of the PSA Presidents contacted Club Lacrosse leadership, asserting that Doe had raped a female student, but that the Office had mishandled the case, so he was later found not guilty.  DA-112.  When Doe learned of this, he contacted OCRSM to resurrect his complaint.  *Id.*  Doe informed the Office that Roe and PSA's

persistent accusations that he was a "rapist" had led to his exclusion from Club Lacrosse events. *Id*. Karmiol and Nastase promptly responded, beginning the intake process and providing Doe with "safety resources and police contact information." DA-017. Karmiol also contacted Kurt Klier ("Klier"), the University's Director of Club Sports, to "[e]nsure" that Doe was not excluded from any lacrosse events. DA-110. Just days prior, however, Club Lacrosse leadership had disinvited Doe from a team event based on Roe's public remarks identifying him as a rapist. DA-112.

Over the next several days, Abraham and incoming Club Lacrosse President, Andrew Skiscim ("Skiscim"), discussed internally a plan to put Doe on "social probation." PA-688. They also considered asking Doe to "step away from the club for everyone's benefit," as the PSA Defendants continued to insist that Doe was "guilty" of raping Roe and should pay for his misconduct. PA-708; DA-113. Klier, however, advised Club leadership that they could not remove Doe based on allegations "for which he was found not responsible." DA-006.

Nonetheless, PSA Vice President, Melanie Turner, emailed Klier directly about "how to proceed with [Doe's] membership" in Club Lacrosse. DA-118. PSA also reached out to Abraham and Skiscim about the same. PA-610. Abraham, in turn, reported to Klier that although Abraham had told PSA that the Club "cannot remove a member of the organization because of allegations on which he was found not responsible," PSA remained "very adamant that [Doe] is guilty and they throw around evidence from the victim's side of the story." DA-117. Abraham further warned Klier that the Club needed to be "very careful with what we say to [PSA Defendants], as they spread information very quickly and can single handedly ruin our reputation if we don't do what they want to see us do." *Id.*

On December 17, 2021, the PSA Defendants texted Abraham, urging him to remove Doe from Club Lacrosse. They acknowledged that while the University "really can't do anything in terms of kicking him off the team . . . you guys have the grounds to ask him to leave the team and see what happens from there." PA-610. One PSA Defendant suggested that PSA's faculty advisor, a legal scholar, could speak with the Club and pressed the leaders to find "a way to really just make [Doe] feel unwelcome enough that he doesn't want to come around anyway." PA-610. Abraham responded: "Hey, thanks for that info. Really unfortunate situation in that we're unable to kick him off, so our plan moving forward was going to be to have an informal removal by asking him to leave. With the timing being finals and us not having social events until the spring, we are still figuring out when the best time to have the conversation will be. We will keep you all updated of course." *Id.*

During this period, Doe completed his intake interview with Nastase, who told him to expect a response from OCRSM after winter break. DA-122. On January 24, 2022, Karmiol issued a Notice of Mandatory Dismissal of Doe's complaint. PA-628–30. As grounds for the dismissal, OCRSM explained that there was "no evidence that [Roe] directly communicated anything to the UMD Club Lacrosse that would entail excluding you from any of its programs or activities" and that the reported allegations "do not meet the definition of Retaliation" under the Policy. *Id.* The Notice advised Doe that he could appeal or contact the Office of Student Conduct ("OSC") regarding his allegation of false information. DA-125. He did neither. DA-009.

### D. Doe is Removed from Club Lacrosse—Second Formal Complaint

On January 27, 2022, Roe emailed Klier directly, copying one of the PSA Defendants, and described in graphic detail her allegations of rape. She told Klier, "In the early morning hours of October 4, 2020, I was sexually assaulted by [Doe]. I immediately filed a report not only with the

school but with the [Prince George's] County police as well.  I ended up filling out two separate police reports, subjected myself to a rape kit and had dozens of photos taken of my body from the injuries that [Doe] caused."  *Id.*  Roe also detailed to Klier why she believed the University had mishandled her complaint and urged Klier to reconsider removing Doe from the Club.  *Id.*  "Even though [Doe] was found not guilty," Roe reasoned, "in no way does that mean he is innocent of what he did to me that night or the marks left on my body."  *Id.*  She added that a Club Lacrosse president had "agreed to release [Doe] from the team due to a bad attitude, lack of athleticism, and lack of participation in practice," but was "going back on his word."  DA-128.  Roe closed by reminding Klier that Doe "is a danger to other girls here on campus."  *Id.*  The PSA Defendant also added in the email chain that "[i]n light of this incident, we would like to work alongside you and your team to get a resolution."  DA-127.

