UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
--------------- X
JOHN DOE, :
Plaintiff, :
v. : Case No.
THE UNIVERSITY OF MARYLAND, : 8:22-cv-00872-PX
COLLEGE PARK, ET AL., :
Defendants. :
--------------- X

College Park, Maryland
Monday, August 26, 2024

Videotaped deposition of GRACE CELIA KARMIOL, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the State of Maryland, taken at 4716 Pontiac Street, College Park, Maryland, at 10:00 a.m., Monday, August 26, 2024, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiff:
BENJAMIN NORTH, ESQ.
Binnall Law Group
717 King St, Suite 200
Alexandria, Virginia 22314
ben@binnall.com
(703) 888-1943l

On behalf of Defendants:
PATRICK SHERIDAN, ESQ.
Maryland Office of the Attorney General
200 St. Paul Place
Baltimore, Maryland 21202
psherican@oag.state.md.us

ALSO PRESENT:
EMILY LEIGH
BRADLEY LLOYD, Videographer



C O N T E N T S

| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| GRACE CELIA KARMIOL | PLAINTIFF |
| BY MR. NORTH | 44 |

E X H I B I T S

| EXHIBIT | | PAGE |
|---|---|---|
| A | Answer of Defendants University of Maryland College Park, Grace Karmiol, and Angela Nastase | 47 |
| B | Corrected First Amended Complaint | 49 |
| C | University of Maryland Policy and Procedures on Sexual Harassment and Other Sexual Misconduct | 51 |
| D | Notice of Allegations and Investigation, Respondent | 62 |
| E | Final Investigation Report | 77 |
| F | Notice of Mandatory Dismissal of Formal Complaint | 81 |
| G | October 15, 2021 email from Deana Michelle Karpavage | 97 |



E X H I B I T S (Continued)

| EXHIBIT | | PAGE |
|---|---|---|
| H | March 23, 2022 Notice of Formal Complaint and Mandatory Dismissal | 103 |
| I | May 25, 2022 Notice of Formal Complaint and Mandatory Dismissal | 105 |
| J | October 8, 2021 email from Grace Celia Karmiol to Jacob Poe | 133 |

PLAINTIFF'S EXHIBIT NO. 141
CASE NO.: 8:22-cv-00872-PX
IDENTIFICATION:
ADMITTED:

P R O C E E D I N G S

THE VIDEOGRAPHER: We are now on the record in the matter of John Doe v. University of Maryland. Today's date is August 26th, 2024. The time is 10 o'clock.

This is the video recorded deposition of Grace Karmiol being taken at 4716 Pontiac Street, College Park, Maryland. I am the camera operator. My name is Bradley Lloyd in association with Remote Legal. The court reporter is Mary Grace Castleberry, also -- or in association with TP.One.

Will all attorneys please identify themselves and the parties they represent beginning with the party noticing this deposition.

MR. NORTH: Good morning, everyone. My name is Benjamin North representing the plaintiff, John Doe.

MR. SHERIDAN: Good morning. Patrick Sheridan, assistant attorney general. I represent all the defendants in this matter.

THE VIDEOGRAPHER: Will the court reporter please administer the oath.



Whereupon,

GRACE KARMIOL,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

THE VIDEOGRAPHER: Please proceed.

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. NORTH:

Q. Good morning, Ms. Karmiol.

**A. Good morning.**

Q. This is a continuation of the deposition that we began a couple of weeks ago. I'm just going to go over the kind of ground rule stuff that we talked about last time just so we're on the same page.

**A. Okay.**

Q. You understand that you're under testimony -- or you're under oath, rather. You're giving testimony. It's the same as if you were to testify in court except there is no judge here, but it's the same oath. You understand that?

**A. Yes.**



Q. When I ask questions, your counsel may object from time to time but unless your counsel instructs you not to answer, you still have the answer the question.

**A. Okay.**

Q. Okay? Like I said last time, I'm sure I'm going to ask some poorly worded questions or confusing questions. If at any time you don't understand my question, please just ask me to rephrase --

**A. Okay.**

Q. -- and I'll do my best. Kind of following from that, is it fair to assume that if you don't ask me to rephrase, it's fair to assume that you do understand the question?

**A. Yes.**

Q. In other words, I don't want you to guess or speculate --

**A. Right.**

Q. -- on any of your answers. Okay.

Now, it's important when you do answer, it's important for the record to give an audible



answer so instead of nodding or shaking your head or uh-huh, a yes or no as appropriate. Does that make sense?

**A. Yes.**

Q. Okay. And finally, normal interruptions kind of happen organically but let's both try not to interrupt the other, just so the record is clear. Does that make sense?

**A. Yes.**

Q. Okay. Is there anything that would prevent you from giving truthful testimony today?

**A. No.**

Q. Are you under the influence of any drugs or alcohol --

**A. No.**

Q. -- that would affect your ability to testify truthfully?

**A. No.**

Q. All right. I want to do my best to pick up with where we left off a couple of weeks ago. I believe we were talking about the answer you filed in this matter. Do you recall that?

Page 47

**A. Yes.**
Q. Okay. So I would like to refer -- I would like to mark this exhibit as Exhibit A and refer you to the copy of the answer that you filed.
(Exhibit A was marked for identification.)
BY MR. NORTH:
Q. Please take your time to review it. Let me know if it is indeed a fair and accurate copy of the answer that you filed.
**A. Okay.**
Q. Okay. So you recognize that document as the answer you filed in this case, or your attorney filed, rather?
**A. Yes.**
Q. Okay. All right. I would like to refer you to paragraph 88, where I think we left off last time.
**A. Okay. 8?**
Q. 88.
**A. 88. Okay.**
Q. Okay. Do you see in paragraph 88, it

Page 48

reads, "Denied"?
**A. Yes.**
Q. Do you see that?
**A. Uh-huh.**
Q. Okay. Do you recall what that was denied -- what you were denying in that paragraph or would you like to compare with the first amended complaint?
MR. SHERIDAN: Objection.
Also, you know, the answer was filed not just on Ms. Karmiol's behalf but on behalf of two other defendants so --
MR. NORTH: Okay.
MR. SHERIDAN: -- just so we understand that.
BY MR. NORTH:
Q. Sitting here today, do you know what that denial refers to or would you like to compare with the first amended complaint?
**A. I would have to compare it to --**
Q. Okay.
**A. -- the first amended complaint.**

Page 49

Q. All right. So I'll refer you to the first amended complaint. Mark that as Exhibit B.
(Exhibit B was marked for identification.)
BY MR. NORTH:
Q. All right. I'll refer you to paragraph 88 of the first amended complaint. Paragraph 88 reads, "Using Doe's name wasn't necessary because a general directive to PSA that it must not harass Title IX respondents or male students would have remedied the harassment against Doe."
Did I read that correctly?
**A. Yes.**
Q. Okay. Now, referring you back to your answer that reads "denied" as to that paragraph, what is the fact -- what is the basis for the denial in paragraph 88, if you know?
MR. SHERIDAN: Same objection.
THE WITNESS: We denied -- we denied 88.
BY MR. NORTH:
Q. And what is the basis for that denial is my question.

Page 50

**A. Oh. I did not say that I was going to contact PSA.**
Q. Okay. We talked last time about your denial as to whether you were going to contact PSA. Paragraph 88 in the first amended complaint refers to whether using Doe's name was necessary because a general directive to PSA that it must not harass Title IX respondents or male students would have remedied the harassment against Doe. And that paragraph was denied.
**A. Uh-huh.**
Q. So I understand your point about you deny that you were going to talk to PSA. Is there any other reason why you denied paragraph 88?
MR. SHERIDAN: Same objection.
THE WITNESS: Okay.
No. That was the reason.
BY MR. NORTH:
Q. Okay. Thank you.
I would like to mark this next document as Exhibit C, which is a copy of the University of Maryland's sexual harassment policy that was produced

Page 51

in this case.

(Exhibit C was marked for identification.)

BY MR. NORTH:

Q. When you're ready, please let me know if this is a true and accurate copy of the University's sexual harassment and other sexual misconduct policy that applied at the time of the facts in this case.

**A. Okay.**

Q. Is this document a true and accurate copy of the University of Maryland's sexual harassment policy?

**A. It appears to be.**

Q. Okay. Fair enough. Are you aware of any other sexual harassment or sexual misconduct policy that the University of Maryland maintained during the facts in this case?

**A. No.**

Q. All right. Fair enough. I would like to refer you to what appears to be page 4825, so you'll see Bates stamps on the bottom right.

**A. Okay.**

Page 52

Q. All right. On this page, there appears to be a section, section 7, titled Prohibited Conduct, that begins on this page. Do you see that?

**A. Yes.**

Q. All right. Now, you would agree with me that this page, this section details, roughly speaking, the kinds of charges that can be brought against students under this policy, is that fair to say?

MR. SHERIDAN: Objection.

THE WITNESS: There's other prohibited conduct in addition to this that can be found in other policies.