Alarmed, Klier quickly forwarded the email to OCRSM, pleading, "I NEED YOUR HELP . . . We are being asked to re-adjudicate this student's claim.  That is something we cannot do.  *The threat at the end* [that] 'PSA is ready to spread this information if needed.  [Doe] is a danger to other girls here on campus' . . . this is very disconcerting.  How do we proceed, how do we respond?  We need your help navigating this issue PLEASE."  PA-639 (italics emphasis added; all caps in original).

The next day, Klier replied to Roe, copying Karmiol, "From what I understand in your email, the University has conducted an investigation and rendered a decision . . . .  My program cannot re-adjudicate the case, nor would we be the appropriate venue to try."  DA-120; DA-006. He added that "all claims of this nature must be handled through [OCRSM]" and urged Roe to contact Karmiol.  *Id.*  At the same time, Skiscim discussed with one of the PSA Defendants the possibility of PSA giving a presentation to the team.  PA-611.  She responded that she would not

feel comfortable unless Doe was "no longer associated" with the team. *Id.* Skiscim responded that "the [University] said we can't take any action," but he and Abraham nevertheless planned "to talk to the member about his status on the team" in hopes that he would "understand the position he is putting the club in." *Id.* Skiscim, for his part, acknowledged that the Club was worried about its image being tainted by allegations that its members had assaulted women. He also explained that even though the Club "knew we couldn't remove [Doe] from the team . . . there were . . . other things that we could do that would . . . take the target off our backs and stop from the distractions." PA-687–88. Shortly thereafter, Abraham and Skiscim called Doe and formally removed him from the Club. PA-799–800; PA-615 (Sorority GroupMe message: "After talks with the president, they have removed [Doe] from the club.").

In response, Doe filed a second formal complaint on February 10, 2022. DA-133–35. In it, he accuses Roe and the PSA Defendants of persisting in their campaign of "harassment and retaliation." *Id.* He contended that "[b]ecause the University chose to take no action—refusing to even open an investigation—the harassment and retaliation campaign is continuing. I have now been denied access to educational opportunities. If the University is going to protect my right to be free from harassment and retaliation, it must do so now." *Id.* Doe also detailed that "PSA co-presidents contacted the UMD Club Lacrosse Team and instructed the team that they must distance themselves from me and exclude me from the team, because they said I am a rapist." DA-135; DA-143.

As to this complaint, Doe heard nothing from OCRSM. Karmiol was on extended leave, and no one else from the Office appears to have contacted him. ECF No. 74. Although Nastase recalls possibly meeting with Doe, she remembered no details, and no documents reflect that such a meeting occurred. PA-266.

While Doe's complaint was pending, the same PSA Defendant who wanted to make Doe "feel unwelcome" at Club Lacrosse posted on Yik Yak[2] that he is a "sexual predator." PA-620. Another Yik Yak post stated, "just the name [Doe] sounds predatory." PA-954. Around the same time, Roe was featured prominently in an article titled "Relaunched sexual assault campaign aims to change campus culture," published in a student-run digital outlet, *Stories Beneath the Shell*. PA-942. The article identifies Roe as an Executive Board member and "Support Chair" of PSA. PA-943. Roe again recounts that she was "assaulted a year and a half ago, and it was two boys in the same night," and complained that although she "had every piece of evidence, one of her assaulters was found innocent and still attends the university." PA-944. To punctuate her comments, Roe ends with: "No girl needs to wake up with her pants undone." *Id.*

On March 23, 2022, OCRSM notified Doe that his complaint had been dismissed. PA-624–27. The notice provided thin explanation for the dismissal, simply stating that even if Doe's allegations were true, they "would not constitute conduct taken by Respondents on the basis of Complainant's sex or because [of] Complainant's prior participation in the University's sexual misconduct adjudication process, rather than because Respondents perceived Complainant as a perpetrator of a sexual offense against Respondent [Roe]." DA-145. OCRSM took no further action on Doe's complaint.