BY MR. NORTH:

Q. Okay. But as to this policy, this section titled Prohibited Conduct lists the conduct violations that can be levied against students --

**A. Mm-hmm. Yes.**

Q. -- under this policy?

**A. Yes.**

Q. Okay. All right. Subsection A is titled sexual harassment. Do you see that?

Page 53

**A. Uh-huh.**

Q. All right.

**A. Yes.**

Q. The preface of a -- the text that follows "sexual harassment" reads, "means conduct on the basis of sex that satisfies one or more of the following," and then it lists about six different kinds of sexual harassment on the following pages.

**A. Uh-huh, yes.**

Q. Okay. So am I correct in understanding that everything under the header of subsection A needs to be conduct on the basis of sex, and then it also needs to meet one of these six, six definitions for any facts to be violations of this policy?

**A. Can you repeat that?**

Q. Sure. That was poorly worded.

The header titled Sexual Harassment that reads, "means conduct on the basis of sex that satisfies one or more of the following," each of the subsections that follows, every one of those subsections still needs to be on the basis of sex for it to violate the policy. Does that make sense?

Page 54

**A. Yes.**

Q. Okay. And you would agree with that?

**A. Yes.**

Q. Okay. So for example --

**A. I would actually use gender.**

Q. Okay. Why do you say that?

**A. Because it applies equally to someone that comes in of a different gender than male or female.**

Q. Okay. Does this section mention gender?

**A. Yes, it does, under prohibited conduct.**

Q. Okay. Subsection A, does that -- let me back up.

When subsection A says, "means conduct on the basis of sex," is it your belief then that it means on the basis of sex or gender?

**A. Yes. It says gender expression in the top paragraph.**

Q. Okay. Now, just as an example, the first subsection here that reads quid pro quo, if I'm understanding the policy correctly, the quid pro quo sexual harassment policy prohibits an employee of the university conditioning the provision of an aid,

benefit or service of the university on an individual's participation in unwelcome sexual conduct, and that has to be on the basis of sex for it to violate the policy. Is that correct?
A. Yes.
Q. Okay. And same thing for hostile environment. A hostile environment has to be on the basis of sex for it to violate the policy, is that correct?
A. Yes.
Q. All right. And same thing for sexual assault. A sexual assault has to be on the basis of sex for it to violate the policy --
A. Yes.
Q. -- is that correct? All right.
Now, under the sexual assault section on the next page, it looks like there are six different kinds of sexual assault that violate the policy and that's A, B, C, D, E and F, is that correct?
A. Yes.
Q. All right. So the first section, rape, I'm correct in understanding that a rape has to be on



the basis of sex for it to violate this policy, right?
A. Yes.
Q. All right. And then separately from the sexual harassment section, referring you to page 4827, there is a retaliation provision. Let me know when you're there.
A. Uh-huh.
Q. Okay. Now, the retaliation paragraph is fairly long but in this paragraph, there is a sentence that says, "Retaliation includes retaliatory harassment," is that correct?
Take your time to read it if you need to.
A. Yes.
Q. Okay. Does the retaliation section of the policy require that a retaliatory motive be present?
A. No.
Q. Okay.
All right. I would like to refer you to page 4838 of that same document. All right. So on this page, there is a section titled report intake and formal complaint at the top. Do you see that?



A. Yes.
Q. And you would agree with me that now we're in the section of the policy that deals with the procedures that the university uses when it receives a report of prohibited conduct or a formal complaint?
A. Yes.
Q. All right. Now, sections A and B on this page, you would agree with me that this refers to what the university does in response to a report of prohibited conduct?
A. Yes.
Q. Okay. And in this -- let's walk through these two briefly. Subsection A explains what OCRSM will do when it receives a report of prohibited conduct in kind of very general terms? Would you agree with that?
A. Yes.
Q. Okay. And then subsection B provides that when OCRSM receives a report of prohibited conduct, it will conduct an intake and an initial assessment?
A. Yes.
Q. Okay. These two sections don't refer to



what the university will do in response to a formal complaint, is that correct?
A. Yes.
Q. Okay. Now referring you to -- well, let's move on to subsection C on the next page titled supportive measures. This provision of the policy generally provides that OCRSM will provide supportive measures even without a formal complaint. Would you agree with that?
A. Yes.
Q. Okay. All right. So moving on to page 4841. Now, subsection D describes how a formal complaint may be filed under this policy, is that correct?
A. Yes.
Q. Okay. And then the second paragraph of subsection D reads, "Should the complainant decide to file a formal complaint, the Title IX officer will review the formal complaint and determine whether it should be dismissed or moved into the resolution process," is that correct?
A. Yes.

Page 59

Q. Okay. And when it says the Title IX officer, does that refer to the Title IX coordinator?
**A. I believe so, but other input comes into the Title IX coordinator as well.**
Q. Okay. What other input comes in?
**A. In order to make a decision to treat something as a formal complaint, I -- we would also speak to the complainant.**
Q. Okay. Is that the only other input that you were referring to?
**A. I believe so.**
Q. All right. On the next page, subsection F, deals with when the university must dismiss a formal complaint, and then the section continues to when the university may dismiss a formal complaint, is that correct?
**A. Yes.**
Q. And relevant to this case, you, as the Title IX coordinator, dismissed two of [redacted] formal complaints under this section, is that correct?
**A. Yes.**

Page 60

MR. SHERIDAN: Objection. This was not the policy in place at the time of the -- of Mr. [redacted] complaint.
MR. NORTH: Okay.
BY MR. NORTH:
Q. Did you apply the language of this policy in dismissing [redacted] formal complaint?
**A. I would have applied the language to -- to following the policy and procedure that was in effect at that time.**
Q. All right. Reading this policy, subsection F, is there any language in this policy that looks incorrect as to when you applied the policy to dismiss [redacted] formal complaints?
MR. SHERIDAN: Objection.
THE WITNESS: No.
BY MR. NORTH:
Q. All right. When a formal complaint is filed, does this policy permit the Title IX coordinator or any other official in the Title IX office to conduct a preliminary investigation before deciding whether to open it --

Page 61

**A. Yes.**
Q. -- under the formal grievance process?
**A. (Witness nodding.)**
Q. Okay. Where is that?
MR. SHERIDAN: Same objection to the extent that you're asking for the -- the response to Mr. [redacted] complaint.
MR. NORTH: Noted.
THE WITNESS: Can you repeat that?
BY MR. NORTH:
Q. Sure. Where in this policy does it provide that the Title IX coordinator or her designee may conduct a preliminary investigation in response to a formal complaint before deciding whether to open the complaint for the formal grievance process?
**A. Can you repeat that?**
Q. Sure. I know, and it's a complicated question.
We discussed last time that -- a paragraph in your answer that described a preliminary investigation. Do you recall that?
**A. Yes.**

Page 62

Q. All right. What I'm asking is can you point me to where in this policy you are authorized to conduct a preliminary investigation in response to a formal complaint?
**A. I don't know.**
Q. All right. Thank you.
All right. Now, I would like to talk about the case in which [redacted] was a respondent beginning around October of 2020. I'll refer you to the notice of allegations and investigation by OCRSM that I'll mark as Exhibit D.
(Exhibit D was marked for identification.)
BY MR. NORTH:
Q. Whenever you're ready, let me know if this is a true and accurate copy of the notice of allegations and investigation.
**A. Yes, it is.**
Q. Okay. All right. At the top of this document, it states, after the from, your name and then Title IX coordinator/director, is that correct?
**A. I'm looking for it.**

Q. Sure. It's right at the top.
**A. Yes.**
Q. Okay. So is it fair to say then that you approved this document before it went out?
**A. I don't recall.**
Q. Okay. In your tenure as Title IX coordinator at the University of Maryland, was it your practice of not reviewing notices of investigations before they went out?
**A. No. I reviewed them.**
Q. Okay. So even if you don't recall specifically, it's fair to say that it was your normal practice to review these documents before it went out?
**A. To renew what? I'm sorry, can you restate?**
Q. I'll repeat the question.
**A. Okay.**
Q. The question was, even if you don't recall reviewing this document specifically, is it fair to say that it was your normal practice to review notices of allegations before they went out?