### E.     May 2022: Off-Campus Incident and Third Complaint

On May 13, 2022, while at a bar near campus, Roe pointed to Doe and repeatedly screamed, "he raped me!" PA-1149–51. Roe also threatened that her boyfriend was waiting to "beat [Doe] up." *Id.* Although no fight ensued, cellphone video footage depicts Roe and others speaking with county police. *Id.* Doe immediately emailed Karmiol and Nastase about the incident. DA-149–

---

[2] Yik Yak was a social-media application that allowed users within a defined geographic radius (such as a college campus) to post and view anonymous, location-based messages. The platform is now defunct.

50.  Nastase forwarded his email to James Bond of OSC, and Dr. Andrea Goodwin, Dean of Students, and reiterated to Doe that he could pursue a referral with OSC or contact University police.  *Id.*

On May 18, 2022, Doe submitted his third formal complaint to OCRSM.  In it, he alleged that Roe had violated the no-contact order still in effect from her original case, and that she had engaged in retaliation and harassment.  *Id.*  That same day, Bond contacted both Doe and Roe, reminding them that the no-contact order remained in effect and inviting them to meet with him.  DA-154.  Bond also invited Doe to submit a referral to OSC so that it could "examine the incident as a violation of the no-contact directive, as a harassment issue, or both."  DA-154.  Doe did not respond.  *Id.*

### F.    This Lawsuit

On April 11, 2022, Doe sued the University in this Court, alleging deliberate indifference to pervasive student-on-student sexual harassment (Count I) and retaliation for his participation in the Title IX process (Count II), both in violation of Title IX; common-law defamation against Defendants Two and Three (Count III), and intentional infliction of emotional distress ("IIED") against Defendants Two and Three (Count IV).  ECF No. 1.  Shortly thereafter, Doe amended the Complaint as of right.  ECF No. 33.  The Court next permitted the case to proceed under pseudonyms for the students involved (Doe, Roe, and Defendants Two and Three) and directed Doe to file a Corrected Amended Complaint.  ECF No. 50.  The Corrected Amended Complaint withdrew the IIED claim and added claims under the Equal Protection Clause of the Fourteenth Amendment against Karmiol and Nastase in their individual and official capacities (Counts IV and V).  ECF No. 52.

The University Defendants (Karmiol, Nastase, and the University) moved to dismiss the Corrected Amended Complaint. ECF No. 57. Defendant Two moved for summary judgment in her favor. ECF No. 58. Defendant Three answered. ECF No. 61. After a hearing, the Court dismissed the official-capacity claims against Karmiol and Nastase (Count V) but otherwise denied the motions to dismiss and for summary judgment. ECF No. 71. The PSA Defendants and Doe later settled the claims against them. ECF No. 93. The remaining Defendants now move for summary judgment in their favor. ECF No. 128. For the reasons that follow, summary judgment is denied as to Count I and granted as to all other claims.

## II.    Standard of Review

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)) (alteration in original). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). But "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'" *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967)). Where the party bearing the burden of proving a

claim or defense "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is warranted. *Celotex*, 477 U.S. at 322.

### III.    Analysis

#### A.    Deliberate Indifference to Student-on-Student Sexual Harassment (Count I)

Count I alleges that the University's chronic refusal to address the months-long campaign to remove Doe from Club Lacrosse because he was labeled a "rapist" amounts to deliberate indifference to student-on-student sexual harassment. Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Sex discrimination under Title IX includes sexual harassment. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 686 (4th Cir. 2018) (recognizing liability for student-on-student harassment under *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999)). A funding recipient may be liable for "deliberate indifference to known acts of [student-on-student sexual] harassment in its programs or activities," where that harassment "is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633. Where the institution's deficient response to student-on-student sexual harassment is "clearly unreasonable," the institution has contravened Title IX. *Id.* at 648; *see S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty.*, 819 F.3d 69, 77 (4th Cir. 2016). However, liability attaches only when the institution "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis,* 526 U.S. at 645.