**A. Like this document --**
Q. Correct.
**A. -- for example? Yes.**
Q. All right. Do you recall receiving [redacted] formal -- formal complaint?
**A. I don't recall.**
Q. Okay. To the best of your memory, before issuing the notice of allegations, did you conduct a preliminary investigation to see if her allegations were true or false?
MR. SHERIDAN: Objection.
THE WITNESS: I don't recall.
BY MR. NORTH:
Q. Okay. Would you agree with me that it is the purpose of the formal grievance process to determine whether allegations are true or false? That determination is not made on the front end?
**A. Yes.**
Q. Okay. Now, in this document, [redacted] is notified that he is accused of violating some policy provisions. Is that accurate?
**A. Yes.**



Q. Okay. And you would agree with me that at this point, when the notice of allegations is issued, you had determined that [redacted] complaint, if true, would violate the policy?
**A. Yes, if true.**
Q. Okay. Now, we discussed earlier that all sexual harassment needs to be conduct on the basis of sex, correct?
**A. Yes.**
Q. Okay.
**A. I believe that's changed, though, to gender.**
Q. Fair enough.
**A. Okay.**
Q. Let's say for sake of argument that conduct on the basis of sex or gender, okay?
**A. Okay.**
Q. You would agree with me that each of -- well, let me back up. On this first page, there begins the list of policy violations that [redacted] at that time was accused of --
**A. Yes.**



Q. -- of committing, correct?
**A. Mm-hmm, yes.**
Q. Okay. It continues from page 4520 to 4521, there are three sexual assault charges, I'll call them, and two other sexual misconduct charges on the next page. Just let me know if I have that correct.
**A. Okay. Can you repeat?**
Q. Sure. Let's take the first page first. So there are three sexual assault conduct violations listed --
**A. Yes.**
Q. -- on the first page, okay? Each of those three -- it's your understanding that each of those three had to be conduct on the basis of sex or gender to violate the policy, right?
**A. Yes.**
Q. And then the same thing applies to the two other sexual misconduct policy violations listed on the next page, is that correct?
**A. What page are you referencing?**
Q. This is 4521, roughly the first half of

Page 67

that page.

**A. All right. Can you restate?**

Q. Yes. So the same sexual -- "on the basis of sex or gender" element that we've been discussing, you would agree with me that that is required for the other sexual misconduct conduct violations listed on this page?

**A. No.**

Q. Okay. Well, let's start with the sexual assault conduct violations on that first page. On this page, there is no -- I'll rephrase.

Above where it describes the three conduct violations titled sexual assault, there is a sentence that reads, "Specifically, you are alleged to have violated the following provisions of the policy."

Do you see that?

**A. Yes.**

Q. Okay. And then the first conduct violation under there is titled sexual assault - rape?

**A. Yes.**

Q. And then under that, there is a definition

Page 68

of rape?

**A. Yes.**

Q. And that refers to the policy that we already reviewed?

**A. Yes.**

Q. Do you agree with that?

**A. I -- I'm not really sure. I mean, in terms of what we referred to?**

Q. Yeah. Let me ask you a more --

**A. Okay.**

Q. -- a more specific question. After the word rape --

**A. Mm-hmm.**

Q. -- there is a citation to section VII.A.3.a.

**A. Mm-hmm.**

Q. Page 10.

**A. Mm-hmm.**

Q. That refers to the sexual harassment and sexual misconduct policy that we already have reviewed today.

**A. Yes.**

Page 69

Q. Right? Okay.

Now, nowhere on this page does it list that there has to be a finding that this conduct occurred on the basis of sex or gender, correct?

**A. No.**

Q. Okay. Why was that element omitted in this notice of allegations?

MR. SHERIDAN: Objection.

THE WITNESS: What? Can you further --

BY MR. NORTH:

Q. Sure. So we -- we've been discussing that -- the element that conduct has to be on the basis of sex or gender to violate the policy, we discussed earlier that that applies to the sexual assault provision of the policy among other provisions?

**A. Yes.**

Q. Okay. My question is, why is that element not included in the citations to the policy in this document?

MR. SHERIDAN: Objection.

THE WITNESS: Why is what element?

Page 70

BY MR. NORTH:

Q. The conduct on the basis of sex or gender, as you believe, why is that element not included in this document?

**A. I think it refers to the policy and that element is within the policy.**

Q. Okay.

**A. Not everything is said in a notice of allegations and investigation. More information comes to light at different periods of time during the process.**

Q. But the policy stays the same?

**A. The policy stays the same, somewhat. We've changed policies a few times.**

Q. Fair enough. The policy during the pendency of an ongoing sexual misconduct case, the university would apply one policy to that entire case, correct? It doesn't change the rules midway through?

**A. Yes, correct.**

Q. Okay. So we discussed earlier how, when a formal complaint is submitted, the Title IX

coordinator makes the determination to see whether those allegations, if true, would violate the policy?
**A. Yes.**
Q. Okay. And we discussed how you did that in this case with regard to Jane Roe's allegations --
**A. Yes.**
Q. -- that you can see here, right?
**A. Yes.**
Q. Okay. So even though the "on the basis of sex or gender" element is not listed here, am I correct in understanding that it's your position that you reviewed the allegations to determine whether her allegation of rape was conduct on the basis of sex?
**A. Yes.**
Q. Okay. And why did you make the -- well, let me back up. And you -- it's also fair to say that you determined that, if true, it would be conduct on the basis of sex?
**A. Yes.**
Q. Okay. Why did you make that determination?



**A. Because we had more information in the preliminary investigation leading up to it.**
Q. What more information are you referring to?
**A. When we do a preliminary assessment, usually what happens is within the office, someone does a -- has the complainant flesh out their complaint a little bit.**
Q. Okay. And if I'm understanding your testimony correctly, that it's your position that when that happened, that helped you determine whether her allegation alleged conduct on the basis of sex?
**A. When what happened?**
Q. The preliminary investigation that you just described that you did with respect to Jane Roe's [redacted]
**A. Yes.**
Q. And to be clear, when you used the phrase "preliminary investigation," am I correct in understanding that you referred to the initial assessment that was conducted?
**A. Yes.**



Q. Now, going back to my question previously, you described that information that you gained during the initial assessment that you conducted with Jane Roe helped you to determine whether she was alleging conduct on the basis of sex?
**A. Yes.**
Q. And what information did you learn during the initial assessment that allowed you to determine that her allegations alleged conduct on the basis of sex?
**A. I don't recall.**
Q. Okay. Sitting here today, is there any -- well, let me rephrase. Jane Roe alleged that John Doe had raped her, correct?
**A. Correct.**
Q. All right. And then it is the -- rephrase.
When she submitted her formal complaint, did she point to particular provisions of the policy that she believed John Doe should be charged with?
**A. Not her, no.**



Q. Okay. Who did that?
**A. The person who does the initial intake in coordination with the assistant director.**
Q. When you say assistant director, who is that?
**A. Angela Nastase.**
Q. Okay. She was the assistant director at that time?
**A. Yes.**
Q. Okay. And when you say assistant director, referring to Angela, am I correct in understanding that she was the assistant director of the Title IX office?
**A. Yes. I don't know when she came on board so I should say I don't recall.**
Q. Okay. In the middle of this page, there is a heading titled allegations.
**A. Yes.**
Q. And the paragraph directly under that describes the factual basis of Jane Roe's complaint, is that fair to say?
**A. Yes.**

Q. Okay. Now, I think we discussed last time that, when reviewing a formal complaint, the Title IX coordinator looks at the face of the formal complaint and assesses whether the conduct alleged, if true, would constitute a violation of the university's policy?

**A. Yes.**

Q. Okay. Now, looking at the face of Jane Roe's [redacted] allegations today, do you recall determining that, if these allegations were true, they would constitute rape?

**A. I don't recall.**

Q. Okay. Sitting here today, do you recall any reason why you determined that her allegation of rape was conduct on the basis of sex or gender?

**A. By doing the initial intake with the complainant.**

Q. Okay. I guess my question was that, once you receive a formal complaint, when you're doing your review of the face of the formal complaint, that's when you determine if the allegations in the formal complaint, if true, would constitute a



violation of the policy, correct?

**A. Yes.**

Q. Okay. Now, we've been discussing that conduct on the basis of sex or gender is one of the provisions of the policy that, if the facts alleged in the formal complaint are to be believed, it would have to show conduct on the basis of sex, that would also be sexual harassment, right?

**A. Right.**

Q. Okay. My question is, sitting here today, can you recall any reason why you determined that her allegations in this notice alleged conduct on the basis of sex?

**A. I don't recall.**

Q. Okay. All right. I would like to refer you to page 4522, which I believe is the third page of this document. There is a heading kind of midway down the page titled investigation. Do you see that?

**A. Yes.**

Q. Okay. The first sentence reads, "This matter will transition to an investigation followed by an adjudication which is part of the resolution



process."

Did I read that correctly?

**A. Yes.**

Q. Okay. That investigation refers to the formal grievance process under the university's policy, correct?

**A. The -- the procedure, yes.**

Q. All right. Thank you.

All right. I would like to refer you to the first eight pages of the final investigation report generated relating to the Jane Roe versus John Doe complaint.

(Exhibit E was marked for identification.)

BY MR. NORTH:

Q. The whole report is about 520 pages, so this is only the first eight, but if there is an objection, I'm sure we can handle it through requests for admissions or the like.

Whenever you're ready, let me know if this is a true and accurate copy of the first eight pages of that final investigation report.



**A. I believe so, yes.**

Q. Okay. All right. I would like to refer you to page 4, which is also Bates Number 2551. Section 3 begins around line 18. It's titled chronology of the investigation. Do you see that?