To establish a student-on-student sexual harassment claim, a plaintiff must show that (1) he attended an educational institution receiving federal funds; (2) he suffered harassment because

of his sex; (3) the harassment was so severe and pervasive that it deprived him of equal access to an educational benefit; and (4) "there is a basis for imputing liability to the institution." *Hurley*, 911 F.3d at 686; *see also Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 263–64 (4th Cir. 2021).  The parties do not dispute that the first element is satisfied.  However, the University vigorously contends that no reasonable juror could find in Doe's favor on the remaining elements.  The Court examines each in turn.

### 1.    Harassment "on the basis of sex"

The University principally argues that, as a matter of law, a "false accusation" of sexual harassment is not "conduct on the basis of sex."  ECF No. 128-1 at 10.  Doe does not contend that a false allegation, standing alone, amounts to sexual harassment.  Rather, he asserts that the persistent pattern of publicly identifying him as Roe's "rapist" which led to his removal from Club Lacrosse, constitutes harassment directed at his sex.  The Court agrees.

"Sexual harassment" includes "sex-specific language that is aimed to humiliate, ridicule, or intimidate."  *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc); *see also Doe v. Salisbury Univ.*, 107 F. Supp. 3d 481, 488 (D. Md. 2015) ("[A] claim of sexual harassment must allege sex-specific conduct aimed to humiliate, ridicule, intimidate, or insult.").  Plainly, a reasonable juror could conclude that persistent public pronouncements that Doe is a "rapist," a "sexual predator" and "dangerous to girls on campus," is language aimed at his sex and his sexual conduct.[3]  Indeed, such language is no less based on sex than the insults that supported the sexual-harassment claim in *Hurley*.  911 F.3d at 680.  There, female members of a women's rights

---

[3] In determining whether Doe had been harassed based on his sex, a reasonable juror could also consider the source of the comments.  The PSA was the on-campus support group for female victims of sexual violence perpetrated by male community members.  For instance, during the on-campus "Slut Walk," PSA members carried signs stating "Tell *men* not to rape" and "Pussy grabs back."  PA-1–4; PA-353 (emphasis added).  From this, a reasonable juror could infer that the PSA Presidents' public campaign to brand Doe a "rapist" drew on the same sex-specific framing embodied in PSA's slogans and was consistent with the organization's broader sex-based mission.

organization opposed the authorization of male-only fraternities. *Id.* In response, the university's all-male rugby team and their supporters "expressed—in offensive terms—strong criticism" of the plaintiffs. *Id.* This included a drive-by shout of "Fuck the feminists!," chants glorifying the rape of women; and a barrage of on-campus Yik Yak posts referring to female students as "femicunts, feminazis, cunts, bitches, hoes, and dikes." *Id.* at 682. Even though the misconduct in *Hurley* consisted entirely of speech celebrating sexual violence against women and name-calling aimed at female promiscuity, neither the district court nor the Fourth Circuit hesitated to conclude that this verbal vitriol constituted "conduct on the basis of sex." *Id.* at 689 ("Indeed, the Complaint portrays repeated instances of UMW students targeting and harassing Feminists United members with threats and other sex-based hostility. Those harassing activities were reported to the University on multiple occasions over many months.").

The Court reaches the same conclusion. To hold otherwise would defy logic and common sense in light of *Hurley*. Harassment based on sex is no more or less actionable when men call women "bitches" and "hoes" than when women brand men "rapists" and "sexual predators." Accordingly, whether the conduct amounts to sex-based harassment remains a question for the jury to decide, and on this record a reasonable juror could so conclude. Indeed, even the University classifies "Non-Consensual Sexual Penetration," i.e., rape, as sex-based "Prohibited Conduct." PA-1098. Because rape is inherently sex-based, persistent and unfounded branding of a man as a "rapist" cannot be easily dismissed as anything other than sex-based harassment.