**A. Yes.**

Q. All right. Now, this section describes kind of the timeline of the Jane Roe versus John Doe complaint. Would you agree with that?

**A. Yes.**

Q. All right. On page 36 -- or sorry, not on page 36. Line 36 reads, "On 10/27/20, Roe submitted the formal complaints against Doe and Poe and completed the complainant notice of rights and responsibilities form."

Do you see that?

**A. Yes.**

Q. Okay. And then two lines down, roughly line 39 reads, "On 10/29/20, the NOIs were simultaneously emailed to Roe and Doe and separately to Roe and Poe from the office of student conduct."

Page 79

A. **Yes.**
Q. Do you see that?
A. **Uh-huh.**
Q. Okay. So let me first clarify, the NOIs referenced on line 39, that refers to the document that we just reviewed, the notice of allegations and investigation, correct?
A. **Yes.**
Q. All right. Now, this document says that [redacted] submitted the formal complaints two days before the notice of allegations went out, right?
A. **I don't know.**
Q. That's what this document says, correct?
A. **That -- repeat, please.**
Q. Sure. This document says that on October 27th, 2020, [redacted] submitted her formal complaint, and then two days later, the notice of allegations and investigations went out?
A. **Yes.**
Q. All right. Do you have any reason to believe that that timeline is incorrect?
A. **No.**

Page 80

Q. All right. Now, the time between October 27th and October 29th, that took place after the initial assessment period, right?
A. **I don't recall.**
Q. Okay. All right. Thank you.
Now, eventually during the case that [redacted] brought against [redacted], [redacted] was found not responsible on all charges, right?
A. **Yes.**
Q. All right. After he was found not responsible, he at some point or another alleged that he was the victim of prohibited conduct committed against him, right?
MR. SHERIDAN: Objection.
THE WITNESS: He alleged that he was -- I'm not -- not necessarily the prohibited conduct with him, but he -- he alleged retaliation.
BY MR. NORTH:
Q. Okay. I would like to refer you to the notice of mandatory dismissal of formal complaint that I believe refers to the retaliation you described.

Page 81

(Exhibit F was marked for identification.)
BY MR. NORTH:
Q. All right. I've just handed you what's been marked as Exhibit F. Is this a true and accurate copy of the notice of mandatory dismissal of formal complaint relating to [redacted] retaliation complaint?
A. **Yes.**
Q. Okay. And when you said just a moment ago that he alleged retaliation, is this what you were referring to?
A. **I believe so. There were several complaints.**
Q. All right. So after the hearing decision in which [redacted] was found not responsible, you were made aware that [redacted] felt that he was being retaliated against --
A. **Yes.**
Q. -- right? All right.
A. **I don't think I would use "retaliated against" as fair phrasing.**

Page 82

Q. Okay. What phrasing would you use?
A. **We had difficulty fleshing out his complaint due to nonparticipation.**
Q. Okay. So why would you use different language than "retaliated against"?
A. **I would have to see -- I would have to see whether it met the criteria of retaliation under the policy.**
Q. Okay. And the document that you are holding now is the notice of mandatory dismissal as to his factual allegations and the retaliation policy, correct?
A. **Yes.**
Q. Okay. And I'm correct in understanding that, in this document, you determined that his allegations did not meet the definition of retaliation?
A. **Yes.**
Q. Okay. And why did you determine that it did not meet the definition of retaliation?
A. **Based on the description of retaliation in our policy, we determined that it did not fall under**

**that.**
Q. And I guess my question is, why did you determine that his allegations did not fall under this section of the policy?
**A. Because if -- he would have to have prohibited conduct. It would have to be related to -- and it would have to forego or interfere with an educational opportunity.**
Q. You stated that retaliation has to interfere with an educational opportunity, is that correct?
**A. Yes.**
Q. Okay. Where is that required under the retaliation policy?
**A. It's required by law.**
Q. Okay. But not under the policy, is that correct? I mean, correct me if I'm wrong, I mean, if --
**A. Okay.**
Q. Take your time to review if you need to but is that requirement in the policy cited in this document?



**A. I'm not -- I'm not quite sure what you're asking.**
Q. Sure. So you just testified -- and again, correct me if I'm wrong. I'm not trying to put words in your mouth, but I believe you testified that retaliation has to interfere with an educational opportunity for it to constitute retaliation. Is that correct?
**A. Under Title IX.**
Q. Fair enough. All right. My question is, where is that requirement listed in the policy cited in this document? Can you point me to it?
**A. I don't know whether it is or not but it is under federal law.**
Q. Okay. Can you take your time and read the paragraph on retaliation and let me know if it's in there?
**A. Uh-huh.**
**Okay. What is your --**
Q. Is it in there?
**A. Can you repeat?**
Q. Sure. The question was, can you review



this section of the policy listed in this document and let me know if there is a requirement that retaliation has to interfere with an educational opportunity?
**A. It's by federal law.**
Q. Okay.
**A. It's inferred.**
Q. Okay. And by inferred, you mean it's not stated in this policy but it's implied in some other way?
**A. Well --**
MR. SHERIDAN: Objection. I mean, the policy speaks for itself and it does say that in the policy that's listed, but the policy speaks for itself.
BY MR. NORTH:
Q. Okay. Can you point me to where it says that in this policy?
**A. Exactly where what is said?**
Q. The requirement that retaliation has to interfere with an educational opportunity.
**A. This -- these definitions were in relation**



**to requirements of federal law.**
Q. As Title IX coordinator, you apply the university's policy, correct?
**A. Correct.**
Q. Okay. And in this document, you are assessing that -- you were assessing Doe's formal complaint, right?
**A. Yes.**
Q. And we discussed earlier how the Title XI coordinator assesses the face of the formal complaint to see if the allegations, if true, would constitute a violation of university policy, right?
**A. Would constitute a violation of Title IX policy, not all university policies.**
Q. Okay. Fair enough. I'll rephrase my question to say that when a formal complaint is submitted, the Title IX coordinator -- in this case you -- reviews the formal complaint to see if the facts alleged, if true, would constitute a violation of the university's Title IX policy?
**A. Yes.**
Q. All right. I guess my question is, are

Page 87

you including elements that you believe required under federal law that are not included in the policy? Are you --
**A. No.**
Q. -- also assessing those?
**A. No, I'm not.**
Q. Okay. So when you said earlier that retaliation has to interfere with an educational opportunity, that phraseology in your view comes from federal law? Is that --
**A. Yes.**
Q. -- fair to say?
**A. Uh-huh.**
Q. Okay. Is that phraseology in the university's Title IX policy?
**A. I believe --**
MR. SHERIDAN: Hold on. Are you talking about the phrase that you're using or the phrase that appears in federal law? Because you're using a phrase and that might not be consistent with federal law, with what the Title IX --
MR. NORTH: That's fair. So what I'm --

Page 88

MR. SHERIDAN: Are you asking if the specific phrase that you're using is included in that policy or if that policy refers to federal law?
MR. NORTH: The first, but --
MR. SHERIDAN: Okay.
MR. NORTH: -- I'll specify that I'm using the witness' phraseology. I believe she testified that it needs to, quote, interfere with an educational opportunity.
MR. SHERIDAN: Well, she's referred to the law, to Title IX.
MR. NORTH: Okay. So let me ask some clarifying questions.
MR. SHERIDAN: Which is what the policy refers to too.
BY MR. NORTH:
Q. All right. Let me ask some clarifying questions then because I want to make sure I understand your testimony. When you used the phrase "retaliation has to interfere with an educational opportunity," were you referring to retaliation under federal law or retaliation as it's defined by the

Page 89

university's Title IX policy?
**A. I would say both.**
Q. Okay. Now, this next question only asks for an answer that relates to the university's policy. I'm not asking about your view of federal law.
**A. I haven't worked with the policy since -- for two and a half years.**
Q. Okay. When you testified earlier, I believe you said you'd found that [redacted] allegations did not constitute retaliation because they didn't allege an interference with his educational opportunities. Is that correct?
**A. Not necessarily.**
Q. Okay. Why is that not correct?
**A. Every case is a case-by-case basis that we evaluate the context in which it's brought and then apply the policy and procedures to them.**
Q. When you say the policies and procedures that you just referenced --
**A. The Title IX policies and procedures.**
Q. Okay.

Page 90

**A. The --**
Q. All right. I thought you testified earlier that the reason why you determined that [redacted] allegations did not constitute retaliation under the university's policy and procedure was because they didn't allege an interference with his educational opportunities. Is my memory correct --
**A. Yes.**
Q. -- or incorrect?
**A. Yes.**
Q. By yes, do you mean my memory is correct?
**A. Your memory is correct.**
Q. All right. So my question is, when you determined -- well, let me back up one more time. When you say that you determined that his allegations did not allege an interference with his educational opportunity, is the phrase "interferes with educational opportunity" intended to refer to federal law or to the university's Title IX policy?
**A. Both.**
Q. Okay. Now, just considering the university's Title IX policy -- I'm not asking about

Page 91

federal law -- where in the university's Title IX policy does it require an interference with educational opportunity?