Next, as to the "aim" of the sex-specific language, a reasonable juror could conclude that the harassment was designed to humiliate and ridicule Doe as an alleged "rapist" who had been wrongly exonerated. PA-333. Roe and the PSA Defendants repeatedly contacted Club Lacrosse presidents and Director Klier to press for Doe's removal from the team, his preferred University

16

community.  And it appears they succeeded.  Social events with Doe were canceled; he was placed on "social probation;" and told to "step away from the club for everyone's benefit," all in light of Roe's insistence that he was "guilty" of raping her.  DA-113; PA-610 (noting PSA's purpose was to find "a way to really just make [Doe] feel unwelcome enough that he doesn't want to come around anyway").  Ultimately, the Club expressed concern about the "optics" of keeping an accused rapist on its roster and, according to Doe, cut him from the team.  PA-699; PA-688; PA-685.  On this record, a reasonable juror could find that the campaign to brand Doe a "rapist" was intended to ridicule and demean him, culminating in his exclusion from Club Lacrosse.  Accordingly, sufficient evidence exists to support Doe's claim of sex-based harassment.

In response, the University contends that *Balazs v. Liebenthal*, 32 F.3d 151 (4th Cir. 1994), compels a different result.  The Court disagrees.  *Balazs* principally addressed whether an employee had exhausted administrative remedies to pursue a Title VII sex-discrimination claim. *Id.* at 154.  Nonetheless, the *Balazs* Court did opine, with limited analysis, that an employee's alleged termination based on a false accusation of sexual misconduct was insufficient to state a sex harassment claim.  *Id.* at 155 ("An allegation that he was falsely accused of conduct which, if true, might have given rise to a claim of employment discrimination based on sex by someone else in no way states a cause of action that plaintiff himself was a victim of discrimination based on his sex.").  This case is materially different.  Doe has produced evidence of far more than a single false accusation.  A reasonable juror could find that, like the plaintiffs in *Hurley*, Doe was publicly ridiculed, shamed, and targeted for months as a "rapist," a "sexual predator," and a "danger to girls" on campus.  In this way, Doe's case cleaves more closely to *Hurley* than *Balazs.*

Because Doe has generated sufficient evidence that Roe and the PSA Defendants engaged in sex-based harassment, it is for the jury to decide whether such conduct was "on the basis of

sex."  Fact-intensive questions of motive "must be grounded in common sense and social experience" and are "not easily or helpfully reduced to formulaic legal conclusions."  *Doe v. Hamilton Cnty. Bd. of Educ.*, 329 F. Supp. 3d 543, 561 (E.D. Tenn. 2018); *see also Jennings*, 482 F.3d at 705 (Gregory, J., concurring) ("[A] rational jury could conclude that [the remark] was sexual harassment").  As the Tenth Circuit has explained, "it should be up to a jury to determine whether the [harasser's] bias was based on a protected trait or merely a non-protected trait that breaks down across gender lines."  *Doe v. Univ. of Denver*, 1 F.4th 822, 836 (10th Cir. 2021); *see also Roe v. Marshall Univ. Bd. of Governors*, 145 F.4th 561, 572 (4th Cir. 2025) (Quattlebaum, J., concurring) ("the task at summary judgment is simply to ask whether the plaintiff has pointed to record evidence creating a genuine dispute").  On this record, a reasonable jury could conclude that Doe's exclusion and the campaign branding him a "rapist" were driven by sex-based hostility.

### 2.    Deprivation of an Educational Benefit

The Court next turns to the second element of Doe's claim, whether the harassment was severe and pervasive enough to deprive him of an educational benefit.  *Davis*, 526 U.S. at 633. The University argues that the claim fails because Doe's removal from Club Lacrosse did not amount to an educational deprivation.  ECF No. 128-1 at 16; ECF No. 137 at 4–8.  The Court again parts company with the University.  Harassment "effectively bars the victim's access to an educational opportunity or benefit," when it prevents participation in educational programs or activities.  *Hurley*, 911 F.3d at 686 (quoting *Davis*, 526 U.S. at 649–50).  That principle extends to harassment that undermines a student's participation in university sports.  *Jennings*, 482 F.3d at 696, 700 (holding that educational deprivation includes sexually harassing conduct that negatively affects a student's ability to participate on a sports team).  Organized extracurricular athletics such

18

as Club Lacrosse are squarely among the activities in which exclusion can give rise to liability under Title IX.