**A. It -- that's what the Title IX regulations would come in.**

Q. Okay. I'm -- but I'm asking about the university's policy --

**A. Right.**

Q. -- that you applied in this case.

**A. Right. But Title IX itself protects prohibited conduct, right, but that lists what is retaliation as well.**

Q. Yes. I'm not asking about your interpretations of the regulations. I'm asking about how you applied the retaliation policy that the university maintained at that time.

**A. Okay.**

Q. And you testified that you dismissed [redacted] retaliation complaint because it did not allege interference with an educational opportunity, right?

**A. And it didn't meet the definition of**

Page 92

**retaliation within our policy.**

Q. All right. My question is, how did it not meet the definition of retaliation under the university's policy?

MR. SHERIDAN: Yeah, objection. It's -- I mean, this is in the document. So you have the document in front of you. Is there -- the policy speaks for itself and the policy is in the document, is referred to in the document.

BY MR. NORTH:

Q. Sure. Let's refer to the next page.

MR. SHERIDAN: Well, the policy is on the first page of the document. It says, "Specifically, the respondent is alleged to have violated the following provisions of the policy." That's the policy. It speaks for itself.

MR. NORTH: Agreed that the policy speaks for itself.

BY MR. NORTH:

Q. My question is, when you applied this policy to the facts alleged in [redacted] formal complaint, what was your basis for determining that

Page 93

his allegations did not meet the policy cited on the first page of this document?

**A. I don't recall.**

Q. All right.

MR. SHERIDAN: Again, that's in the document too. I mean, this -- the mandatory dismissal, you know, it's -- every question that you're asking is in the document, and the document speaks for itself.

MR. NORTH: All right.

MR. SHERIDAN: If you have specific questions about what's in the document, I would refer to specific passages from that document.

BY MR. NORTH:

Q. All right. Let's refer to the next page, Bates stamped 63. There is a subsection here titled prohibited conduct. Do you see that?

**A. Yes.**

Q. Okay. And the second paragraph begins with a sentence that reads, "OCRSM is not in receipt of any specific allegation or incidents of retaliation from [redacted]."

Page 94

Do you see that?

**A. Yes.**

Q. Okay. And then it goes on, the next sentence, "While you stated there was an instance at the bar where you saw the respondent pointing at you at a distance; this act alone is not sufficient to indicate that an act of retaliation occurred."

Do you see that?

**A. Yes.**

Q. Okay. What is the factual basis for stating in this document that -- well, let me ask two questions. The first question relates to the first sentence that says, "OCRSM is not in receipt of any specific allegations or any incidents of retaliation from [redacted]."

You would agree with me that this sentence doesn't explain why [redacted] complaint does not meet the definition of retaliation, it just says that it doesn't, right?

MR. SHERIDAN: Objection.

THE WITNESS: I'm not sure what you're asking.

Page 95

BY MR. NORTH:
Q. This document is signed by you, right?
**A. Yes.**
Q. Okay. And you approved it before it went out?
**A. Yes.**
Q. Okay. So when you approved the language, "OCRSM is not in receipt of any specific allegation or incidents of retaliation from [redacted]," what was the -- how did you determine that his allegations did not meet the definition of retaliation?
**A. By speaking with the individual who does intake that may have met with him.**
Q. Okay. And who was that?
**A. It could be -- we changed intake people several times so I don't recall which one it was.**
Q. Fair enough. Whoever the intake person was, am I correct in understanding that you spoke with the intake person and that helped you to determine whether his allegations would constitute retaliation if they were true?

Page 96

**A. Yes.**
Q. Okay. And I'm correct in understanding that, through working with the intake person, you gained additional information to help you make your decision?
**A. Yes.**
Q. Okay. What information did you gain?
**A. I don't recall.**
Q. Okay. We discussed earlier how -- well, let me rephrase.
The intake person that you referenced just a minute ago --
**A. Mm-hmm.**
Q. Generally intakes, according to the policy, are done in response to reports of prohibited conduct, right?
**A. Yes.**
Q. Not in response to formal complaints?
**A. Reports.**
Q. Okay. So why was an intake person assigned after [redacted] submitted his formal complaint?
**A. I don't recall.**

Page 97

Q. Okay. I would like to refer you to -- I think this is Exhibit G that we'll mark.
(Exhibit G was marked for identification.)
BY MR. NORTH:
Q. This looks to be an email thread between you and Lindsay McKasson --
**A. Yes.**
Q. -- is that correct?
Okay. And then the -- at the very top of the document, there is a from Deana Karpavage.
**A. Uh-huh, yes.**
Q. And then to a Maxient email address? Right at the very top?
**A. Yeah.**
Q. Okay. Who is Deana Karpavage?
**A. She was a case manager, administrative person in the office.**
Q. Okay. And she worked under you as --
**A. Yes.**
Q. -- when you were Title IX coordinator?
**A. Yes.**

Page 98

Q. Okay. Is it fair to say that after you had the email communication with Lindsay that is described in this document, you forwarded that to Deana?
**A. I don't recall.**
Q. Okay. In this first page, right in the middle of the document, there is an email from you dated Friday, October 8th, 2021?
**A. Uh-huh.**
Q. And it reads, "Lindsay, the behaviors you cited are concerning. We will consider this a formal complaint from [redacted] even though the complaint should come from him directly, and contact him to do an intake as soon as possible to address whether this rises to the threshold of retaliatory harassment." And, "Best regards, Grace Karmiol"?
**A. Yes.**
Q. Okay. All right. So at this point, you, as Title IX coordinator, accepted a formal complaint from [redacted] right?
**A. Yes.**
Q. Okay. And we just discussed how the

Page 99

normal course is for -- once you as Title IX coordinator receive a formal complaint, you look at the face of the formal complaint to see if it alleges conduct that would violate the policy if true, right?
A. **Yes.**
Q. Okay. Why did you not conduct that review immediately after receiving the formal complaint from Doe ?
MR. SHERIDAN: Objection.
BY MR. NORTH:
Q. Or let me back up.
A. **Yeah.**
Q. Did you conduct that review when receiving the formal complaint from Doe on Friday, October 8th, 2021?
A. **I believe that we called him to flesh out additional information.**
Q. And is that the intake person that you described?
A. **Yes.**
Q. Okay. We discussed earlier how an intake is done in response to a receipt of --

Page 100

A. **A report.**
Q. -- report, not a formal complaint, right?
A. **Yes.**
Q. Okay. So why did you appoint an intake person when that is not the normal course of the university's process upon receipt of a formal complaint?
A. **Well, there -- responsibilities are split up between everyone in the office. And in this case, it -- it would have been given to Deana to draft something.**
Q. Okay. Is there any other reason that you can think of as to why an intake person was assigned at this time?
A. **No.**
Q. Okay. And just to be clear, at the very top, there is a subject line that reads, "Incident report - email notification," right?
A. **Yes.**
Q. Okay. But the document referred to in this email thread was not a report of prohibited conduct. It was a formal complaint, right?

Page 101

MR. SHERIDAN: Objection.
THE WITNESS: I would say not necessarily.
BY MR. NORTH:
Q. Okay. The email that we just described, you stated, "We will consider this as a formal complaint from Doe ," right?
A. **Yes.**
Q. All right. After you sent this email on October 8th considering it a formal complaint from Doe , did you thereafter talk to people in the Title IX office describing this as a report of prohibited conduct instead of a formal complaint?
A. **No. He specifically asked that it be treated as a complaint.**
Q. Okay. All right. Thank you.
All right. Now, at some point during the December to -- December 2021 to the spring 2022 months, you went on leave from your employment at the University of Maryland, is that correct?
A. **Yes.**
Q. Okay. Now, I'm not interested in the details of that leave other than, when you were on

Page 102

leave, you were not acting as Title -- as Title IX coordinator, is that correct?
A. **It depends what type of leave. I did intermittent leave and then I would be acting in the role.**
Q. Okay. I believe in your answer on paragraph 5, you described that you went on medical leave on February 4th, 2022?
A. **I would have to check the dates.**
Q. Does that sound --
A. **I don't know.**
Q. Okay. At the time you reviewed your answer, you reviewed it for accuracy, right?
A. **Yes.**
Q. All right. Do you have any reason to believe that this February 4th, 2022 date is not accurate?
A. **I don't know.**
Q. Okay. And then later in that paragraph, it says you returned from leave on May 9th, 2022. Again, any reason to -- that you have to say this is not accurate?