To escape *Jennings*, the University attacks the weight rather than sufficiency of the evidence on Doe's exclusion from Club Lacrosse. It characterizes Doe's evidence as "gossamer thin," and asserts that his testimony is "contradicted by the record." ECF No. 137 at 5–7. But this is precisely what juries are for: to decide which version of events to believe. On this record, Doe has produced sufficient evidence of the "concrete and negative effect" his ouster had on him. *Jennings*, 482 F.3d at 699; *see* DA-182 (describing emotional injury arising from "having been excluded from the club lacrosse team and by being publicly and repeatedly accused of rape, among other things," and referencing counseling expenses).

### 3.    Imputing Liability to the University

Lastly, the University contends that no evidence supports imputing liability to it. ECF No. 128-1 at 18. An educational institution may be held liable for deliberate indifference when its response is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Deliberate indifference includes where the University makes "an official decision by the recipient not to remedy the violation[,]" *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 276 (1998), or where the school "did not engage in efforts that were 'reasonably calculated to end [the] harassment.'" *Hurley*, 911 F.3d at 689 (quoting *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669 (2d Cir. 2012)).

Doe contends that the University had been deliberately indifferent to each of his three complaints of student-based harassment. The Court considers the complaints in turn.

On the first complaint, no reasonable juror could conclude that the University's response was clearly unreasonable. When Doe, through counsel, initially contacted OCRSM, the Office

responded within minutes.  It also provided a letter of exoneration for Doe to share with Club Lacrosse and any other detractors.  The Office also advised Klier that Doe could not be excluded based on allegations for which he had been found not responsible.  Given the University's robust response to the first complaint, no reasonable juror could conclude the response amounted to deliberate indifference.

As to the third complaint concerning Roe's outburst at an off-campus bar, OCRSM refused to pursue the matter on the ground that the conduct occurred outside its jurisdiction.  Sure, while an argument could be made that the off-campus incident was simply a continuation of her on-campus attacks, no trier of fact could deem the University's jurisdictional determination clearly unreasonable.

The University's non-response to the second complaint tells a different story.  Doe submitted the complaint on February 10, 2022, shortly after Club Lacrosse leadership removed him from the team.  DA-143.  Unlike the first complaint, OCRSM appears to have done nothing. The record is bereft of any evidence that the University spoke with Doe about the complaint or investigated the circumstances of his ouster.  Instead, Doe received a Notice of Mandatory Dismissal that summarily stated the matter was dismissed because, "even if substantiated," his allegations "would not constitute conduct taken by Respondents on the basis of Complainant's sex or because [of] Complainant's prior participation in the University's sexual misconduct adjudication process, rather than because Respondents perceived Complainant as a perpetrator of a sexual offense against Respondent [Roe]."  DA-145.

When reviewing the record most favorably to Doe, a jury could find the University's stated ground for disclaiming "jurisdiction" over this complaint to be clearly unreasonable.  For the first complaint, OCRSM took immediate action in assuring Doe that Club Lacrosse could not remove

him from the team because he had already been cleared of all rape charges. DA-110. OCRSM also looked into the claim prior to its dismissal. PA-059. Yet for the second complaint—when Club Lacrosse in fact excluded Doe on account of the harassment—OCRSM did nothing because now the claim was somehow not "sex-based." This study in contrasts can lead a reasonable juror to conclude the University's failure to act was clearly unreasonable such that liability may be imputed to it.[4]

Because Doe has generated sufficient evidence from which a reasonable juror could find in his favor on the sexual-harassment claim, the Court denies summary judgment on Count I.[5]

### B.    Title IX Retaliation (Count II)

Turning next to the retaliation claim, Title IX does not expressly provide a cause of action for retaliation, but the Supreme Court has recognized an implied one. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005). Courts apply the familiar elements of Title VII retaliation in the Title IX context. *See Hurley*, 911 F.3d at 694; *see also Jennings*, 482 F.3d at 695. To withstand summary judgment, Doe must adduce sufficient evidence that (1) "that [he] engaged in a protected activity under Title IX" and (2) "that—as a result of [his] protected activity—[he] suffered an adverse action attributable to the defendant educational institution." *Marshall*, 145 F.4th at 569 (quoting *Hurley*, 911 F.3d at 694).