Page 103

**A. I don't recall.**
Q. All right. When you were on leave from February 4th, 2022 to May 9th, 2022, was that an intermittent leave as you described or you were --
**A. I don't recall.**
Q. Okay. Do you recall acting as Title IX coordinator during that period of time?
**A. No, I don't recall.**
Q. Okay. And again, I just want to be clear. When you say that you don't recall, in response to that question, do you mean I don't recall in the sense of I don't remember either way or I don't remember ever acting as Title IX coordinator in the period February 4th to May 9th?
**A. I don't remember. I don't recall.**
Q. And again, just so I understand correctly, when you say I don't recall, you mean you don't recall either way?
**A. Right.**
Q. Okay. All right. I would like to refer you to what I'll mark as Exhibit H, please.
(Exhibit H was marked for

Page 104

identification.)
BY MR. NORTH:
Q. All right. Please take your time to review and, when you're ready, let me know if this is a true and accurate copy of the second notice of mandatory dismissal issued in response to a formal complaint from [redacted]
**A. I believe so.**
Q. Okay. Now, for this document, as opposed to the other document we reviewed, in the from line on the top, it lists Angela Nastase, right?
**A. Yes.**
Q. Okay. And it says she is the associate director of OCRSM and deputy Title IX coordinator.
**A. Yes.**
Q. Right? Okay.
Do you recall whether you were consulted related to [redacted] formal complaint described in this case?
**A. I don't recall.**
Q. Okay. Now, it lists Angela in the from line and not you. Do you recall whether you were --

Page 105

whether you had any decision-making role as to this notice of formal complaint?
**A. I don't recall.**
Q. All right. Thank you.
Refer to Exhibit -- what I'll mark as Exhibit I.
(Exhibit I was marked for
identification.)
BY MR. NORTH:
Q. Please take your time to review and let me know if this is a true and accurate copy of the notice of formal complaint and mandatory dismissal as it relates to [redacted] third formal complaint.
**A. Yes.**
Q. All right. And in this document, in the from line, this says it's from you, right?
**A. Yes.**
Q. Okay. And this was, to the best of your knowledge, after you returned from leave?
**A. Most likely, yes.**
Q. Okay. Now I would like you -- I would like to refer you to the subheading that reads

Page 106

allegations, and then under that where it reads sexual harassment. Now, in this document, we have listed that sexual harassment means conduct on basis of sex that satisfies one or more of the following. Do you see that?
**A. Yes.**
Q. Okay. That's the language that was not listed in [redacted] case against [redacted], right?
**A. I don't recall.**
Q. Okay. I'll refer you to -- I believe it was Exhibit D. Looking at the notice of allegations and investigation dated October 29th.
**A. Yes.**
Q. Okay. So the beginning of the third paragraph under allegations, says, "Specifically, you are alleged to have violated the following provisions of the policy."
Do you see that?
**A. Yes.**
Q. I would like you to compare that with Exhibit I, second paragraph under allegations that

Page 107

says, "Specifically, in the formal complaint received on May 18, 2021, the respondent is alleged to have violated the following provisions of section VIII of the policy."
Do you see that?
**A. Yes.**
Q. Okay. And then in Exhibit I, there is a heading that says, "Sexual harassment means conduct on the basis of sex that satisfies one or more of the following," and then a colon, right?
**A. Yes.**
Q. Okay. Now, that language that I just read you is not included in Exhibit D, right?
MR. SHERIDAN: Objection. I mean, the documents speak for themselves but, you know, sexual harassment was not even a charge in the October 29, 2020 notice of allegations.
You can answer the question.
BY MR. NORTH:
Q. Yeah, you can answer the question.
**A. That is in one document and not the other?**
Q. Right.

Page 108

**A. Yes.**
Q. All right. You reviewed Exhibit I before it went out, right?
**A. Yes.**
Q. Why did you decide to include the sentence, "Sexual harassment means conduct on the basis of sex that satisfies one or more of the following" in this document?
MR. SHERIDAN: Objection.
THE WITNESS: I don't remember.
BY MR. NORTH:
Q. Okay. Would you agree with me that that's a required element under the policy?
MR. SHERIDAN: Objection.
THE WITNESS: No. Sexual harassment is required for us to do -- take any action?
BY MR. NORTH:
Q. That there is conduct on the basis of sex, that that's a required element of sexual harassment under the policy.
**A. Yes.**
Q. Okay. As we already discussed today.

Page 109

And you determined, again referencing Exhibit I, that [redacted] allegations did not constitute sexual harassment even if true, right?
**A. Yes.**
Q. Okay. I would like to refer you to the second page of Exhibit I, the heading titled prohibited conduct - analysis. There is a sentence that begins -- or I suppose a clause that begins on the third line, and it reads, "Complainant's allegations, if substantiated, would not constitute conduct taken by respondent on the basis of complainant's sex or because of complainant's prior participation in the university's sexual misconduct adjudication process."
**A. Yes.**
Q. Do you see that?
**A. Yes.**
Q. Okay. And this first clause, "On the basis of complainant's sex," that refers generally to the sexual harassment policy, right?
**A. Yes.**
Q. Okay. And then the second clause, "or

Page 110

because of complainant's prior participation in the university's sexual misconduct adjudication process," that section refers to [redacted] retaliation, that part of his complaint, right, and the retaliation policy?
**A. Yes.**
Q. All right. And I'm correct in understanding that when you -- when you, as Title IX coordinator, reviewed -- well, let me back up.
As Title IX coordinator, when [redacted] submitted this formal complaint, you reviewed it to determine whether it alleged conduct that, if true, would violate either sexual harassment or retaliation, right?
**A. I believe so.**
Q. Okay. And this prohibited conduct section describes that you as Title IX coordinator determined that it would not constitute conduct taken by respondent on the basis of complainant's sex? Let's just take that first part first.
**A. Okay. Go again.**
Q. Okay. So you -- this section title prohibited conduct analysis describes that you, as

Page 111

Title IX coordinator, determined that the conduct alleged in [redacted] formal complaint would not constitute conduct taken by respondent on the basis of complainant's sex, right?
**A. I believe so, yes.**
Q. The question is, why did his allegations not constitute conduct taken by respondent on the basis of complainant's sex?
**A. It didn't meet the criteria in our policy.**
Q. And how did it not meet those criteria?
**A. It didn't allege anything that happened on the basis of sex under our policy.**
Q. Okay. And --
**A. And with respect to retaliation as well.**
Q. Sure. How do you determine whether conduct is on the basis of sex in your role as Title IX coordinator?
**A. It's case by case, and it would involve the individual complaint that we got, so there's not one way to determine it. It's within context.**
Q. Is there any standard you use to determine whether one complaint alleges conduct on the basis of

Page 112

sex or another complaint does?
MR. SHERIDAN: Objection.
THE WITNESS: No.
BY MR. NORTH:
Q. Okay. Now, we talked earlier, with regard to Exhibit D, that you determine that Jane Roe's [redacted] allegation of rape alleged conduct on the basis of sex, right?
**A. Yes.**
Q. Okay. How did you determine that that was conduct on the basis of sex?
**A. By talking with the intake person who would have took -- who would have done the initial intake and assessment.**
Q. Okay. And what did you learn during that intake assessment?
**A. I don't recall.**
Q. Okay. Maybe I'm not asking my question correctly --
**A. I understand what you're getting at. I just don't recall.**
Q. Okay. Let me try asking it this way.

Page 113

Instead of asking how did you determine, because I understand that that can be kind of ambiguous, why did you determine that Jane Roe's [redacted] allegation of rape alleged conduct on the basis of sex?
**A. By applying the policies to her allegations.**
Q. And the policy requires, among other things, that conduct has to be on the basis of sex, right?
**A. Yes.**
Q. Okay. My question is, can you explain how you determined that her allegations, if true, alleged conduct on the basis of sex?
**A. By doing a preliminary assessment.**
Q. Okay. But you can't point me to any standard that you used to help you determine that?
**A. I mean, the standards that we use is federal law, first and foremost. That's the first thing I would do.**
Q. And can you articulate that standard to me here today?

Page 114

**A. No.**
Q. All right. Fair enough.
**A. I don't have that in front of me.**
Q. All right. Now, setting aside kind of how you came to this determination or why you did, you would agree that you did at some point determine that her allegations alleged conduct on the basis of sex, right, as to her allegation of rape?
**A. Yes.**
Q. All right. And you determined that Doe's allegation of being falsely accused of that same rape was not conduct on the basis of sex?
MR. SHERIDAN: Objection.
BY MR. NORTH:
Q. Right?
MR. SHERIDAN: Objection.
THE WITNESS: I don't -- I mean, I don't recall.
BY MR. NORTH:
Q. Okay. But that -- that's what Exhibit I says, right, that you determined that his allegations, if substantiated, would not constitute

conduct taken by respondent on the basis of complainant's sex?
A. **Yes.**
Q. All right. I guess my question is, how is a rape allegation conduct on the basis of sex but a false allegation of rape relating to the very same rape, how is the false allegation not conduct on the basis of sex but the rape is?
MR. SHERIDAN: Objection. That's argumentative. I don't think it's -- I don't think there is a factual basis for that question.
Go ahead.
BY MR. NORTH:
Q. Okay. You can answer.
A. **What was it?**
Q. My question is -- maybe I'll ask it this way. If the rape allegation levied by Jane Roe alleged conduct on the basis of sex, how did Doe's allegation that he was falsely accused of that very same rape, how did his allegation in the allege conduct on the basis of sex?
MR. SHERIDAN: Objection.