---

[4] The University also suggests that even if the Club Presidents removed Doe from the team, that decision could not be imputed to the University because OCRSM had earlier directed the Club not to remove him. ECF No. 137 at 5. But all this really reflects is the Club Presidents' defiance of the directive. This cannot absolve the University of its obligation to take further remedial action. To the contrary, a reasonable juror could conclude that the University's decision to do nothing after students ignored the Office's directive was *itself* clearly unreasonable, or, put differently, that the University "did not engage in efforts that were 'reasonably calculated to end [the] harassment.'" *Hurley*, 911 F.3d at 689. To the extent the University claims it lacked "control" over the student-run organization, nothing in the record supports that contention.

[5] The University separately contends that Doe's Title IX claim fails because the relief he seeks is unavailable. ECF No. 128-1 at 20. Doe concedes that he is no longer seeking injunctive relief. ECF No. 130 at 25 n.12. Nominal damages, as well as other monetary relief, are nonetheless available. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 286 (2021); *see also Rendelman v. Rouse*, 569 F.3d 182, 187 (4th Cir. 2009), and so the claim is not extinguished on this ground.

Doe principally frames his retaliation claim as arising from his "participation" in Roe's Title IX proceedings.  ECF No. 52 ¶¶ 123–35.  This liability theory suffers from two primary defects.  First, protected activity does not clearly encompass mere participation as the accused in a Title IX process.  Rather, the cause of action is reserved for those who "complain" or "oppose" sex discrimination and then suffer adverse consequences as a result.  *See Jackson*, 544 U.S. at 174; *see also Du Bois v. Bd. of Regents of Univ. of Minnesota*, 987 F.3d 1199, 1205 (8th Cir. 2021) (holding that mere participation in a sexual-harassment investigation on the side of the accused does not constitute protected activity).  This understanding accords with the purpose of the claim: to ensure that victims of sex discrimination may seek redress without fear of reprisal.  It is not clear that these concerns animating recognition of a retaliation claim extend to an accused's participation in investigative and adjudicative processes.

But even assuming the claim could be construed to encompass participation in a Title IX proceeding, no evidence suggests that the hostility Doe later faced was *because* of that participation.  To the contrary, the public campaign against Doe began only after Roe's case against Doe had ended with Doe's exoneration.  Because Doe's "participation" in Roe's Title IX case fully predated any harassing conduct, no reasonable jury could conclude that he had been harassed in response to such participation.

Nor is there any evidence that the harassment was connected to Doe's own Title IX complaints.  To the contrary, the harassment prompted Doe to complain to OCRSM, not the other way around.  Likewise, nothing in the record suggests that his subsequent complaints spurred new or different harassment.  Absent evidence of a causal connection between Doe's Title IX complaints and the harassment, the claim cannot proceed.  The Court, therefore, grants summary judgment to the University on Count II.

C.      **Karmiol and Nastase—Equal Protection (Count IV)**

The Court lastly addresses Doe's equal protection claim against Karmiol and Nastase, based on their alleged "practice of investigating complaints by female students and ignoring complaints by male students." ECF No. 52 ¶¶ 156–63. In support, Doe points to the disparate treatment he received during the Title IX process as compared to Roe. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To establish a violation, a plaintiff must first show "that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Persons are "similarly situated" when they "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the [University's] treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

When viewing the evidence most favorably to Doe, no reasonable juror could conclude that he and Roe were similarly situated in any way other than both had filed complaints with OCRSM. Roe's complaint involved allegations of forcible rape by two men on a single night, PA-982–89, whereas Doe alleged a persistent and escalating series of verbal taunts and public shaming that culminated in his ouster from a student-run organization. Accordingly, one claim concerned solely allegations of sexual assault, and the other, allegations of persistent verbal harassment. No rational factfinder could conclude the complainants had been similarly situated on all respects such that treating them differently gives rise to an inference of discrimination. Thus, the Court grants summary judgment to Karmiol and Nastase on Count IV.

**IV.    Conclusion**

For the foregoing reasons, the Court grants in part and denies in part the University Defendants' Motion for Summary Judgment.  A separate Order follows.


September 26, 2025                                                    _____/S/_____
Date                                                                         Paula Xinis
                                                                                 United States District Judge