THE WITNESS: You're asking whether there is a distinction between the two complaints?
BY MR. NORTH:
Q. Only as it relates to the "on the basis of sex" element that we keep talking about.
A. **Uh-huh.**
Q. So my question is, how do you determine that element existed in one complaint but not the other?
A. **One was persistent, pervasive and objectively offensive, and the other was alleging conduct that was not.**
Q. Okay. The severe, pervasive and objectively offensive language, that comes from the definition of hostile environment/sexual harassment in the policy, right?
A. **Yes.**
Q. All right. That's separate from the element of it has to be on the basis of sex, right?
A. **Right.**
Q. All right. Is there any other reason or any other explanation you can give as to why Jane Roe's



[redacted] allegation of rape alleged conduct on the basis of sex in your view, but Doe's allegation that he was falsely accused of that rape did not allege conduct on the basis of sex in your view?
A. **Okay. In the paragraph regarding retaliation, it specifically says that if someone raises a false allegation, we would give it to student conduct.**
Q. I'm not talking about retaliation, I'm talking about the sexual harassment piece.
A. **Okay.**
Q. So is there any other reason you can give other than for -- again, let me just repeat the whole question so the record is clear. I'm only talking about the sexual harassment piece. We'll get to the retaliation piece in a second.
Is there any other explanation you can give as to why you determined that Jane Roe's allegation of rape alleged conduct on the basis of sex but John Doe's complaint that alleged he was falsely accused of that rape, that complaint didn't allege conduct on the basis of sex?



MR. SHERIDAN: Objection.
THE WITNESS: It didn't. It didn't allege it based on sex.
BY MR. NORTH:
Q. And why do you say that?
A. **He didn't put it in the complaint.**
Q. Okay. And is that the standard you use, that a complainant has to specifically put those words in the complaint for you to move forward?
A. **No, not necessarily. It's done on a case-by-case basis looking at the context in which it's brought.**
Q. Did Jane Roe include those words in her formal complaint as far as --
A. **I believe so.**
Q. Okay. All right.
Okay. So let's talk about the retaliation piece of this. So we've been talking about the first part of that sentence, whether it was on the basis of sex. Now let's talk about the statement that the complainant's allegations, if substantiated, would not constitute conduct taken by respondent because of

Page 119

complainant's prior participation in the university's sexual misconduct adjudication process. Okay. So I'm referring to retaliation this time --
A. **Okay.**
Q. -- not to sexual harassment.
How did you determine, from reviewing -- well, let me back up.
In -- after receiving [redacted] formal complaint as it relates to Exhibit I, did you conduct any investigation this time as it relates to Exhibit I?
A. **I don't recall. We probably did an initial assessment.**
Q. Okay. And how did you determine, after that initial assessment or otherwise, how did you determine that [redacted] did not act because of complainant's prior participation in the university's sexual misconduct adjudication process?
A. **By looking at the face of the complaint and talking further with the complainant.**
Q. The complainant in this case being [redacted]?
A. **Yes.**

Page 120

Q. Okay.
A. **I believe an intake was done and there was a discussion between Angela Nastase and complainant to flesh out more information.**
Q. Okay. I guess my question is, I think we agreed earlier that the retaliation policy generally requires like retaliatory motive. Is that correct? Correct me if I'm wrong. I might be misremembering but --
A. **Yes.**
Q. -- I think we talked about that.
A. **Mm-hmm.**
Q. And this section that we've been discussing that reads "because of complainant's prior participation in the university's sexual misconduct adjudication process," that relates to why [redacted] allegedly did or didn't do something, right?
A. **Yes.**
Q. Okay. The question is, how do you determine [redacted] motive without opening the matter for investigation?
MR. SHERIDAN: Objection.

Page 121

THE WITNESS: It may -- may be from the initial intake and discussion.
BY MR. NORTH:
Q. In which you say is -- in which you say a member of the Title IX office spoke with [redacted]?
A. **Yes.**
Q. Okay. Is there any other reason why you would be able to determine [redacted] motive as it relates to this formal complaint at that time?
MR. SHERIDAN: Objection.
THE WITNESS: No.
BY MR. NORTH:
Q. Now, referring to the same paragraph, after the italicized section we've been discussing it reads, "Rather than because respondent perceived complainant as a perpetrator of a sexual offense against respondent."
A. **Where are you reading from, the complaint?**
Q. From the section that says prohibited conduct analysis. It should be Bates stamped UMCP 9 on Exhibit I.
A. **Oh, 9. Okay.**

Page 122

Q. Yeah. Let me just read the whole sentence just so we're clear. "The complainant's allegations, if substantiated, would not constitute conduct taken by respondent on the basis of complainant's sex or because of complainant's prior participation in the university's sexual misconduct adjudication process, rather than because respondent perceived complainant as a perpetrator of a sexual offense against respondent."
Do you see that sentence?
A. **No. I'm --**
Q. Are you looking at Exhibit I? It's okay. Take your time.
A. **Yeah, I'm looking at Exhibit I.**
Q. Okay. Do you see the italicized section in the middle of that paragraph?
A. **Yes.**
Q. Okay. And that italicized section -- I'll just read the italicized. It says, "On the basis of complainant's sex or because of complainant's prior participation in the university's sexual misconduct adjudication process"?

Page 123

**A. Yes.**
Q. Okay. And right after that, it reads, "Rather than because respondent perceived complainant as a perpetrator of a sexual offense against respondent"?
**A. Yes.**
Q. Okay. All right.
So I guess my question is, this sentence seems to say that in the OCRSM's view, you know, it's more likely that [redacted] did this because she -- because she perceived [redacted] as a perpetrator of a sexual offense. Is that -- would you agree with that kind of paraphrasing?
**A. Yes.**
Q. Okay. How do you know why [redacted] did or didn't do something without conducting an investigation?
MR. SHERIDAN: Objection.
THE WITNESS: We don't necessarily have to conduct a full investigation. We could just do a preliminary assessment. So somewhere in there, somewhere during the process, an initial assessment

Page 124

was done and we put the complaint against the policy and the definitions of the policy and then decide what to do from there.
BY MR. NORTH:
Q. I thought we agreed earlier that the initial assessment piece is done in response to a report of prohibited conduct, not in response to a formal complaint.
**A. It may be done with respect to a formal complaint as well.**
Q. Okay. With respect to any initial assessment conducted in response to this formal complaint, do you recall anyone from your office speaking with [redacted]?
**A. No.**
Q. Okay.
**A. An investigator.**
Q. You do recall --
**A. For the investigation, just for the investigation.**
Q. What investigation are you referring to?
**A. The investigation into her complaint.**

Page 125

Q. Right, right. My question is, in response to [redacted] complaint that we're talking about with Exhibit I, you referenced an initial assessment was conducted, right?
**A. Yes.**
Q. Okay. To the best of your knowledge, during that initial assessment, did anyone speak to [redacted] that you're aware of?
**A. No.**
Q. Okay. Would you agree with me that [redacted] could have taken these actions on the basis of complainant's sex?
MR. SHERIDAN: Objection.
BY MR. NORTH:
Q. That that's possible?
MR. SHERIDAN: Objection.
THE WITNESS: No.
BY MR. NORTH:
Q. And why do you say it's not possible?
**A. Because it didn't happen.**
Q. How do you know if -- how do you know it didn't happen without investigating?

Page 126

**A. I'm not saying it didn't happen, the allegations didn't happen. It's just they didn't fall under Title IX.**
Q. We -- yeah. So to be clear, the -- when a formal complaint is filed, you as Title IX coordinator review the complaint to see if it alleges conduct that would violate the Title IX policy. You don't determine whether allegations are true or false, right?
**A. Correct.**
Q. Okay. And in this case, we're dealing with kind of the motivation for why [redacted] was doing the things that she was doing, right, among -- among other things?
MR. SHERIDAN: Objection.
THE WITNESS: No.
BY MR. NORTH:
Q. Okay. Why do you say no?
**A. By looking at the preliminary -- by looking at the face of the complaint.**
Q. It's your belief that the face of the complaint made it more likely that she did what is

Page 127

alleged in the formal complaint as a result of her perceiving Doe as a perpetrator of a sexual offense?
A. Can you repeat that?
Q. Sure. Sure. That was a sloppy question.
Well, let me just ask it this way. I believe you've testified that, in response to Doe's formal complaint referenced in Exhibit I, you reviewed the face of the complaint, right?
A. Yes.
Q. And I believe you testified that you also conducted an initial assessment?
A. I believe so.
Q. Okay. But you don't know for sure?
A. No, I don't know for sure.
Q. All right. Is there any -- are there any other steps you took that helped you determine whether Doe's formal complaint alleged conduct on the basis of sex or because he participated in the university's Title IX process?
A. Yes.
Q. Okay. What other steps helped you

Page 128

determine?
A. I can speak generally about what steps I used to determine it. I can't speak --
Q. Sure.
A. -- specifically to this.
Q. Okay. Let's start with the steps that you normally use.
A. Okay.
Q. What steps are those, after you receive a formal complaint?
A. Okay. We -- we invite the person in to meet with an intake specialist who then fleshes out the complaint further by meeting with her, so more information might be obtained that way.
Q. And is that information information you could potentially add to the formal complaint to -- or clarify the allegations that you initially receive?
A. Yes.
Q. Okay. And I believe you testified a moment ago that you don't recall doing that specifically with this complaint but those are the

Page 129

steps you normally take?
A. Yes.
Q. Right? Okay.
Specifically with regard to this complaint, do you remember what steps you took?
A. No.
Q. Okay. All right.
But you determined -- whatever steps you took, you came to the conclusion that it is not possible that Jane Roe harassed Doe because of his sex or because he participated in the university's Title IX process --
A. Yes.
Q. -- right? Okay. All right.
With respect to any of John Doe's formal complaints, have you had direct contact with Jane Roe?
A. No.
Q. Okay. During the Title IX case that --
I'll rephrase. During the sexual misconduct case that she brought against Doe, did you have direct contact with Jane Roe?

Page 130

A. No.
Q. Okay. Have you ever had direct contact with Defendant 3?
A. No.
Q. Do you know who Defendant 3 is?
A. Yes.
Q. Who is Defendant 3 as far as you understand?
A. She had a position in a group called PSA.
Q. Okay. What is PSA's relationship to OCRSM as far as you know?
A. There is no relationship.
Q. Would you say you know Defendant 3 well?
A. No.
Q. Okay. Have you ever had a conversation with Defendant 2 regarding John Doe?
A. I don't know who that is.
Q. And I don't actually think I asked this with respect to Defendant 3 Defendant 3 Have you ever had a conversation with Defendant 3 --
A. No.

Page 131

Q. -- regarding [redacted]?
A. No.
Q. Okay. Do you know who Cortney Fisher is?
A. Yes.
Q. Okay. Who is Cortney Fisher?
A. She was an advisor for the PSA club or group.
Q. Have you ever had a conversation with Cortney Fisher about [redacted]?
A. Once.
Q. Okay. When did that conversation occur as far as you know?
A. I couldn't tell you the date where it fits into the timeline but we did have a discussion. I called her.
Q. Okay. Do you recall what occurred during that conversation?
A. Yes.
Q. Okay. What occurred?
A. Okay. I asked if she knew of any PSA members who were circulating allegations with respect to [redacted].

Page 132

Q. Okay. And what did she say, if anything?
A. She didn't know but she went and spoke with them. She said it was not a result of any kind of relationship that they had with PSA. They were out individually doing things that weren't representing the organization.
Q. Did you have any other conversations with Cortney Fisher about --
A. No.
Q. -- about this matter?
A. No.
Q. Okay. Did you take any other steps as Title IX coordinator after that conversation with Cortney to determine whether what Cortney said was true?
A. I don't recall.
Q. Okay. Do you know if anyone in the Title IX office ever spoke to [redacted] or [redacted] about allegedly harassing [redacted]?
A. No.
Q. Okay. No in the sense of you don't know or no, you know it didn't happen?

Page 133

A. I don't know.
Q. Okay. I would like to refer you to what I'll mark as Exhibit J, I believe.
(Exhibit J was marked for identification.)
BY MR. NORTH:
Q. All right. This is an email thread between you and [redacted], correct?
A. I'm sorry, an email between who?
Q. Up at the top --
A. Yeah.
Q. -- it reads from Grace Karmiol?
A. Yes.
Q. And then to [redacted]?
A. Yes.
Q. Okay. This is an email thread between you and [redacted], right?
A. Excuse me?
Q. Sorry. This is an email thread between you and [redacted], right?
A. It appears to be, yes.
Q. All right. Halfway down the page, there

Page 134

is an email from [redacted] from Monday, October 4th, 2021. Do you see that?
A. Yes.
Q. Okay. And in that email, [redacted] informs you of a picture that [redacted] had posted to her SnapChat story, right?
A. I believe so.
Q. Okay. And if you flip to the next page, I believe you'll be able to see the SnapChat that was attached to the email. Do you see the SnapChat?
A. Yes.
Q. All right. In [redacted] email, he -- it reads, "She seemed" -- well, let's read the whole email. "Hi, Ms. Karmiol. This morning [redacted] added the picture attached to her SnapChat story in reference to the investigation concerning myself. She seems to be trying to spread information that is contrary to the conclusion of the investigation which makes me uncomfortable. I was curious if this classified as retaliatory harassment outlined in the letter from the OCRSM to notify me of the conclusion of the investigation. Regardless I wanted to bring

Page 135

this to your attention and thank you for your time in this matter."

Did I read that correctly?

**A. Yes.**

Q. All right. Now, in response to that email, you stated, among other things, that "We do not believe that this incident alone of the screen shot you sent me meets the threshold for retaliatory harassment"?

**A. Yes.**

Q. Is that right? Okay. Why did it not meet the threshold for retaliatory harassment? Or let me rephrase.

**A. Yeah.**

Q. Again, sloppy again.

When you refer to the threshold for retaliatory harassment, what is the threshold that you refer to?

**A. I don't recall.**

Q. Reviewing this email and the SnapChat, is there a reason -- does that refresh your recollection at all --

Page 136

**A. No.**

Q. -- as to why you determined --

**A. No.**

Q. Okay. All right. Thank you.

MR. NORTH: Do you mind if we just take a five-minute break?

MR. SHERIDAN: No.

MR. NORTH: I just want to make sure if that's it.

THE VIDEOGRAPHER: Stand by. We are off the record at 11:54.

(Recess.)

THE VIDEOGRAPHER: We are on the record at 12:08.

BY MR. NORTH:

Q. I just have a few more questions, Ms. Karmiol. One, have you -- has OCRSM, to your knowledge, ever held any events with PSA?

**A. I believe they -- we were listed as hosting an event with them in the newspaper, their college newspaper, but we really didn't have anything to do with them.**

Page 137

Q. Okay.

**A. We attended an event, I believe, that they organized.**

Q. When you say we attended, who --

**A. The office.**

Q. Everyone at the office?

**A. No. Just random -- I couldn't even tell you who but --**

Q. Okay.

**A. -- with anything that's on campus, we try and send an OCRSM representative there.**

Q. By anything on campus, do you mean anything on campus involving PSA or literally any event?

**A. Any. Anything.**

Q. Okay. So every --

**A. Any event. Any event that touches on Title IX work or not, we try and attend an event.**

Q. Okay. And PSA events would qualify as touching on Title IX work?

**A. To be honest, I didn't even know what PSA stood for before this came up. There's no**

Page 138

**relationship at all with PSA and OCRSM.**

Q. Okay. I guess my question was, do -- let me ask it this way. You described one event that you know that at least someone from OCRSM went to that was an event with PSA where there --

**A. I believe there was one but I don't really recall.**

Q. Okay. Do you recall any other events where OCRSM attended?

**A. No.**

Q. An event with PSA?

**A. No.**

Q. Okay. Has OCRSM, to your knowledge, ever referred any students to PSA?

**A. Absolutely not.**

Q. Okay. Have you ever given any student PSA's contact information or anything like that?

**A. Never.**

Q. Okay. Did you keep any notes referring to any conversation you've had with Lindsay McKasson?

**A. No.**

MR. NORTH: All right. That's all my

questions.

Do you have any questions, Patrick?

MR. SHERIDAN: No, I don't have any.

MR. NORTH: Okay.

MR. SHERIDAN: So, Ms. Karmiol, you can read your deposition, review it for accuracy. You can't change the substance of your testimony through that review. You can just check like just the accuracy of the transcription essentially. If you do change the substance of your testimony, then Mr. North could reopen your deposition and ask you about those changes. You would have 30 days to review the transcript and sign the transcript. Or you could waive the reading and signing of the transcript and just trust that the court reporter has transcribed everything accurately today. People usually read and sign now so, but it's up to you.

THE WITNESS: I'm happy to read and sign.

MR. SHERIDAN: Okay. She'll read and sign.

THE VIDEOGRAPHER: All right. Stand by. We are off the record at 12:12.



(Whereupon, at 12:12 p.m., the taking of the instant deposition ceased.)



CERTIFICATE OF REPORTER

UNITED STATES OF AMERICA ) ss:
STATE OF MARYLAND )

I, MARY GRACE CASTLEBERRY, RPR, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties for the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

/s/Mary Grace Castelberry
Notary Public in and for
the State of Maryland

My commission expires: 06/18/2027