UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

---

JOHN DOE,

Plaintiff,

v.

THE UNIVERSITY OF MARYLAND, COLLEGE PARK, et al.,

Defendants.

ATTORNEYS' EYES ONLY

Civil Action No.: 8:22-cv-00872-PX

---

VIDEOTAPED DEPOSITION

---

| | |
|---|---|
| WITNESS: | Defendant Three |
| DATE: | Tuesday, June 25, 2024 |
| START TIME: | 10:04 a.m., ET |
| END TIME: | 1:47 p.m., ET |
| REMOTE LOCATION: | Remote Legal platform |
| PROCEEDINGS OFFICER: | Olivia Wilson, CER-1600 |
| JOB NO.: | 26864 |

CONFIDENTIAL

FOR ATTORNEYS' EYES ONLY



**Remote Legal Court Reporting**
**646.461.3400 info@remotelegal.com**

A P P E A R A N C E S

BINNALL LAW GROUP
717 King Street, Suite 200
Alexandria, Virginia 22314
By: BENJAMIN NORTH, ESQUIRE
ben@binnall.com
Appearing for Plaintiff

OFFICE OF THE ATTORNEY GENERAL
HIGHER EDUCATION DIVISION
200 Saint Paul Place, 17th Floor
Baltimore, Maryland 21202-2021
By: PATRICK SHERIDAN, ESQUIRE
psheridan@oag.state.md.us
Appearing for Defendants, University of Maryland, College Park, and individuals, Grace Karmiol and Angela Nastase

LEVIN & GANN, P.A.
1 West Pennsylvania Avenue, Suite 900
Towson, Maryland 21204
By: JOHN J. "JACK" CONDLIFFE, ESQUIRE
jcondliffe@levingann.com
Appearing for Witness

A P P E A R A N C E S (CONT'D)

ROLLINS, SMALKIN, RICHARDS & MACKIE, LLC
300 East Lombard Street, Suite 900
Baltimore, Maryland 21202
By: BENJAMIN BEASLEY, ESQUIRE
bbeasley@rsrm.com
Appearing for Witness

ALSO PRESENT:
EMILY BOLYARD LEIGH, Observer

I N D E X O F T E S T I M O N Y


EXAMINATION OF Defendant Three: PAGE

By Mr. North 9

By Mr. Sheridan 105

By Mr. North 132

By Mr. Sheridan 138

# I N D E X O F E X H I B I T S

(available for download)


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| A | Emails and text messages between Jane Roe, Defendant Three, and others | 27 |
| B | College Park News Article | 52 |
| C | Text messages between Defendant Three and Jane Roe | 59 |
| D | Text messages between Defendant Three, Defendant Two, and Jane Roe | 76 |
| E | Instagram Posts of psa_umd | 80 |
| F | Text messages between Defendant Three, Defendant Two, and Cortney Fisher | 95 |
| G | Audio file | 99 |
| H | Confidential Settlement Agreement | 123 |
| I | Notice of Formal Complaint | 132 |




**Remote Legal Court Reporting**
**646.461.3400 info@remotelegal.com**

P R O C E E D I N G S

THE PROCEEDINGS OFFICER: Good morning. We are now on the record. Today's date is June 25th, 2024, and the time is approximately 10:08 -- 10:04 a.m., Eastern.

My name is Olivia Wilson, and I am the officer designated by Remote Legal, 11 Broadway, Suite 468, New York, New York, to take the record of this proceeding.

This is the deposition of Defendant Three, taken in the matter of Doe versus the University of Maryland, et al., Civil Action Number 8:22-cv-00872-PX, filed in the United States District Court for the District of Maryland, Southern Division.

Will all counsel please identify themselves for the record and state who they represent starting with the noticing attorney.

MR. NORTH: Good morning, everyone. Ben North representing Plaintiff, John Doe.

MR. SHERIDAN: Morning.

MR. BEASLEY: Good morning. Ben --

MR. SHERIDAN: Sorry.

MR. BEASLEY: Sorry. Go ahead.

MR. SHERIDAN: Hi. Good morning. Patrick Sheridan. I'm an Assistant Attorney General. I

represent the University of Maryland, Angela Nastase, and Grace Karmiol.

MR. BEASLEY: And good morning. My name is Ben Beasley. I'm counsel for the deponent, Defendant Three.

MR. CONDLIFFE: And good morning. Jack Condliffe. I'm also counsel for -- actually, I don't think she's the defendant anymore, Ben -- but the witness, Defendant Three.

MR. BEASLEY: My apologies. I thought I said the deponent -- my apologies if I said the defendant.

THE PROCEEDINGS OFFICER: This deposition is being taken remotely on behalf of the plaintiff and is being conducted pursuant to the procedural rules and laws governing this matter.

As such, all parties agree to this means of capturing the official record which may include recording by audio, audiovisual, and/or stenographic means, and agree not to oppose admissibility of the testimony in this proceeding on the basis of the personnel or method by which the testimony was captured.

Further, all parties agree that the deposition officer or person administering the oath may be authorized to administer the oath under the rules

where they reside.

Do the parties so stipulate?

MR. NORTH: Yes.

MR. SHERIDAN: Yes.

MR. BEASLEY: Agreed on behalf of Ms. [redacted].

THE PROCEEDINGS OFFICER: I will now swear in the witness.

Ma'am, please raise your right hand. State and spell your name for the record.

[redacted]: [redacted]

THE PROCEEDINGS OFFICER: Do you swear or affirm that the testimony you shall give in this proceeding will be the truth, the whole truth, and nothing but the truth?

[redacted]: I do.

WHEREUPON,

[redacted] [redacted],

having been called as a witness, being duly sworn by the notary public present, testified as follows:

THE PROCEEDINGS OFFICER: Thank you.

The witness is sworn.

Counsel, you may begin.

MR. NORTH: All right. Thank you.

And good morning, Defendant Three. Before we begin, is there a way you'd like me to address you, Defendant Three? Do you have a preference?

THE WITNESS: Defendant Three fine.

MR. NORTH: All right. All right. Sounds good. You can call me Ben as well.

EXAMINATION

BY MR. NORTH:

Q Before we begin, I just want to ask some preliminary questions. First question is, have you ever been deposed before?

A No.

Q Okay. Have you prepared for the deposition today?

A Yes.

Q Okay. And how did you prepare?

A I've been reading over documents and meeting with my attorneys.

Q All right. Without telling me what you spoke to your attorneys about, specifically, how long did you meet with your attorneys?

A Two hours.

Q Okay. And when was that?

A Yesterday.

Q Okay. All right. Do you have any documents

in front of you right now?

A Yes.

Q Okay. And what documents are those?

A The documents that we shared with you all.

Q Okay. Any other documents?

A No.

Q All right. Since you haven't been deposed before, I just want to go over some ground rules of the deposition before we get into more substantive questions.

First point is, you are giving testimony and you are under oath. This is the same oath as if you were to testify in court, but as you can see there's no judge here. But it is the same oath, and you are under the same oath to tell the truth under penalty of perjury. Do you understand that?

A Yes.

Q Okay. When I ask questions, your counsel may object from time to time. But unless your attorney instructs you not to answer the question, you still need to answer the question. Does that make sense?

A Yes.

Q All right. When I ask you a question, you must answer the question unless your counsel instructs you not to answer. Is -- do you understand that?

A Yes.

Q And when you do answer, it's important for the court reporter that you give an audible answer rather than shaking or nodding your head. Does that make sense?

A Yes.

Q All right. And if you ever need a break today, that's fine. Just let me know. But can we agree that we'll not take breaks while a question is pending?

A Yes.

Q All right. And as long as the deposition continues, it's important that you do not talk to anyone about your testimony, and that includes your attorneys. Do you understand?

A Yes.

Q All right. And finally, can we agree that I will not interrupt your answers and you won't interrupt my questions?

A Yes.

MR. NORTH: All right. I just want to state for the record, I am a person who stutters. So there might be some disfluency. But, you know, that just, kind of, is what it is. I appreciate your patience.

BY MR. NORTH:


Remote Legal Court Reporting
646.461.3400 info@remotelegal.com

Q All right. Is there anything that would prevent you from giving truthful testimony here today?
A No.
Q All right. Are you under the influence of any drugs or alcohol that would affect your ability to testify truthfully?
A No.
Q Okay. You were served with a subpoena before testifying here today, correct?
A Yes.
Q All right. And you understand that that subpoena also included a command to produce documents in response to the subpoena?
A Yes.
Q And in response to the subpoena, did you compile documents?
A Yes.
Q Okay. And when did you compile documents?
A Over the last three weeks.
Q Did you work with your attorney to make sure the documents you compiled were complete?
A Yes.
Q Okay. Without telling me any conversations you had with your attorneys about the documents you gave them, how did you ensure that you made a complete

document production?

A I had compiled two years ago and those were the documents I used.

Q So the only documents you used were documents you compiled two years ago?

A I don't have access to most of the documents now.

Q Okay. So in response to the subpoena, did you compile any additional documents aside from the ones that you compiled two years ago?

A No.

Q Okay. Did you search for any responsive documents after you were served with the subpoena?

A Yes.

Q Okay. And how did you search for responsive documents?

A I went through my email and my texts.

Q And when did you review your text messages?

A Most of the texts are deleted. So within the last few days, but there was no new information found.

Q When you say that most of the texts were deleted, what do you mean by that?

A iPhone automatically deletes messages after a certain date. So after I had screenshotted them, they were deleted.

Q How long have you had the setting on -- well, let me back up.
When you say "the iPhone automatically deletes text messages," is that a setting you have on your phone?
A Yes.
Q Okay. And how long have you had that setting?
A Since I got the iPhone.
Q And when was that?
A Last year.
Q Okay. What phone did you have prior to your current iPhone?
A The iPhone 12.
Q Okay. Did you carry over, kind of, the same account and information from your old iPhone to your new iPhone?
A Yes.
Q All right. Did you do, kind of, like a backup transfer, I think they call it, from your old iPhone to your new iPhone?
A Yes.
Q All right. Did you have the same setting to automatically delete text messages after one year on your prior iPhone?
A No.

Q Okay. And what prompted you to make the decision to automatically delete text messages?
A They were already screenshotted.
Q I guess my question was, what prompted you to turn on the setting to automatically delete text messages?
A Honestly, it was automatically done, and I didn't realize it was on until the text messages were deleted. But I had already screenshotted them.
Q And when did you screenshot them?
A Two years ago.
Q Okay. When did you realize the setting was on?
A I don't know.
Q Was it in the past month or was it prior to that?
A Prior to that.
Q Okay. Was it several months prior, two months prior? Do you have any estimation on that?
A Probably a month or two after I got the phone in November.
Q Okay. All right. In the past few weeks since you were served with subpoena, did you review your email?
A Yes.

Q Okay. Which email accounts did you review?
A My personal email address.
Q What email address is that?
A It's [redacted]83@gmail.com.
Q Do you have -- do you have access to any other email accounts?
A No.
Q Do you have a work email account?
A Yes.
Q Do you have access to that work email account?
A Yes.
Q Okay. Did you search that account?
A No.
Q When did you review your email account?
A Within the last week.
Q Was that the first time -- going back. We discussed earlier a document collection you did two years ago. Back then, did you review your email accounts?
A Yes.
Q Okay. Between that document collection and now, you referenced looking at your email about a week ago. Was that the first time you looked for documents in your email account after the period you did, two years ago?

A Yes.
Q All right. Do you remember what day you looked at your email account?
A No.
Q Okay. Was it beginning of last week, end of last week? Do you have any sort of estimation on that?
A No.
Q Okay. Did you send any documents from your email account to your attorneys to comply with the subpoena?
A Yes.
Q Which documents were those?
A I sent over the texts I had received. I resent them and I compiled them into one document as well as emails.
Q Okay. On your email account, did you have any sort of setting that automatically deletes emails?
A No.
Q Have you deleted any emails regarding this case?
A No.
Q Okay. In your efforts to comply with the subpoena, did you review any social media accounts?
A No.
Q Do you have any social media accounts?

A Yes.
Q And what accounts are those?
A I have a Twitter, Instagram, Facebook, a TikTok account.
Q Okay. What is your Twitter handle?
A Defendant Three.
Q Okay. What is your Instagram handle?
A Just my name.
Q Is your name on Facebook the same as Instagram?
A Yes.
Q All right. What is your TikTok handle or username?
A It's my name.
Q Okay. Same as Instagram?
A Yeah.
Q All right. Why did you not search your social media to comply with the subpoena?
A There's nothing on my social media that mentioned or related to this case.
Q But you just said you didn't search your social media. So how do you know that there was nothing on your social media?
A I never posted anything.
Q But you didn't go through and check your

social media to make sure of that to comply with the subpoena; is that correct?
A Correct.
Q Okay. So complying with the subpoena, did you search your computer?
A No.
Q Okay.
A My -- my computer, I lost all the data. This is a new computer.
Q Okay. When did you lose all the data on your computer?
A Last -- this past February.
Q When you say you lost all data on your computer, can you describe what that means?
A The computer died and didn't turn back on, so I had to buy a new one.
Q What computer did you have when that happened?
A I had a MacBook Pro.
Q Okay. And was that associated with your iCloud account?
A Yes.
Q Okay. Did you have your iCloud account and your computer set up where it synchronized the messages between your phone and your computer?
A Yes.

Q Okay. After your MacBook Pro died, did you get another computer?
A Yes.
Q Okay. And what computer was that?
A It's a MacBook Air.
Q Is that also synced to your iCloud account?
A Yes.
Q And same question. It has the messages synced between your computer and your phone?
A Yes.
Q Okay. When you got your second -- what I'm just going to call your second Mac computer. I don't know if it's actually your second Mac computer, but you know what I'm talking about, right?
A Yes.
Q Okay. When you got your second Mac computer, did you restore that from a backup that you had had from your prior computer?
A No. I didn't have any backup.
Q Okay. Do you purchase cloud storage from Apple?
A No.
Q When you said earlier that you had screenshotted text messages two years ago and made sure that you -- and resent them to your attorneys -- I think

that's what you said, correct me if I'm wrong. When you said that, what method did you use to look at the screenshots you took two years ago?

A They were already in a document.

Q What document was that?

A Document that I sent to my attorneys.

Q And where did you look at that document?

A On my computer, in my Google Drive.

Q Okay. What Google Drive is this?

A My email Google -- Google Drive.

Q Okay. And you store documents on that drive; is that right?

A Correct.

Q Okay. Documents relating to the case; is that correct?

A Yes.

Q Okay. Did you search the Google Drive in response to the subpoena?

A No.

Q Okay. Are you aware that you're referred to as Defendant 3 in this case?

A Yes.

Q Or were referred to at least?

A Yes.

Q Who is Defendant 2 as far as you understand?

A [redacted]

Q Okay. Are you and [redacted] represented by, at least, one of the same attorneys?

A Yes.

Q Okay. And who was that?

A Jack Condliffe.

Q Okay. Are you aware -- or I'll rephrase.

Do you know whether [redacted] produced documents to your attorney?

A Yes.

Q Do you know when she produced documents to your attorney?

A Two years ago.

Q Okay. When you say "two years ago," do you have an approximate month?

A Assuming after we were served, so post May 2022.

Q Okay. Fair enough. All right. Thank you for answering those questions about the production. Aside from litigation in this case, have you ever been involved in litigation before?

A No.

Q All right. Can you tell me a little bit about your education?

A Attended University of Maryland to get a

Bachelor's of Arts in Communication and a minor in Business.

Q All right. What degrees do you have from the University of Maryland?

A Bachelor's of Arts.

Q Okay. When you were at the University of -- well, let me ask you this first.

When you say the University of Maryland, are you referring to the University of Maryland, College Park?

A Yes.

Q Okay. When you were at the University of Maryland, were you part of any extracurricular clubs, sports teams, things of that nature?

A Yes.

Q Okay. And what clubs or groups were you part of?

A I was in the Best Buddies Organization. I founded a club that got -- called Get Ovary It, that got free menstrual products on campus, and I was the President of the Preventing Sexual Assault Club.

Q Okay. What is Best Buddies?

A It's where you partner with someone with disabilities.

Q All right. And you also mentioned an

organization that got free menstrual products to students. What was the name of that organization?
A Get Ovary It.
Q Get Ovary It?
A Yes.
Q Okay. So reference to ovaries, I guess.
A Yes.
Q Okay. Got it. And then you also mentioned Preventing Sexual Assault. Is that PSA?
A Yes.
Q All right. Are you currently going to grad school or pursuing any postgrad?
A No.
Q Okay. Are you currently employed?
A Yes.
Q Where are you currently employed?
A Walker & Dunlop.
Q What is that?
A Commercial real estate firm.
Q Okay. Where is that located?
A Headquartered in Bethesda, Maryland.
Q Is that where you currently work?
A No.
Q Okay. Where do you currently work, physically?

A I work in Chicago, Illinois.

Q All right. And at the commercial real estate firm, what kind of job duties do you have?

A I handle all of our public relations efforts.

Q All right. And what does that mean, kind of, in layman's terms?

A Creating press releases, organizing interviews.

Q All right. So all kind of things like the public would see --

A Correct.

Q -- about the firm? Do you know Jane Roe?

A Yes.

Q When did you first meet Jane Roe?

A In-person?

Q Sure.

A I met her in-person on September 22, 2021.

Q Okay. That's a very specific date. Is there a reason why you know that that's the specific date?

A I have the direct messages.

Q All right. When did you first have contact with Jane Roe?

A September 8, 2021.

Q And how do you know that that's the date?

A I have the direct messages.

Q All right. And as far as you understood, at the time, was Jane Roe a student at the University of Maryland?

A Yes.

Q All right. In the fall 2021 semester, what year were you at the University?

A I was a senior.

Q All right. Do you know what year Jane Roe was at that time?

A She was a junior.

Q Did Jane Roe ever tell you about a sexual encounter she had with John Doe?

A Yes.

Q Okay. And just so the record is clear, do you understand John Doe is the plaintiff in this case?

A Yes.

Q All right. When did Jane Roe first tell you about the sexual encounter she had with John Doe?

A September 8, 2021.

Q Okay. And what did she tell you about that encounter?

A She said she was raped.

Q On September 8, 2021, did you know to whom Jane Roe was referring when she said she was raped?

A No.

Q Okay. When did you understand her to be talking about John Doe?

A September 21st -- sorry. September 22, 2021.

Q Bear with me for one second.

MR. NORTH: I'll refer you to an exhibit that I'd like to mark as Exhibit A.

(Exhibit A marked for identification.)

THE WITNESS: Yes.

BY MR. NORTH:

Q Can you see the exhibit?

A Yes.

Q All right. My understanding is that everyone can scroll independently.

Are you able to scroll through the entire document?

A Yes.

Q All right. Can you take your time, review this document, let me know if these are all the documents that you understand you produced in response to the subpoena?

A Yes.

Q Are there any documents you believe you produced that are not included in this packet?

A No.

Q All right. I'd like to refer your attention

to page 4. Let me know when you're there.
A Yes.
Q All right. Are these messages between you and Jane Roe?
A This is between Jane Roe and the Preventing Sexual Assault Instagram.
Q Fair enough. Did you have access to that Instagram account?
A Yes.
Q Is that Instagram account psa-umd?
A I believe it's just psaumd.
Q Okay. You might be right on that. Did anyone else have access to that Instagram account during the fall 2021 semester?
A Yes.
Q And who else had access to that account?
A Defendant Two and our social media manager, Sophia Stone (phonetic).
Q Okay. Want to get in a little bit more later to the structure of PSA. But am I correct in understanding that you were a co-president of PSA at this time?
A Yes.
Q Okay. And was Defendant Two the other co-president at that time?

A Yes.

Q All right. The messages that I'm referring you to now, you said it was from -- rather between Jane Roe and the PSA Instagram account. Did you yourself type these messages on page 4?

A Yes.

Q Okay. Referring to the bottom of page 4, where it's date-stamped September 22nd at 10:51 a.m., is that September 22, 2021?

A Yes.

Q All right. And it looks like Jane Roe says:

Walking over.

And it looks like you were saying:

Hahaha what are you wearing?

And then Jane Roe says:

I'm in black leggings and gray tie-dye shirt that says UMD club volleyball.

Did I read that correctly?

A Yes.

Q All right. So am I correct in understanding that you and Jane Roe had an in-person meeting on September 22, 2021?

A Correct.

Q All right. And was it in this in-person meeting that Jane Roe told you she was referring to John

Doe as her rapist?

A Yes.

Q Okay. What specifically did she tell you during that conversation?

A To my recollection and Defendant Two was present as well, she told me that she was a part of a Title IX case that was, in her opinion, not handled well, and she was not given justice for the rape, two men.

Q Did she say who the -- well, let me back up.

When she said "two men," I think we already covered, you understood one of those men to be John Doe; is that correct?

A Yes.

Q All right. Did she say who the other one was?

A Yes.

Q And who is that?

A Jacob Poe I don't recall his last name.

Q When Jane Roe told you about this Title IX case, what was your reaction?

A I cried.

Q What made you cry?

A She showed us images of her battered and bloody.

Q She showed you -- she showed you images of her bleeding?

A Bruised.
Q Okay. So when you say "battered and bloody," she didn't show you pictures of her bleeding; is that correct?
A Correct.
Q Okay. When Jane Roe told you about her Title IX case and I'll -- and that she was raped by two boys, did you believe her?
A Yes.
Q And why did you believe her?
A As a student-run organization, we aim to be a safe haven for survivors of sexual assault. So when a woman comes to us with a story of sexual assault, we believe them.
Q Okay. Do you believe her now?
A Yes.
Q Is it the same reason?
A Yes.
Q Well, let me back up. Okay.
Is there anything different now, I should say, between, you know, why you believe her now as opposed to back then, or is it the same reason you believe her?
A I think the fact that this trial is happening shows guilt.
Q Why do you say that?

A Because in my opinion, if this person was actually innocent, they would not have been going through these lengths.

Q Why do you think an innocent person would not -- well, let me back up.

When you said trial earlier, are you referring to the lawsuit that -- you know, that's why we're here today?

A Correct.

Q I understand you to be saying that in your opinion, an innocent person would not have filed this lawsuit; is that correct?

A Yes.

Q All right. And why do you think an innocent person would not have filed this lawsuit?

A They would have nothing to gain.

Q What does that mean?

A This person was already anonymous. There is nothing to gain from this.

Q Are you aware of the allegations in this lawsuit?

A Yes.

Q Okay. Are you aware of Plaintiff's claims against the University defendants?

A Yes.

Q Are you aware that those claims have to do with the University's alleged failures to respond to his Title IX complaints?

A Yes.

Q Okay. If -- when Jane Roe told you that she felt the school did not adequately respond to her complaints, did you think that she had the right to file a federal complaint about that belief?

A Yes.

Q Okay. John Doe having the same opinion that the University failed to adequately respond to his complaints, am I correct in understanding you don't feel that he has a right to pursue that?

A There's nothing that -- there is nothing to complain about.

Q And why do you think there's nothing to complain about?

A I don't believe that he was defamed.

Q Do you believe that he was sexually harassed?

A No.

Q Okay. And why do you not believe he was sexually harassed?

A I don't know what the grounds for sexual harassment is, but I did not sexually harass him.

Q Okay. When John Doe alleged he was sexually

harassed, in this lawsuit or elsewhere, why did you not believe John Doe when he made that allegation?

A Personally?

Q Yeah.

A I have not sexually harassed John Doe. I've never met the person.

Q When he alleged that Jane Roe sexually harassed him, did you believe him then?

A I can't speak to that.

Q Why can't you speak to that?

A I wasn't there.

Q Okay. You weren't there during the sexual encounter between Jane Roe and John Doe, right?

A Correct.

Q And yet you believe Jane Roe, right?

A Yes.

Q Okay. You weren't there when Jane Roe allegedly sexually harassed John Doe, right?

A Correct.

Q And yet you don't believe John Doe, right?

A Correct.

Q Okay. Why don't you believe John Doe if you believe Jane Roe?

A I -- first and foremost, our job is to help victims of any sort of sexual harassment whether that's

John Doe or [redacted]. Personally, I can only speak to the events that happened prior to our lawsuit.
After the lawsuit, things may have happened that I cannot speak to, because I was not there. In the original conversation with [redacted], I believe her.
Q You were aware prior to this lawsuit being filed that John Doe had complained to the Title IX office about [redacted] harassing him, correct?
A Yes.
Q Okay. And you did not offer support to John Doe at that time; is that accurate?
A Correct.
Q Okay. Why did you not offer support to John Doe at that time?
A I did not know he was being sexually harassed.
Q After you discovered that he was alleging that he was sexually harassed before he filed this lawsuit, did you reach out to John Doe to offer him any support?
A No.
Q Okay. So I think you already said that you have never met John Doe; is that correct?
A Correct.
Q All right. Prior to this lawsuit being filed and actually, prior to [redacted] telling you about John Doe, were you aware of who he was around campus?

A No.

Q Okay. So when [redacted] told you that she was raped by John Doe, was that the first time you had heard that name?

A Yes.

Q Okay. Were you aware that John Doe defended himself in the Title IX process between him and [redacted]?

A Yes.

Q Okay. Do you think that John Doe is a rapist?

A I don't know.

Q Did you tell anyone that John Doe is a rapist?

A No.

Q Did you tell anyone that John Doe is a sexual predator?

A Yes.

Q Who did you tell that John Doe is a sexual predator?

A I posted it on Yik Yak.

Q What is Yik Yak?

A It's an anonymous platform similar to Twitter, but it does not have names.

Q Do you have a Yik Yak account?

A No.

Q Did you have a Yik Yak account when you posted the Yik Yak?

A Yes.
Q Okay. What was your Yik Yak username?
A There aren't any usernames.
Q Fair enough. What was the -- was there an email address that you used to sign into Yik Yak?
A I don't recall.
Q If there was an email address to sign into Yik Yak, would it have been your personal email address that you used?
A Yes.
Q Okay. You said earlier that you don't have a Yik Yak account currently; is that correct?
A Yes.
Q Why don't you have a Yik Yak account now?
A It was a fad, and then it went away.
Q Did you delete your account?
A Yes.
Q When did you delete your account?
A I don't recall.
Q Was it within the past month?
A No.
Q Was it within the past year?
A No.
Q Past two years?
A Most likely.

Q Okay. Do you remember where you were living at the time when you deleted it?
A In College Park, Maryland.
Q Okay. All right. My understanding of Yik Yak is that it works on -- is that different Yaks appear depending on where you are currently located physically. Is my understanding correct?
A Yes.
Q Okay. And when I say Yak, that's the Yik Yak terminology for, like, a post, right?
A Correct.
Q All right. Where were you when you posted the Yik Yak that John Doe is a sexual predator?
A I don't recall.
Q Was it within the University of Maryland area, more or less?
A Yes.
Q Okay. So your understanding was that the University of Maryland students would be able to see that yak, right?
A Yes.
Q Okay. What was the purpose or what was your intent that you had in your mind when you wrote that?
A Keeping people safe.
Q And how would writing that yak keep people

safe in your mind?

A From what I had seen and what I had been told, John Doe was a dangerous person. And as my moral compass, I wanted to protect others from him.

Q Okay. Have you ever reviewed any evidence in the Title IX case between John Doe and Jane Roe

A Yes.

Q All right. When did you review the evidence in the Title IX case?

A I briefly skimmed it. I did not read it all. It was printed out when we were served.

Q When you say "when we were served," are you referring to when you were served with this lawsuit?

A Correct.

Q Okay. You said "it was printed out." How is it printed out?

A In one of the apartment building's printer.

Q When you say "one of the apartment building's printers," was that the building that you were living in?

A No.

Q Who was living in that building -- well, let me rephrase.

Were you with anyone when that document was printed out?

A Jane Roe.
Q Okay. Was it Jane Roe's apartment?
A I don't recall.
Q Okay. And your understanding, at that time, was Jane Roe living in that building?
A I don't recall.
Q Okay. Did you know anyone else living in that building?
A Yes.
Q And who was that?
A Friends. I didn't --
Q Anyone involved in PSA?
A I'm sure, but I -- I don't know who.
Q Okay. Defendant Two, for example?
A No.
Q Okay.
A Yes. Defendant Two did live there. Apologies.
Q All right. No problem. You said "it was printed out." Did Jane Roe or Defendant Two print it out for you?
A Jane Roe did.
Q Okay. Did you have a conversation then with Jane Roe after you were served with the lawsuit?
A Yes.
Q Okay. What was that conversation like?

A To my recollection, we told her what had happened. That's all that happened.

Q When you say "told her what had happened," what do you mean by that?

A We had been served with a lawsuit.

Q Okay. And what was her response to the fact that you had been served with a lawsuit?

A I don't recall.

Q Did she then go and print off evidence from the Title IX case?

A The evidence was, to my recollection, for purpose, but I don't remember what it was.

Q I'm not sure I understand your last statement. You said the evidence was, to your knowledge, for a purpose. Maybe I misheard you. What was your last statement?

A It was printed out for a purpose meaning one of the lawyers wanted to look at it again. I can't recall why it was printed out.

Q Okay. But when you say for a purpose then, do you mean to say that the reason why it was printed out had something to do with the lawsuit?

A Correct.

Q Okay. When you say "one of the lawyers wanted to look at it again," perhaps, are you referring to the

lawyers that are representing you here today?
A Yes.
Q Okay. Did you speak with any other lawyers about the fact that you were served with lawsuit?
A Our club advisor is also practicing law. But she was not practicing at the time of our case. She was not our lawyer.
Q Okay. Is that Cortney Fisher?
A Correct.
Q Okay. You said that she was practicing law at one point or another; is that right?
A Correct.
Q All right. Did she tell you that she was a practicing attorney?
A Yes.
Q Did she say a particular area of law that she practiced?
A No.
Q Okay. Did you speak with any other attorneys about this, not including your current counsel?
A No.
Q Do you speak with Rebecca Berkowitz?
A No.
Q Did you have any sort of contact with Rebecca Berkowitz?

A We contacted her to find Jack.
Q Contacted her to find Jack?
A She pointed us in the direction of the Sexual Assault Legal Institute lawyer.
Q And when you say Jack, are you referring to your current counsel, Jack Condliffe?
A Yes.
Q All right. I just want to make sure I had everything clear. Who is Ben Abraham?
A I don't know.
Q Would you disagree with me if I represented to you that he was one of the presidents of Club Lacrosse at one time or another?
A Yes. I did not know his last name, but I know Ben Abraham.
Q Sounds good. Who is Andrew Skiscim?
A He was also the club -- the president of Club Lacrosse four times.
Q Okay. And if I represented to you that the other young man who is accused with John Doe, his name is Jacob Poe [redacted], would you disagree with me?
A No.
Q Okay. All right. We've talked a little bit about PSA so far, but can you tell me, kind of, generally what PSA does at UMD?

A Yes. The club was founded in 2016. As a result of a serial rapist that had raped multiple women, they came together and formed the club. I joined the club in 2019. The mission is to provide a voice, comfortable place for survivors of sexual assault and create a community where they can feel welcomed, comfortable.
Q All right. You mentioned a serial rapist. Was this a male student?
A Correct.
Q Okay. When you say "survivors of sexual assault," are the students that you serve primarily female?
A Yes.
Q Okay. Is PSA an official student organization at UMD as far as you understand?
A Yes.
Q We talked a bit earlier about how you and Defendant Two were, at one time or another, co-presidents. Were there any other leadership positions?
A Yes.
Q What were those?
A We had an executive board. I don't have all of the positions in front of me. There was a historian, events coordinator, vice president, Greek Life Liaison.

Q Was Jane Roe ever on the executive board?
A Yes.
Q Okay. Do you recall when she was given a position on the executive board?
A No.
Q Do you know generally if it was in the fall 2021 semester or the spring 2022 semester?
A Spring 2022.
Q All right. Again, we talked earlier that you and Defendant Two were co-presidents. Did you and Defendant Two have a -- have a term as co-presidents?
A School year 2021 to 2022.
Q Okay. So, you and Defendant Two, then -- I just want to make sure I understand correctly -- you and Defendant Two were both the co-presidents through the fall 2021 semester and through spring 2022?
A Around December 2021, Defendant Two took a leave of absence from school. I don't recall when she came back. I believe it was sometime around the spring of 2022.
Q All right. Did she ever resign from her position as co-president?
A No.
Q All right. So even on her leave of absence, she was still actually the co-president?
A Correct.

Q Okay. Does PSA have a faculty advisor?
A Yes.
Q Is that Cortney Fisher?
A Yes.
Q Did you understand her to be a university employee?
A Yes.
Q What does Cortney Fisher do with respect to PSA?
A She's there if we need anything, but she mostly stays in the background.
Q Is she there for you to ask questions about university policy and procedure?
A Yes.
Q Do you know what kind of contact, if any, she has with the University's Title IX office?
A No.
Q Okay. What kind of role, if any, does PSA itself have with the Title IX office at UMD?
A None.
Q No meaning no role?
A No role.
Q Who is Melanie Turner?
A She's our vice president.
Q By vice president, is it -- is it fair to say

that she served under you and Defendant Two

A Correct.

Q What does PSA do when a survivor comes to PSA looking for support?

A We encourage them to attend our events. We keep in contact with them, check in on them to see how they're doing. We provide them with like-minded individuals to rely on if they so need it.

Q Do you ever help them make public statements about their experience?

A No.

Q I'd like to refer back to Exhibit 1 -- or Exhibit A, rather. Defendant Three, can you see Exhibit A?

A Yes.

Q You scroll to page 20.

A Yes.

Q What is this document?

A It's a speech that Jane Roe presented at our event, Real Talk.

Q This was a public statement that Jane Roe made; is that correct?

A Yes.

Q Okay. And how did you come to have a copy of this speech in your possession?

A She sent it to me when I asked for it when we

were served.

Q Okay. When was this event?

A This would have been November 2021.

Q Would you disagree with me if I told you it was November 10, 2021?

A No.

Q Okay. I think you described this event as Real Talk; is that correct?

A Correct.

Q And am I correct in understanding that you invited Jane Roe to speak at this event?

A We gave her the platform should she -- should she so want it.

Q Did Jane Roe know about the Real Talk event before joining PSA?

A I don't know.

Q Did you tell her about the Real Talk event?

A Yes.

Q Okay. You said earlier that you gave Jane Roe a platform to speak at that event. Were you aware that she would speak about her experience in the Title IX process?

A Yes.

Q Okay. Including talking about John Doe as a rapist?

A Yes.
Q Have you -- in preparation for today's deposition, have you referred -- sorry -- have you reviewed this speech?
A Yes.
Q Do you agree with Jane Roe's statements in the speech?
A For the most part.
Q Are there any points that you don't -- or that you don't agree with? You can take your time to review. That's fine, if you need it.
A When she showed this to me, I cautioned her about mentioning their names, and she said that she was fully allowed, within her case, to mention them.
Q Since my question was, are there any points in the speech that you don't agree with, and that was your response, am I correct in understanding that your only point of disagreement might have been whether to mention John Doe or not?
A John Doe and Poe Correct.
Q All right. Thank you. Does PSA encourage survivors to go to the police for assistance?
A In some cases, yes.
Q Why only in some cases?
A Retaliation is a very dangerous thing. And

sometimes when people go to the police, their assaulters or assailants find out and come to -- come back at them. It's a very real risk.

Q Does PSA encourage survivors to go to the Title IX office at UMD?

A Also in some cases.

Q Okay. And for the same reason in some cases?

A Correct.

Q Okay. How many survivors have you helped during your time at PSA?

A Probably five or six.

Q And how many of those five or six are female?

A All of them.

Q Am I correct that you've never assisted any male survivors?

A I believe that we did come in contact with a male survivor, but I do not recall the details.

Q You can't tell me that male survivor's name?

A No.

Q You can't give me any details about that male survivor?

A No.

Q Does PSA hold any events or demonstrations?

A Yes.

Q What events are those aside from Real Talk,

which we already talked about?

A We have an event at the beginning of the school year, usually in September, called SlutWalk. And we have an event at around March called Occupy McKeldin.

Q Okay. Let's talk about SlutWalk first. What -- can you tell me a bit about that event?

A We make signs and we go to different spots around campus chanting. We share survivor stories.

Q Why is it called SlutWalk?

A SlutWalk is a national movement. And I -- I don't have the national definition in front of me, but that is something that you should be able to find if you looked up it on -- on Google.

Q Yeah. No, that's fine. I'm not asking you to recite any national definition, but in your understanding. Do you have an understanding of why it was called SlutWalk?

A To normalize the word slut, it's not a dirty word. To get rid of or make aware people of slut-shaming and victim blaming.

Q What is slut-shaming?

A That is when someone is called a slut, any means of the word due to any action.

MR. NORTH: Refer you to another exhibit that I'll mark as Exhibit B.

(Exhibit B marked for identification.)
BY MR. NORTH:
Q Can you see this exhibit?
A Yes.
Q All right. I refer you to -- make sure I'm at the right page here, page 14.
A Yes.
Q Okay. Is this a news article that has a picture of the SlutWalk?
A Yes.
Q Okay. And is this the SlutWalk that occurred at the University of Maryland while you were PSA co-president?
A Yes.
Q Okay. Are these the signs -- are these some of the signs that the PSA made?
A Yes. Well, people came and made their own signs.
Q All right. Fair enough. One of these signs says "Pussy Grabs Back." What does that mean?
A That we don't stand for injustice.
Q Anything more particular than that?
A I think it's in relation to Donald Trump's claims about grabbing a pussy.
Q Okay. And there's a sign, looks like

partially obscured by the sign I just mentioned. As far as you can tell, does that sign say something to the effect of getting rapists off campus?

A Yes.

Q Okay. Thank you. Now, you also mentioned the occupy event, I think. What is that event?

A That's an event we pour 30 plus thousand dollars into, getting speakers, usually activists, to come speak to the campus community. We have different booths of different organizations that are there to help as well as we had, you know, therapy dogs there and the like.

Q Have you ever done an event called Walk a Mile in Her Shoes?

A I've heard of it, but I have not been a part of it.

Q Did you host an event called Catcalls of College Park?

A It was not an event.

Q Okay. What was it?

A We anonymously polled for catcalls that people had been --- had heard on campus towards them. We confirmed with them that we had the ability to share those catcalls, and we chalked them around campus to bring awareness to the prevalence of catcalling on our

own campus.

Q Okay. And as far as you're aware, did PSA make an Instagram post about that event?

A Yes.

Q Okay. And as far as you're aware, did that Instagram post accurately depict the event or the chalking or whatever you described?

A Yes.

Q All right. So I know we talked a bit about Real Talk. But what -- first -- I guess, first question, why is it called Real Talk?

A It's a candid conversation in a bar where alcohol is freely flowing -- or not freely flowing, but there's alcohol at a bar, and it aims to end the stigma that there -- alcohol means you're, you know, susceptible to any sort of malexperience. And we have a candid conversation where we go over statistics. We talk about different issues that are prevalent on campus. There's usually a -- a leader. So, me and Defendant Two -- me at the time and our last president and people in the room can chime in with their thoughts.

Q Aside from when Jane Roe talked about her experience in the Title IX process, did any other survivors talk about their own personal experiences at that event -- either at that specific event that day or

other Real Talk events?
A Yes.
Q Okay. Did --
A Actually -- I -- I actually don't recall. I -- I wasn't at the -- the Real Talk before that, but I -- I assume -- I don't know.
Q All right. Fair enough.
MR. NORTH: All right. Is it all right with everyone if we take, like, a five-minute break?
MR. BEASLEY: Sure.
THE WITNESS: Yes.
MR. SHERIDAN: Yes. That's --
MR. NORTH: All right. Just -- I just want to come back here at 11:25.
THE PROCEEDINGS OFFICER: -- Eastern.
MR. CONDLIFFE: Sure.
THE PROCEEDINGS OFFICER: Right.
MR. CONDLIFFE: Hey, if you're not using an exhibit at any particular moment, Ben, can you take that down? Because then I have a better screen.
MR. NORTH: Yeah. Of course.
MR. CONDLIFFE: Yeah. Thanks.
(Off the record.)
THE PROCEEDINGS OFFICER: We're going to go back on the record at 11:25 a.m., Eastern.

MR. NORTH: Thank you.

I'll say for the record, Jack as well, I think that you can also freely access the exhibits after they've been marked. See it on your left-hand column.

BY MR. NORTH:

Q All right. We're back from the break. Continuing with questions here. Defendant Three, would you agree with me that female students are often the ones being called sluts?

A Yes.

Q Okay. So would you agree with me that the SlutWalk was primarily designed to help the stigma that female students face?

A Yes.

Q Kind of same questions for the Catcalls of College Park. Would you agree with me that female students are often the ones who are being catcalled?

A Yes.

Q Okay. And your understanding is that men that are often doing the catcalling?

A Yes.

Q So this event, then, you'd agree with me that, you know, it was designed to help female students?

A I would say there's also an awareness piece that garnered many men to join as well.

Q Fair enough. The awareness piece that you're talking about with men is being aware that they might be doing catcalling unintentionally. Is that fair to say?
A Or just the notion that it's happening around them.
Q Okay. But not that they themselves are victims of cat calling, right?
A Sure.
Q Okay. While you were co-president of PSA, did you ever host or facilitate an event specifically about the problems facing male students?
A We had a branch of Real Talk, called Real Talk As Well, where we went to fraternities and spoke to them about sexual assault.
Q And when you spoke to them about sexual assault, would you agree with me that you were speaking to them about, you know, the sexual assault that might be going on at those fraternities?
A Yes.
Q Okay. Not that the men are victims of sexual assault, but that they should be aware of --
A No.
Q -- their brothers who might be sexually assaulting?
A No. For men as well.

Q Okay. What does patriarchy mean to you?
A The notion that men have held legislative as well as societal leadership roles throughout history.
Q Do you believe that we live in a patriarchy?
A Yes.
Q Why do you believe that?
A Well, all of you are men.
Q When you say all of us are men, what do you mean by that?
A I would say all the lawyers here are men.
Q What does that mean, I guess, is my question? Like, how -- I'll rephrase.
How does us all being men support your belief that we live in a patriarchy is my question.
A Well, this is a case about sexual assault of women, and there is not a woman lawyer here. I would say --
Q What does it mean?
A -- that illustrates the patriarchy very well.
Q What is significant about there not being a female lawyer in this case?
A I would say there are challenges for women to move up the ranks in very high-paying career paths. And I think that is what I mean by that statement.
Q Okay.

MR. NORTH: I'll refer to you an exhibit that I'll mark as Exhibit C.

(Exhibit C marked for identification.)

BY MR. NORTH:

Q Defendant Three, can you see this exhibit?

A Yes.

Q Okay. Now, in this exhibit, are these text messages between you and Defendant Two, as far as you can tell?

A Yes.

Q Okay. So when it says at the top on the first page: Messages between Defendant Three and me, does me refer to Defendant Two?

A Yes.

Q I would like to refer you to page 20. Well, actually, before I say that, feel free to take a read through this entire document and just let me know, as far as you can tell, are these text messages accurate text messages between you and Defendant Two

A Yes.

Q Okay. All right.

MR. CONDLIFFE: Can I just ask a stupid question? How do you scroll through to additional pages? I'm having a little trouble with that.

MR. NORTH: Jack, I think you scroll

down, and it should just pop --

MR. CONDLIFFE: I got it. It's at the bottom.

MR. NORTH: Yeah.

MR. CONDLIFFE: I see it. All right. This actually says 36 pages, though. Not 20.

MR. NORTH: Right. Yeah. So I -- and I misspoke earlier, I refer you to what looks to me as page 21.

MR. CONDLIFFE: Got it. All right. Thanks. I got it now.

MR. NORTH: Sure. The page I mean to refer to as the first text on this page reads, seriously, with a bunch of exclamation points. Is everyone on that page?

MR. BEASLEY: You said -- you said page 20?

MR. NORTH: I'm realizing now it was 21.

MR. BEASLEY: Oh, okay. All right. I got it. Thank you.

MR. NORTH: All right. Thank you.

BY MR. NORTH:

Q Defendant Three, am I correct in understanding that in these text messages, the blue refers to -- or the blue text messages are Defendant Two text messages, and the gray

are your text messages --

A Yes.

Q -- as far as you can tell? Okay. Do you see where [redacted] texts you: Burning down the patriarchy?

A Yes.

Q Was that -- you would agree with me that that was in reference to John Doe, correct?

A I wouldn't say it's in reference to John Doe at all.

Q All right. Now, I'd like to refer you to page 20. Do you see at the start of page 20, you text [redacted]

Also, I won't be able to go in-person to [redacted]'s interview. Would you want to talk before it and then fill me in after?

A Yes.

Q And then do you see later in the -- later on in the page, you discuss [redacted] in a news article about her experience?

A Yes.

Q That experience that [redacted] had that's going in the news article was her interaction with John Doe, correct?

A I think it was more of how the Title IX case was handled.

Q And that was the Title IX case with John Doe, right?
A Correct.
Q So again, referring to page 21, when she says: Burning down the patriarchy, and you respond:
Also, like, need to emphasize how much evidence she had. I know people will spin it.
When you said "how much evidence she had," you were referring to the evidence in the Title IX case, correct?
A Correct.
Q And that was the Title IX case with John Doe?
A Correct.
Q Okay. And that was part of the same conversation where Defendant Two said: Burning down the patriarchy?
A I -- I don't recall.
Q The text directly prior to your text about the evidence said: Burning down the patriarchy, right?
A Yes. I -- I think so. I -- I don't recall if it's on the same -- in the same day or the same chain. I -- I assume so.
Q All right. Fair enough. In any event, you didn't produce these text messages in response to the subpoena, right?

A [redacted] did.

Q These are text messages between you and [redacted] correct?

A Correct.

Q And you did not produce these text messages in response to the subpoena?

A Because they're already produced.

Q Are you aware of your -- of your obligations under the subpoena?

A Yes.

Q To produce all documents that you have in your possession --

A Did I not produce this?

Q -- particular issue?

A I -- we sent you this, correct?

Q What I'm asking you is, did you produce this document in response to the subpoena?

A No. I did not screenshot it, but I did produce it.

Q You produced this document in response to the subpoena. Is that your testimony?

A [redacted] put together this document, but it was sent to our lawyers as a production for the subpoena.

Q Right. I guess what I'm trying to understand is --

A No. This is not my screenshot.
Q Right. And am I correct in stating that Defendant Two sent this to your attorney --
A Correct.
Q -- as far as you understand? Okay. So in other words, you did not yourself send this to your attorney in response to the subpoena; is that correct?
A No.
Q By no, are you saying you did send this document personally to your attorney?
A No. They already had it from two years ago.
Q Right. My question to you -- I just want to make sure the record's clear here.
You yourself did not send this document to your attorney in response to the subpoena, right?
A No.
Q And by "no" you're agreeing with me that you did not, correct?
A Correct.
Q Okay. Thank you. What did Jane Roe tell you specifically happened in the sexual encounter that she had with John Doe?
A I don't recall explicit details. She told me that she was assaulted by way of fingers. She told me she was shoved in a closet. She told me she was

ejaculated on. She told me she was beaten. She told me she was messed up inside afterwards, causing her to need to get medical attention. That's the knowledge I have.

Q All right. When Jane Roe told you all of this information, did you ever attempt to verify that what she was saying was accurate?

A No.

Q Aside from Jane Roe herself, who have you spoken to about the sexual encounter between Jane Roe and John Doe?

A Nobody. Defendant Two was present, but nobody else.

Q You would agree with me you spoke with Defendant Two about John Doe and Jane Roe's interaction after that conversation?

A Sure.

Q Okay. And you'd agree with me that you also spoke to Cortney Fisher about the situation?

A I did not go into detail.

Q But you spoke to Cortney Fisher, generally speaking, about the interaction between Jane Roe and John Doe, correct?

A Sure.

Q Okay. Did you speak to anyone else at PSA about, generally speaking, the interaction between Jane Roe and John Doe?

A No.

Q Did you speak to anyone named Jess (phonetic) about the situation between Jane Roe and John Doe?

A Yes.

Q Who is Jess?

A She is our -- she was our sexual assault liaison for my sorority.

Q What is -- well, first off, what sorority?

A Zeta Tau Alpha. I apologize if I did not mention that at the beginning of this call. So I was also in a sorority all four years of college.

Q Okay. And I think you said sexual assault liaison; is that correct?

A Correct.

Q What is that position?

A They attend a -- a meeting every week called Ten Woman Plan or Ten Man Plan. The Ten Man Plan is for the fraternities, and Ten Woman Plan is for sororities. And it's an educational class, if you will, to help educate your own chapter about sexual assault. So they are the liaison who learns and brings it back to the rest of the chapter, as well as 10 or so other people. Hence, Ten Woman Plan.

Q Okay. Was Jess a student or an employee at the University?

A Student.
Q Okay. You said earlier that you, at one point, skimmed the evidence in the Title IX file. Do you recall what document you skimmed?
A No.
Q Okay. Do you recall generally what that document said?
A No.
Q Did you speak to any other university employees about John Doe and [redacted]?
A No.
Q Did you speak to Kurt Klier about John Doe and [redacted]
A Not explicitly. No.
Q All right. I'd like to refer everyone back to Exhibit A, bottom of page 1. This is an email sent from your personal or -- yeah, what appears to be your personal email account, right?
A So sent by [redacted], not me. Are you referring to the first email or the second?
Q The second email.
A Second. Yes.
Q That is an email that you wrote, correct?
A Correct.
Q And it says -- I think if you can, kind of,

squint your eyes here, it looks like it's sent to K. Klier; is that correct?

A Correct.

Q And K. Klier is Kurt Klier, right?

A Yes.

Q Kurt Klier is a university employee; is that correct?

A Yes.

Q You said in this email:

Hi, Mr. Klier,

My name is [redacted] and I am the Co-President of PSA, as [redacted] mentioned. As a student-run organization on campus, our hope is to be in close relation with the school and its leaders. In light of this incident, we would like to work alongside you and your team to get a resolution. If this is not something you're able to help with, guidance on who to contact would be much appreciated. Best, [redacted].

Did I read that correctly?

A Yes.

Q Okay. When you referenced "this incident," that referred to the incident between [redacted] and John Doe, right?

A That referred to [redacted]'s email to Kurt Klier. Correct.

Q Which had to do with her encounter with John Doe, right?
A Yes.
Q Okay. And what did you mean by "get a resolution"?
A I knew that Jane Roe was feeling hurt. And whether or not a resolution ended with awareness, his position on his team -- or just making Jane Roe feel more safe, that's what I meant.
Q You mentioned "his position on his team" as part of a resolution. What does that mean?
A Whether or not he is a athlete on the Club Lacrosse Team.
Q So am I correct in understanding that, in your view, part of the resolution involved seeing if he could no longer be an athlete on the Club Lacrosse Team?
A I guess let me rephrase. Part of the resolution was keeping people safe, and that would be attained by having him removed from his time on the team.
Q All right. And that is included in what you meant when -- in this email when you said "to get a resolution."
A Correct. Now, we've been over, I think, a few people that you've admitted that you spoke to about

these allegations. Are there anyone else that I haven't mentioned so far that you spoke to about the situation between John Doe and Jane Roe?

A Spoke to Andrew and Ben, and I spoke to the women in the -- in that group chat at the bottom of this exhibit.

Q Okay. So let's talk about that group chat.

A I do want to just add that this email that Jane Roe sent to Kurt Klier was not reviewed by me or signed off on by me.

Q All right. Let's go back to the email. You just testified that the email that Jane Roe sent was not reviewed by you or sent by you. Did you email Jane Roe to tell her that she shouldn't have sent that email?

A I talked to her over the phone. My email was an attempt to save face back to Klier.

Q Did you email Klier personally without?

A No. The only email --

Q I'll rephrase --

A -- to Klier is the one here, you see here.

Q Okay. So you didn't send any other emails saying -- you know, to Klier privately?

A No. I --

Q Jane Roe's email is not sanctioned by PSA or anything of the like, right?

Q Okay. All right. I'd like to direct your attention to the group chat at the bottom of this document. I believe it starts on page 11. Do you agree with me there?
A Yes.
Q Okay. What is this group chat?
A It's -- to my knowledge, Jess is the sexual assault liaison, as I mentioned. And the other person in there is Sydney, and she's our events coordinator, and I -- I've -- I don't remember what Ruby's role was.
Q All right. Are all of these female students?
A Yes.
Q Okay. At the start of the messages on the left-hand column, it starts off by saying:
Hi, guys, in regards to the social with club lax and all other SAP related discussions -- and continues.
What does SAP stand for?
A Sexual assault prevention.
Q And "the social with club lax," what was that?
A It's a party that sororities and fraternities throw. And Club Lacrosse is, I guess, considered a fraternity in this case.
Q Why is it considered a fraternity?
A I don't know.

Q All right. I'd like to direct your attention to page 13. These are text messages between you and Andrew Skiscim; is that correct?
A Correct.
Q The blue is your text message, and the gray is his text message; is that right?
A Yes.
Q Okay. You wrote to Andrew:
Hey Andrew, just talked to our risk chair. Hopefully, the comvo with the person went ... well?
The person that you're referring to is John Doe, correct?
A Correct.
Q Okay. What was your understanding of the conversation Andrew was going to have with John Doe?
A He did not like John Doe. He thought John Doe was the worst, and he wanted to make him leave the team.
Q Okay. Moving on to the next page, page 14. It looks to be another group chat titled The Brotherhood. What is this group chat?
A This is my entire sorority on GroupMe.
Q Okay. And GroupMe is a social media app?
A I guess I wouldn't say -- it's more of a messaging app.
Q Fair enough. It -- it's an app that you can

have on your phone to message people, right?

A Correct.

Q And just to, again, be clear, when you say The Brotherhood, the title of this group, that's, kind of, a play on words, because it's a sorority group chat and it's all women, correct?

A Sure.

Q All right. The top of the second column, there's a sentence that says:

He will not be there and this was an isolated incident, however, we know that some people still may feel uncomfortable.

You understood "he" in that sentence to refer to John Doe, right?

A Correct.

Q Okay.

A Actually -- actually, just remembered something about the previous message that we looked at. The one with -- with Andrew, one on page 13. I just wanted to add that this conversation happened over the phone after these text messages.

And that was, to my knowledge, when Andrew had said, "I would like you to leave Club Lacrosse," and John Doe had said, "I will think about it." And that's what he told me on the phone.

Q Okay. And what was your response to Andrew saying that?
A I don't recall.
Q You still have access to GroupMe; is that right?
A No.
Q Did you delete GroupMe --
A When I graduated --
Q -- off your phone?
A -- college, yes.
Q Do you still have a GroupMe account?
A Not to my knowledge.
Q In response to the subpoena, did you check if you had any messages on GroupMe that might have been responsive?
A It would have been deleted.
Q How do you know it would have been deleted?
A When you delete your account, you delete all your messages.
Q I thought you said you deleted the app, but you -- do you mean to say that you deleted your entire GroupMe account?
A I -- to my knowledge, I -- I could be wrong. I believe that when you delete the app, it deletes your account associated because it's just your phone number.

So I -- I don't have access.

Q Okay. After you were served with the subpoena, did you check to see if that was the case?

A No.

Q Okay. Referring to page 9 of this document. This appears to be another group chat. Who is in this group chat?

A Ben Abraham, who is the Club Lacrosse President of -- of 2021, and Melanie Turner, who was our vice president and who was helping me out while Defendant Two was on leave.

Q All right. And down at the bottom of the left-hand column, there's a blue text. That was a text that you typed, correct?

A Yes.

Q You said:

Or if you have any questions for us regarding how to do that, there is a way to really just make him feel unwelcome enough that he doesn't want to come around anyway.

Right?

A Yeah. I -- I --

Q Did I read that correctly?

A Yeah. That was actually their idea originally, but over the phone.


Remote Legal Court Reporting
646.461.3400 info@remotelegal.com

Q Okay. And am I correct in understanding that that text means, you know, even if they can't just remove him from the team, they could make his experience so unpleasant that it would kind of force him to want to leave the team by himself? Is that a fair read?
A Sure.
Q Okay. And you offered to answer any questions as to how to make that happen, right?
A Correct. But I do want to note that this was not -- you know, this was their -- this is something they wanted to do.
Q Okay. Thank you. I'd like to refer you to another exhibit.
MR. NORTH: I think we're on D, so I'll mark that as Exhibit D.
(Exhibit D marked for identification.)
BY MR. NORTH:
Q All right. Can you see this exhibit?
A Yes.
Q Okay. Please take your time to review it and let me know if it is text messages between you, Jane Roe, and Defendant Two?
A Yes.
Q Okay. And again, at the top of the page, "me" refers to Defendant Two; is that correct?

A Yes.
Q Okay. You didn't produce these messages in response to the subpoena, correct?
A No.
Q Okay. Thank you. I think you testified earlier that part of the solution that you envisioned was getting John Doe removed from the Club Lacrosse Team. Why did you want John Doe to be removed from the Club Lacrosse Team?
A As I said, to my knowledge, this person was dangerous, and I wanted to make campus safer for everybody.
Q Were you aware at that time that he was found not responsible by the University?
A Yes.
Q Did that change your opinion at all?
A No.
Q Why did it not change your opinion?
A I had spoken to Rebecca Berkowitz -- or Rebecca Berkowitz had told Jane Roe that that was the work -- the most poorly handled Title IX case in her career.
Q Did she say why?
A She said the evidence was -- it was not presented correctly, was not told to store correctly. I don't know the ins and outs, but that, to me, was

confirmation that there was injustice.

MR. CONDLIFFE: I just apologize. I wasn't clear, Ben, whether your question was, did Rebecca Berkowitz say that or did [redacted] say that? So I was confused by that question.

MR. NORTH: My question was, did Rebecca -- I think my question was, did Rebecca Berkowitz say anything else. And I think she answered that question.

MR. CONDLIFFE: Okay. Yeah. Just that she, but I wasn't sure.

MR. NORTH: If I'm -- if --

MR. CONDLIFFE: Yeah. Thank you.

MR. NORTH: If you were saying what [redacted] had said, you know, please let me know. But I thought you were referring --

THE WITNESS: That was for -- yes. Rebecca Berkowitz had said that, and that was related to me by [redacted].

BY MR. NORTH:

Q Okay. So I -- again, I just -- okay. I just want to make sure I understand. I thought you were just testifying about what you learned from Rebecca Berkowitz; is that correct?

A It was relayed to me through [redacted].

Q Okay. So did you have a -- did you yourself

have a conversation with Rebecca Berkowitz?
A No.
Q Okay. So the only way you learned -- probably not phrasing that correctly.
Did your knowledge of Rebecca Berkowitz's opinion of the Title IX case come from any source other than [redacted]?
A I would say no.
Q Okay. When did you learn that John Doe was found not responsible?
A I knew that at the beginning, the first time [redacted] spoke to us -- or I guess her case closed -- no, her case closed September, right before she spoke to us. So, yes, I knew that.
Q Do you think it's possible for a man to be falsely accused of sexual assault?
A Sure.
Q Do you think John Doe was falsely accused of sexual assault?
A Absolutely not.
Q Are you familiar with the -- are you familiar with the phrase "unofficial justice"?
A Yes.
Q What does that mean?
A I would say not taking the route of legality

and instead -- not taking the route of legality.

Q And in the context of PSA, would that -- do you mean by that to mean, you know, taking action against someone outside of the Title IX process itself?

A Correct.

Q Okay. Was that something PSA pursued?

A Yes.

MR. NORTH: I would like to refer you to what I'll mark as Exhibit E.

(Exhibit E marked for identification.)

MR. CONDLIFFE: Ben, I'm stepping away for a minute, but just keep going.

MR. NORTH: Sure. Thanks.

BY MR. NORTH:

Q All right. Do you see this document?

A Yes.

Q Okay. Do you notice on the first page a date stamp in the bottom-right corner?

A Yes.

Q September 8, 2021?

A Yes.

Q Okay. And on the left side, you agree with me that this is a letter signed by you and Defendant Two?

A Yes.

Q All right. What was the purpose of this

letter? You can take your time to review if you need it.

A Every sorority was saying that they were staying away from Pi Kappa Alpha. To my knowledge, that meant complaints had been made, and this letter was to shed lights on the complaints. We believe that not only the people involved in the case should be safe.

Q Did you write this letter?

A Me and Defendant Two co-wrote it. Yes.

Q Okay. Do you see five or so paragraphs down, starting with:

There should undoubtedly be a zero-tolerance policy when it comes to misconduct of this nature, and it is unacceptable that a chapter like PIKE (or any chapter with allegations against them) continues to exist on campus without any consequences for their actions.

A Yes.

Q Did I read that correctly?

A Yes.

Q Okay. Did you mean by this sentence that in your view, it's unacceptable for an organization to exist if there are sexual misconduct allegations against them?

A Yes.

Q Okay. Do you understand that allegations are not themselves proof?

A Yes.

Q Why, in your view, does an organization deserve to be kicked off campus if there are merely allegations against them?

A Because the majority of allegations that are false is very, very, very slim.

Q How do you know that?

A Because I've looked it up.

Q Where have you looked it up?

A You can look it up on Google. I can look it up right now if -- if you want me to get my number. Correct.

Q No. It's fine. I'm just interested in your mental state when you wrote this.

A Yes. And as an organization preventing sexual assault, we take all the allegations seriously. That is part of our -- our job as -- as leaders.

Q When you say "take allegations seriously," do you -- do you mean to say that you believe all the allegations?

A We -- we -- I don't know, I wouldn't go as far as to say we wholeheartedly believe them in our personal capacity. But I would say we hear those people out, and

we give them the resources that they need.

Q Can you explain the distinction you just raised about personal capacity versus what you described as your job at PSA? What's the difference there?

A My personal capacity, I can be emotionally strained by allegations. However, as an organization, I need to maintain my composure and allow those people to access the resources that they need in my club. My personal beliefs do not have any relevance to the Club's actions because we will always, always, always support survivors.

Q Okay. And is it part of PSA's practice to test whether allegations are true or not or just to provide support?

A Provide support. Regardless of if the allegations are true or not, this person is unwell.

Q Okay. Now, PIKE, I think you said it's a fraternity; is that correct?

A Correct.

Q As far as you understand, you know, fraternities are male-only organizations?

A My sorority was actually a fraternity, technically -- but yes, in -- for your case. Yes.

Q What do you mean that your "sorority was actually a fraternity"?

A Zeta Tau Alpha is a national fraternity. So, technically, no. But for your purposes, yes.

Q Okay. Fair enough. I guess my -- just to be clear, when you earlier referred to your sorority as your sorority, is it fair to say you did that because all of the members of that group are female?

A Correct?

Q Okay. And PIKE, all of -- as far as you understand, all of the members of PIKE are men --

A Correct.

Q -- is that correct? Okay. All right. And is it fair to say that through this letter, otherwise, you sought to get PIKE removed -- well, let me rephrase.

Is it fair to say that through this letter, otherwise you sought to get PIKE removed from campus?

A We sought to create awareness around this issue so that the women in sororities were not the only ones that knew that they were allegations against PIKE.

Q Okay. Do you ever seek to get a female organization kicked off campus?

A I never seen -- I never tried to get any organization kicked off campus. No.

Q Did you ever write a letter like this about a female organization?

A No.

Q Okay. All right. I'd like to refer you back to -- I believe it's Exhibit B. Scrolling to page 5. This is an article by Her Campus; is that correct?

A Correct.

Q Okay. And you can take your time to review, but just want to confirm that you were interviewed as part of this article?

A Yes.

Q Okay. This article discussed a bouncer at a bar named R.J. Bentley's; is that right?

A Yes.

Q Okay. Can you tell me what happened with respect to that bouncer?

A Again, sororities were sending around "Hey, this person is actually on a sexual offender registry." And me, in my professional capacity, decided to take upon myself to make the rest of the campus aware and hopefully the bar aware so that they could take action that they deemed was necessary.

Q Okay. Towards the end of that first page of that article, third paragraph reads:

According to PSA President Defendant Three, an email was sent last week to UMD sorority presidents stating that an R.J. Bentley's employee was on a registered sex offenders list. After some digging,

Defendant Three and her team were able to find the employee's charges and contact R.J. Bentley's.

Did I read that correctly?

A Yes.

Q Okay. When it refers to "find the employee's charges," what is that referring to?

A We looked up this employee, and the first thing that came up was a picture of them in a mug shot.

Q Okay. By "charges," do you mean criminal charges, then?

A Yes.

Q Okay. Did you discover that the fact that he was charged or that he was convicted or both?

A Both.

Q Okay. Thank you. Did Jane Roe ever discussed with you wanting to get Jacob Poe removed from his fraternity?

A No.

Q Do you know why that was?

A I had contacted the president of his fraternity, and his president said that he had left the fraternity.

Q Okay. Did you ever post any Yik Yaks about Poe being a sexual predator?

A No.

Q Why didn't you?
A He was no longer in that space where he had access to drunken women.
Q He was still a student, though, right?
A Not to my knowledge.
Q He wasn't banned from going to any parties or anything, was he?
A To my knowledge, he was not -- no longer on campus.
Q Did -- sorry. Did Jane Roe seem particularly focused on John Doe as opposed to Poe?
A No.
Q She talked to you about John Doe several times, right?
A Correct.
Q And you just testified that she never talked to you aboutPoe right?
A She did talk to me about Poe
Q Okay. When did she talk to you about Poe
A Our initial meeting.
Q Any time after that?
A I don't recall specifics.
Q Okay. And by you don't recall specifics, it's correct that as you testify here today, you can't think of a particular instance in which Jane Roe talked to you

about Poe aside from that first meeting?
A I'm sure it was discussed, but I can't think of a particular instance.
Q Okay. Did Jane Roe express any views as to John Doe's conduct in the Title IX process?
A No.
Q Okay. Did Jane Roe discuss how John Doe defended himself in the Title IX process?
A No.
Q Did Jane Roe ever discuss with you certain things that his lawyers did as part of defending John Doe?
A No.
Q Do you think that if John Doe had not defended himself, he would have been found responsible?
A I don't know.
Q The solution that you mentioned earlier that included potentially John Doe being removed from the Club Lacrosse Team, who came up with that solution?
A Me.
Q Did you communicate with Jane Roe about this plan?
A Sure.
Q Did you communicate with Defendant Two about this plan?

A Yes.
Q You never attempted to get any female students removed from their teams or clubs, correct?
A No.
Q And by "no," you mean I am correct, right?
A Yes.
Q Okay. The only students you ever attempted to get removed were male students then, right?
A Well, male students were the only ones convicted of sexual assault. So, yes.
Q And you understand John Doe was found not responsible, right?
A He was still convicted. I think --
Q How is he still "convicted"?
A He's still -- he was still accused. Sorry. That's the right word.
Q Okay. You were saying anyone can accuse anyone of anything, right?
A Yes.
Q What was it about the fact that he was accused? Why was that important to you?
A I don't think it's the fact that he was accused. I think it was the fact that a woman came to us in a very vulnerable state, showing us pictures and evidence of her bruised body. The fact that she has to

get a colonoscopy at 22 because her rapists messed up her inside so poorly, it's hard for me to hear that and I think that he shouldn't have been accused, that sounds like accusatory behavior -- you know, that sounds accusatory to me.

Q You mentioned a colonoscopy report. Did you ever review that colonoscopy report?

A No. That was something that happened this past week.

Q When you say "that's something that happened this past week," do you mean to say that you reviewed the colonoscopy report this past week?

A No. I mean to say that she told me that she had a colonoscopy and she has to have one at 22 because of how messed up her insides are. She told me that this week.

Q I see. Okay. So you talked to [redacted] this week, then, about this incident?

A I am on her private Snapchat story where she posted that.

Q Okay. Fair enough. As far as you recall, when [redacted] posted that, did she specifically reference that that's because of what she said happened to her at UMD?

A No. She said --

Q And how do you --
A -- she said it was due to assault, but not -- you know.
Q And you understood her to be referencing John Doe?
A Yes.
Q Okay. All right. All right. I am referring back to Exhibit A. Referring to page 6 and 7. All right. Let me direct your attention to email address that appears to be titled Defendant Two & Defendant Three. And then the email address is psapresidentumd@gmail.com. Do you see that?
A Yes.
Q Okay. Is that the PSA President Gmail account?
A Yes.
Q Okay. And it says Defendant Two & Defendant Three. And that refers to Defendant Two and you?
A Yes.
Q Okay. Did it read Defendant Two & Defendant Three then, for the entirety of the -- your term as PSA copresidents?
A Yes.
Q Okay. Do you both had access to this email during your terms?
A Yes.

Q Okay. Thank you. It's fair to say that you, Defendant Two, and Jane Roe discussed the plan to have John Doe removed from the Club Lacrosse Team during the fall 2021 semester?

A Not to remove him. To make his club aware.

Q Okay. Fair enough. But you discussed that plan?

A Yes.

Q During the fall 2021 semester?

A Yeah.

Q Okay. And you also discussed that in the spring 2022 semester with Defendant Two and Jane Roe, right?

A Yes.

Q Okay. Is it fair to say that you and Defendant Two also discussed plans to spread the word that John Doe was a sexual predator?

A No.

Q Did you and Defendant Two discuss posting Yik Yaks about John Doe being a sexual predator?

A No.

Q Let me refer your attention back to Exhibit C, page 8 and 9. So I think we've already established these are text messages between you and Defendant Two, you sent Defendant Two a screenshot of the Yik Yak that you posted about John Doe being a sexual predator, right?

A Yes.

Q Okay. And then in the next page -- well, first off --

MR. SHERIDAN: I --

MR. NORTH: -- at the end of that --

MR. SHERIDAN: Sorry. Sorry to interrupt. I can't see this exhibit for some reason.

MR. NORTH: Can everyone else see it?

MR. BEASLEY: Yeah. I can see it. What page is this, again?

MR. NORTH: This is 8. We had a problem in the last deposition where some people randomly could not see the exhibit. Let me close it and bring it back up.

MR. SHERIDAN: Okay. Thanks.

MR. NORTH: Patrick, can you see it now?

MR. SHERIDAN: Yeah. I can see it now.

MR. NORTH: Okay.

MR. SHERIDAN: What page are we on? Sorry.

MR. NORTH: 8.

MR. SHERIDAN: Yeah.

BY MR. NORTH:

Q All right. Defendant Three, can you see this as well?

A Yes.

Q Okay. So you sent the screenshot to [redacted], and then am I correct that you texted her and figured out a way to not get blocked?
A Yes.
Q What were you referring to there?
A I currently was dating someone at Cornell, and they had done the same thing, and those people got removed from their organizations. So not get blocked with, just do it anonymously.
Q And just so I understand, when you say the people at Cornell did the same thing, are you referring to people at Cornell had a Yik Yak campaign, something like that?
A They posted on a website.
Q Okay.
A Anonymously.
Q And when you say, "not get blocked," were you afraid of getting blocked in some way?
A I did not want my name to be associated with it. No.
Q All right. Then [redacted] said:
Yes.
Proud friend moment.
Is that correct?
A Yes.

Q All right. Then on the next page, it looks like [redacted] sent a Yik Yak to you?
A Yes.
Q Right. Okay. And then you said: Amazing?
A Yes.
Q And that was referring to the fact that there was another Yik Yak --
A Yes.
Q -- saying -- a And you understand that -- is it -- is it fair to say that that Yik Yak implies that John Doe is a predator?
A Yes.
Q All right. Thank you. And you also had a group chat with Cortney Fisher and [redacted] --
A Yes.
Q -- is that correct? Okay.
A There was an email chain between me, Cortney, and [redacted], but [redacted] was texting Cortney separately because I did not have Cortney's number.
Q Okay.
MR. NORTH: I'm going to share another document, I think we're on Exhibit F. Mark this as Exhibit F.
(Exhibit F marked for identification.)
THE WITNESS: Apologize. I did have

Cortney's number, I misspoke.

BY MR. NORTH:

Q Okay. These are group chat messages between you, Cortney Fisher, and [redacted]; is that correct?

A Yes. Yes.

Q Okay. And you didn't submit these documents in response to the subpoena you were issued, right?

A No.

Q Okay. Thank you. At any point, did anyone from the University's Title IX office speak to you about John Doe?

A Not specifically. No.

Q Okay. Well, when you say "not specifically," what does that mean?

A Angela Nastase came up to us at a -- at an event where President Pines was speaking and told us that we were doing bad things or something, and we were like, "What are you talking about"? And she did not expand.

Q Okay. Do you remember when that was?

A It was when President Pines came and spoke about sexual assault. I could find the date, but I don't have it in front of me.

Q All right. That's fine. Was it -- would you say it was in the spring 2022 semester?

A Yes.
Q Okay. But you don't recall, kind of, when in the semester that was?
A No.
Q Okay. The event with President Pines, was that a public event?
A Mm-hmm.
Q Okay. So it could be searched on Google for when that date was?
A Yeah.
Q Okay. Was there anything else particular about that event that would set it apart from other events that President Pines does?
A It was about sexual assault prevention.
Q Okay. Fair enough.
A That's it.
Q I'd like to refer back to Exhibit A. Again, looking at the very end of the document, Jane Roe's speech that we've discussed here. And again, when did you say you were -- you were given this document?
A At some point in the week following when I was served.
Q All right. Do you know whether Defendant Two was given this document?
A It was sent to me.

Q Okay. So the answer to my question, I guess my question was, do you -- do you know if [redacted] was also given this document?

A I don't recall.

Q Okay. Now, I'd like to refer you to 70 percent of the way down the first long paragraph here, the sentence that begins with:

They allowed for false evidence concerning a 911 dispatcher to be included when there was never any record that I -- that I had ever talked to them in the first place.

Do you see that sentence?

A Yes.

Q Okay. Would seeing evidence that disproves any of [redacted]'s statements here change your opinion on whether [redacted] was telling the truth?

A No.

Q Why would it not change your opinion?

A Because I think you're trying to -- I believe her, plain and simple.

Q Okay. And you're not willing to consider any evidence contrary to her at all?

A I'm willing to consider evidence. I'm saying that that evidence would have been produced in a way to make me think and feel a different way than I already

do.

Q And you testified earlier that that evidence wouldn't change your mind?

A Right now, I -- I can't say I never seen the evidence, but I believe her.

Q Okay. Thank you.

MR. NORTH: Bear with me here. I'm going to try to refer to an exhibit, which is an audio file. Let me mark this as Exhibit G.

(Exhibit G marked for identification.)

MR. NORTH: Is everyone able to view this document?

MR. BEASLEY: I see that it's up. But I mean, have you played any of it yet?

MR. NORTH: I will -- I will play. I don't know technically if it plays for everyone if I play it. But --

Defendant Three, I'd ask you listen to the audio file. I'll play it as well.

THE PROCEEDINGS OFFICER: It should play for everyone.

MR. NORTH: All right. Sounds good. I'll hit "play."

(Audio Exhibit Played.)

MR. NORTH: Thank you.

BY MR. NORTH:

Q Does that recording change your mind, Defendant Three about whether Jane Roe was telling the truth, about never talking to a 911 dispatcher?

A I'm sorry. I don't remember saying she didn't talk to a 911 dispatcher.

Q Does that recording change your mind as to whether Jane Roe was telling the truth, generally?

A No.

Q Okay. Thank you. So, during this deposition we've reviewed text messages that you were copied on that you did not produce in the subpoena. Would you agree with me?

A Yes.

Q Okay.

MR. CONDLIFFE: I just need to interrupt here, Mr. Ben. I just want to note for the record, you know, these documents were gathered at the beginning of this case. We never went through discovery, and, you know, I did not save duplicative information.

So, you know, I think you're just -- I'm getting a little annoyed with this line of questioning. I don't think it's appropriate. I think it's a complete waste of time. You know, obviously, everything that we had from both of them have been produced, and I don't

want to hear the suggestion they haven't been.

MR. NORTH: Jack, I'm asking my questions. You're free to say an objection for the record, but --

MR. CONDLIFFE: Yeah. Well, I -- I'm --

MR. NORTH: Your objection is noted.

MR. CONDLIFFE: Yeah. You want to file a motion to compel, be my guest.

BY MR. NORTH:

Q [redacted], would you agree with me --

MR. NORTH: Well, let me just say, I mean, I'm -- let me say for the record that, I mean, there are several documents that this witness has identified as -- you know, that she was copied on, that were not produced in response to the subpoena. And I think this directly supports, you know, our discussion yesterday that the document production response to the subpoena was likely not complete and I think we're going to have to hold this deposition open to ensure that we have a complete document production.

MR. CONDLIFFE: Yeah. You know, we're not going to do that. She has not admitted that there are any -- and you've shown her a document that doesn't mean it's in her possession, so you can do whatever you want. We won't be appearing at a follow-up deposition

based on that. You can file a motion with the court, but, you know, enough is enough. Move on.

MR. BEASLEY: The only thing -- I would -- I would agree -- I would only add to that -- I mean, I think that there's -- she testified earlier that, you know, some of the documents that were perhaps produced by [redacted] are things she just doesn't have anymore. So, you know, I think she's testified to doing a thorough and complete review of her documents to see what she could produce.

Some of the reality is some of the information pertinent to her deposition was contained in [redacted]'s documents that were produced last week. So I also joined in the fact that, you know, I don't think this deposition should be kept open this time.

MR. NORTH: Yeah. Well, thank you. I understand your position. I do want to note again for the record that there are -- the witness identified several social media accounts that she -- that she possesses and that she said she did not review in response to the subpoena. She just said --

MR. CONDLIFFE: That's a -- that is a complete mischaracterization of her testimony. She testified that she had social media accounts where she knows from personal knowledge she did not post something

and didn't bother reviewing it. It's not what you just said. There's a big difference between those two things.

MR. NORTH: Well, I think -- I mean, the court can decide, I suppose --

MR. CONDLIFFE: That's right though.

MR. NORTH: -- but if you don't -- if you don't review --

MR. CONDLIFFE: You're right.

MR. NORTH: -- the accounts, you don't have any personal knowledge that there's nothing responsive there. I mean, how could you possibly know that?

MR. CONDLIFFE: Oh, for goodness sakes. You know what? Go ahead and file a motion. But listen, you know, she's been very cooperative. We arranged this thing, we gave you documents in advance. We're under no obligation to do so. So, you know, for you to suggest that she has withheld anything even remotely based on what you've heard here today is ridiculous.

MR. NORTH: Okay. Well, the -- I -- the record speaks for itself. We don't need to keep going back-and-forth. Almost done with my questions, so I'll just proceed.

BY MR. NORTH:

Q [redacted], if John Doe is, in fact, innocent, do you think it is appropriate to call him a rapist or a sexual predator?
A What's the definition of innocent? Is that innocent by -- proven by court?
Q Let's just say he did not do what he's accused of doing.
A Sure. I -- I would agree.
Q Okay. Would you agree with me that if he's actually innocent, the Yik Yaks, the seeing if he could be -- seeing if he could leave the Club Lacrosse Team would cause him emotional distress?
A No.
MR. BEASLEY: Objection.
You can answer.
BY MR. NORTH:
Q Why would you take these actions against John Doe if you weren't absolutely sure he was guilty?
A Just wanted to protect students at University of Maryland. That's all I was trying to do.
Q All right.
MR. NORTH: That's all my questions. Your counsel may have some follow-up questions.
MR. SHERIDAN: Yeah. I also have some questions. Who wants to go first?

MR. BEASLEY: I don't anticipate asking any questions, so why don't you go ahead?

MR. SHERIDAN: Okay. Can we take, like, five minutes?

MR. BEASLEY: Sure.

MR. NORTH: Sure.

THE PROCEEDINGS OFFICER: 12:43 p.m., Eastern.

(Off the record.)

THE PROCEEDINGS OFFICER: Right now we're back on the record at 12:51 p.m., Eastern.

MR. SHERIDAN: Okay. Thank you.

EXAMINATION

BY MR. SHERIDAN:

Q Good afternoon, Defendant Three My name is Patrick Sheridan. I represent the University of Maryland and Ms. Karmiol and Ms. Nastase in this matter. Mr. North covered most of what, you know, I thought needed to be covered to, but I'm going to have to, like, jump around a little bit here. So bear with me. There are just a few things that I want to follow-up on.

With regard to, like, communicating the allegations against John Doe -- John Doe, to Club Lacrosse and the other people that you communicate these allegations to, you said you did this "to keep people

safe on the University of Maryland campus," correct?
A Correct.
Q Okay. And in the University community, correct?
A Correct.
Q All right. Did you communicate these allegations to retaliate against John Doe for participating in a sexual-misconduct proceeding?
A Never. No.
Q Okay. Did you communicate these allegations to others, against John Doe because he participated in a Title IX proceeding?
A No.
Q Okay. Did you have any objection to him participating in this Title IX proceeding?
A No.
Q Okay. Did you communicate these allegations because Mr. John Doe is male?
A No.
Q With respect to PSA, did you coordinate at all with the membership of PSA when you made these statements?
A Strictly my copresident.
Q Okay. So it's not something that you opened up to the larger membership?


Remote Legal Court Reporting
646.461.3400 info@remotelegal.com

A Never. No.
Q Okay. Did -- now, prior to making these statements, did you coordinate with the University's Title IX office?
A No.
Q Okay. Did you coordinate with the Office of Civil Rights and Sexual Misconduct at the University prior to making these statements?
A No.
Q Okay. Did you coordinate with Cortney Fisher prior to making these statements?
A No.
Q Did you seek Cortney Fisher's approval, before you made these statements?
A No.
Q Okay. John Doe has alleged in this litigation that PSA works closely with the Office of Civil Rights and Sexual Misconduct; is this an accurate statement?
A No.
Q In your time as the president of PSA, did you ever work closely with the Office of Civil Rights and Sexual Misconduct?
A They refused to come to our events, but they were invited.
Q John Doe also alleges in this litigation that

PSA met with the Office of Civil Rights and Sexual Misconduct to coordinate Title IX efforts; is that a true statement?

A Not at all.

Q Okay. Did you ever, in your capacity as copresident of PSA, meet with OCRSM to coordinate their Title IX efforts?

A No.

Q Did you have ever had any meetings with anybody at the University about coordinating a response to the allegations against John Doe?

A No.

Q Did you ever have any meetings with anybody at the University about coordinating response to the sexual misconduct proceeding against John Doe?

A Yeah. Well, I guess, after we were served the Title IX case for expulsion by John Doe, that is when we contacted Cortney Fisher.

Q Okay. But not prior to that, correct?

A Correct.

Q Okay. And so the response to the John Doe allegation -- to his allegations against you, the Title IX allegations, who did you speak with at the University?

A Cortney Fisher.

Q Okay. And what did you discuss with Ms. Fisher?

A What to do next.

Q Okay. What --

A We were confused. We had never heard of any of -- before.

Q Okay. What did she advise you on what to do next?

A She just said, you know, the case has been dismissed, so there's nothing to do now.

Q Okay. Did she, I guess, act on your behalf in response to those allegations?

A She told us that there were some rumors going around administration, that she had told them, you know, she shut it -- she shut them down for us because they were rumors and we hadn't done anything.

Q What were the rumors?

A I don't -- I don't know. There's just flurry going around about -- you know, we had -- you know, since the Title IX case had been issued -- the Title IX expulsion, that's, I assume, what they were mentioning. And I apologize, I also spoke to Kurt Klier, but, you know, we covered that. So I don't know.

Q Okay. What expulsion requests are you referring to?

A A letter came to me and my email and Defendant Two as well, in March 2022, saying that he had tried to get us expelled on the basis of sexual -- or sex. And I don't remember the exact details, but that it had been denied by Title IX office.

Q Okay. Did you ever file, like, a formal response to his Title IX complaint?

A No.

Q Okay. Do you know how many Title IX complaints he filed against you?

A No.

Q Did you ever file any response -- any formal response to any Title IX complaint that was filed against you?

A No.

Q All right. You mentioned Kurt Klier.

MR. SHERIDAN: Ben, can you pull up your Exhibit A, which, I think, is the email -- as the email to Mr. Klier?

MR. NORTH: Yeah. I'm happy to do that. I think you're able to do that too, just so you know, but I'm happy to do it.

MR. SHERIDAN: I can do that. Okay. Sorry.

MR. NORTH: It's okay.

MR. SHERIDAN: If I can do it, I'll do it. Let me see. Okay. I see it.

Can everybody see this?

MR. BEASLEY: No.

MR. NORTH: I cannot.

MR. SHERIDAN: Okay. Sorry.

MR. BEASLEY: Yeah. I got it.

MR. NORTH: Yeah. There we go.

MR. SHERIDAN: Okay. All right.

Just for the record, this is Exhibit A -- page 1 to Exhibit A.

BY MR. SHERIDAN:

Q And the top of the page is an email from Ms. Jane Roe to Mr. Klier, correct?

A Correct.

Q Okay. And then below that is an email from you to Mr. Klier, correct?

A Yes.

Q Okay. Was this part of the same email chain? So in other words, were you --

A Yes.

Q Yes? Okay. And you said -- correct me if I'm wrong -- that you did not review the email that Ms. Jane Roe sent before you sent your email?

A I was -- I was unaware that it was going to be

sent in the first place.

Q Okay. So you just got the email at the same time Mr. Klier did, and you had not reviewed it prior to that; is that correct?

A Correct.

Q All right. And I think you said, in response to Mr. North's question, that you sent this email to Mr. Klier to save face; is that correct?

A Correct.

Q All right. And what do you mean by that?

A Save face might be not the correct term, but I did not want to dampen our relationship with Klier. I felt that the statements that Jane Roe made about me coming after them was inaccurate and not something I had ever consented to.

Q Coming after who?

A Let's see:

John Doe is a danger to other girls here on campus and even the president of the club agreed to release him due to reason --

Okay. Sorry. That's not me.

All right. I just -- I think (indiscernible - audio disruption) sort of conversation was not spoken with me beforehand. I apologize. I -- I thought something was in there about -- she said that I was

going to (indiscernible - audio disruption) action of some kind.

Q Okay. Sorry. You broke -- you broke up there for me. Could you repeat what you just said because I -- you kind of broke up there.

A Yeah. I -- I was just saying that I did not -- I -- I thought there was something in there about me coming after them, but upon, you know, there is not, so -- I -- I just didn't sign off on anything in this -- in this letter.

Q Okay.

A So I was trying to --

Q So --

A -- trying to make sure our relationship with Klier was not dampened by this note.

Q Okay. And what was the relationship that you had with Mr. Klier?

A None.

Q Okay. Well, when you said "I was trying to make sure that our relationship wasn't dampened," what was the -- what relationship are you referring to?

A More specifically, the future relationship. If we were to work together, I did not want him to think we were aggressive by any means.

Q Okay. So when Ms. Jane Roe says -- the third

paragraph from the bottom, you see where it says:

I know that PSA?

A Yes.

Q Okay. So, I know that PSA has been in contact with you for some time.

Had you been in contact with Mr. Klier for some time?

A I -- I believe that is referring to our email exchange where Melanie Turner reached out to Kurt Klier.

Q Okay. Through PSA?

A Through her personal email. But as you know, I was copied on that --

Q Okay.

A -- in the -- in -- with the PSA email.

Q All right. So, in response -- well, I guess your email, you then say, and we -- I mean you discussed this with Mr. North, said:

In light of this incident, we would like to work alongside you and your team to get a resolution.

Correct?

A Correct.

Q Okay. And I think you said that resolution that you were looking for was to have him removed from the Club Lacrosse Team, correct?

A I don't want that to be on the record that

that is the sole reason. There was an awareness piece. If it means that people will be safer, then correct.

Q Okay. And in response -- this is page 2 -- Mr. Klier says:

Thank you for reaching out. From what I understand in your email, the University has conducted an investigation and rendered a decision based on that investigation. the University found that the students in question were not responsible. My program cannot re-adjudicate the case, nor would we be the appropriate venue to try.

Correct?

A Correct.

Q All right. Did you take that to mean that the Club Sports -- Mr. Klier was not going to intervene and ask that John Doe be removed from the Club Lacrosse Team?

A Correct.

Q Okay. And did you take that to mean that that would not be a proper resolution anyway, like he was not to be removed from the Club Lacrosse Team because of these -- because of this Title IX proceeding?

A No.

Q Okay. You did not understand that to be the position of Mr. Klier?

A Position of Mr. Klier, yes. Apologies.
Q Okay. That he was not to be removed from the Club Lacrosse Team because of these allegations, correct?
A Correct.
Q Okay. And also, with respect to Club Lacrosse, you mentioned a conversation that you had with Andrew Skiscim where he said he did not like John Doe, he thought he was the worst, correct?
A Yeah.
Q Okay. Was this a result of the allegations that you communicated to Mr. Skiscim?
A No.
Q Did this --
A He had mentioned --
Q Go ahead.
A Apologies. He had mentioned to me that John Doe was, in lack of better term, slimy that he didn't come to any practice and only came to parties and made people feel uncomfortable.
Q Okay. And was this -- did this predate the allegations against John Doe?
A No.
Q Was it your -- I'm sorry?
A No. This was after the allegations.

Q Okay. So when he said he thought John Doe was the worst, I thought you said that that wasn't because of the allegations. Are you saying that that was because of the allegations?
A It was because he didn't come to practices.
Q Okay.
A He wasn't really a part of the team. He just used it to party --
Q Okay.
A -- was what I was told.
Q And did he indicate that that is why he would ask him to leave the Club Lacrosse?
A Yes.
Q Okay. So apart from the sexual assault allegations, correct?
A Correct.
Q Okay. Sorry. Bear with me here. All right. So after, I guess, drawing your attention to page 9 of Exhibit A. Is this that -- the communication from Melanie Turner that you were referring to?
A I -- I was referring to Melanie Turner's email to Klier previously.
Q Okay.
A But there -- this is another correspondence from her.

Q Okay. And here she says:
Hi Ben --
And that's the Club Lacrosse President that we discussed earlier, I'm forgetting his name right now?
A Yes.
Q Okay.
Hi Ben, it's Melanie and Defendant Three We wanted to fill you in on what has happened so far on our end.
And you said you had a Zoom call with PSA's advisor and that's Cortney Fisher?
A Yes.
Q Okay. And she told you that Kurt, meaning Kurt Klier, can't do anything in terms of kicking John Doe off the Club Lacrosse Team, correct?
A Correct.
Q Okay. And then it says:
But you guys have grounds to ask him to leave the team and see what happens from there.
Who decided that, and what grounds would those be?
A That he does not attend practice.
Q Okay. Who decided that the Club Lacrosse Team had grounds to ask John Doe to leave the team?
A I think it was more of a off-the-record type situation.

Q Okay. Off the record from -- like what off-the-record conversation was there that led you or Ms. Turner to that conclusion?
A Meaning that they could ask him to leave and not want him back, regardless of school jurisdiction.
Q Okay. Did anybody at the University advise you that this is what could be done?
A No.
Q Okay. This is something -- this is an idea that you formed with other people in PSA; is that correct?
A Majority, the Club Lacrosse Team --
Q Okay. So --
A -- has formed the idea.
Q Okay. So the conversation or this conclusion that they could still kick him off the team was reached from off-the-record conversations with Club Lacrosse and PSA?
A Correct.
Q Okay. With no involvement from the University, correct?
A Correct.
Q All right. Moving to page 7 of this exhibit. This is an email from you and [redacted] to Cortney Fisher, correct?

A Correct.

Q Okay. And following up, regarding the Title IX Club Lacrosse situation, what is that referring to?

A This is referring to as I had mentioned there were rumors that were swirling around after we were served with the original Title IX request for expulsion, I guess, is the best way to say it.

Q Okay. And you say:

Again, thank you so much for speaking on our behalf and clarifying the details about PSA's (lack of) involvement as an organization.

When did Cortney Fisher speak on your behalf and clarify the details about PSA's lack of involvement as an organization?

A Probably at some point at the end of January. Well, like I said, there were rumors swirling around at administration. And I guess she talked to the correct people and told them that we didn't do anything wrong about -- about that conversation.

Q Okay. When you say "PSA's lack of involvement as an organization," what -- lack of involvement in what?

A In any sort of -- I believe he called it some sort of sexual abuse.

Q Okay. Like sexual misconduct?

A Correct.
Q All right. Okay. Do you know if John Doe was ever removed from the Club Lacrosse Team?
A The last I heard is he said, I will think about it. So I don't think that was ever done. No.
Q Okay. All right. John Doe also alleges that you knew that the Office of Civil Rights and Sexual Misconduct would protect you from any allegation of misconduct leveled against you. Is that a true statement?
A Absolutely not.
Q Okay. Did anybody at OCRSM ever communicate to you that they would protect you from any allegation of misconduct?
A Absolutely not.
Q Okay. Did anybody at the University ever communicate to you that you would be protected from any allegation of misconduct?
A No.
Q Okay. And you were named as a defendant in this lawsuit initially, correct?
A Correct.
Q Okay. And you're no longer a defendant, correct?
A Correct.

Q Can you tell me what happened that resulted in you no longer being a defendant in this case?

MR. BEASLEY: I'm going to object and advise the witness not to answer.

MR. SHERIDAN: On what grounds?

MR. BEASLEY: Due to a confidentiality, non-disclosure, non-disparagement agreement.

MR. SHERIDAN: Okay. Well, it was my understanding that you produced Defendant Three for this deposition with the understanding that that would not apply to her testimonies. Is that -- that's not correct?

MR. BEASLEY: Mr. North, do we have an agreement that she can discuss the -- discuss the terms of the settlement agreement? I don't know that we really got that far.

MR. NORTH: Yes. Yeah. No objection from our side.

MR. BEASLEY: Okay. All right. Unless Jack has any comment on it, then if we -- if we have that understanding, she can talk about these terms of the settlement agreement, then I'll have her ask -- answer questions.

MR. CONDLIFFE: Sure. To the degree she's not asked any legal questions, I don't care.

MR. SHERIDAN: Okay.

MR. BEASLEY: Okay. All right.

So, Defendant Three you can answer the question if you remember. If you need to have him repeat the question, that's fine, too. Let us know.

THE WITNESS: Okay.

MR. SHERIDAN: All right. I'm going to share this exhibit. Can everybody see it?

THE WITNESS: No.

MR. CONDLIFFE: No.

MR. SHERIDAN: Okay. Can everybody see this?

MR. BEASLEY: Yes.

MR. SHERIDAN: Okay. Can we mark this? Or do I need to mark this? Madam Court Reporter?

THE PROCEEDINGS OFFICER: I'll mark this Exhibit H.

(Exhibit H marked for identification.)

MR. CONDLIFFE: I just want to comment. This should certainly be under seal if it's going to be filed with the court.

MR. SHERIDAN: Yeah. I mean, my understanding is the -- isn't the entire -- didn't we agree that the deposition is under seal at the outset?

MR. BEASLEY: That's my understanding.

MR. CONDLIFFE: Sure. That's fine. I'm just being careful.

MR. SHERIDAN: Yeah.

MR. BEASLEY: But -- right. But I think to Jack's point, if this document is going to be filed outside the context of the deposition, it would be asked that it be kept under seal as well.

MR. SHERIDAN: Yeah. I mean, I don't plan on filing this. Just wanted to --

MR. BEASLEY: Sure.

MR. NORTH: Yeah. And if it ever is filed, I agree, filing under the seals is the way to go.

MR. BEASLEY: Okay. Very well. Thank you.

MR. SHERIDAN: Okay.

BY MR. SHERIDAN:

Q Defendant Three, do you -- do you recognize this document that's been marked as Exhibit H?

A Yes.

Q And what is this?

A This is our settlement agreement.

Q Okay. And did you review this agreement before signing it?

A Yes.

Q All right. And if you go to page 9 of the

agreement, is that your signature?

A Yes.

Q Okay. And what's your understanding of the terms of the settlement between you and John Doe?

MR. BEASLEY: I'll object to it, saying it calls for legal conclusion.

But you can answer if you can.

THE WITNESS: It's confidentiality based on what was agreed upon is my understanding.

BY MR. SHERIDAN:

Q Okay. And as part of the settlement, John Doe agreed to dismiss his case against you, correct?

A Correct.

Q And release all claims he may have had against you; is that correct?

A Correct.

Q Okay. And in return, you, Mr. John Doe, received a sum of money, correct?

A Correct.

Q Okay. $15,000, correct?

A Correct.

Q Okay. All right. Sorry. Bear with me here. Okay. You said in response to Mr. North's questions, that you reviewed the evidence in the Title IX case by briefly skimming it, correct, the -- and by the Title IX

case, I'm referring to Ms. Jane Roe's Title IX case against John Doe?

A Yes.

Q Okay. And you briefly skimmed it after you were served with Mr. John Doe's lawsuit against you, correct?

A Correct.

Q And since that time, have you done anything more than briefly skim the Title IX case?

A No.

Q Mr. North asked you about PSA's assistance to sexual assault survivors. Do you recall that line of questioning?

A Yes.

Q Okay. And I think you said you came into contact with one male who had come to PSA indicating that he was a survivor of sexual assault, correct?

A Yes.

Q Okay. Did PSA, during your time there, ever turn any male survivors or males who said they were survivors of sexual assault away?

A No.

Q Okay. How many males who had alleged that they were survivors of sexual assault came to PSA during your time as a member of PSA?

A Just the one that I -- I barely recall. But no others. No.
Q Okay. Is there like a -- and that's one, I think you said five or six females, correct, came to you during that time?
A Correct.
Q Okay. What -- of those five to six females who came to PSA during your time there, what percentage of those women alleged that they had been assaulted by a male?
A All of them.
Q Did -- and what percentage of those females alleged that they've been assaulted by another female?
A None of them.
Q You said with the Yik Yak post that you didn't want your name to be associated with it, correct?
A Correct.
Q Okay. And Yik Yak is anonymous, correct?
A Correct.
Q All right. Why did you not want your name to be associated with the allegation that you made on Yik Yak?
A I didn't think it was important.
Q Okay. Is that -- and that's the only reason, because you didn't think it was important to put your

name on that allegation?

A I work in Public Relations. I know what defamation means. And I did not want that to be seen as any sort of defamation.

Q Okay. When was the last time you spoke with Ms. Jane Roe?

A I text her every year on the anniversary of her assaulting. So October.

Q Okay. And what did you communicate to her in October of 2023?

A Just that I -- I was thinking of her.

Q Okay. Have you discussed this case with her at all?

A No. After -- after the initial, she asked to not be involved, so, no, after that.

Q Okay. And she was never sued by John Doe to your knowledge, correct?

A Correct.

MR. BEASLEY: Did we lose Mr. Sheridan? I don't see him on the screen anymore.

MR. CONDLIFFE: Oh, yeah. We did.

MR. BEASLEY: Yeah. We did. He's gone. Okay.

MR. NORTH: Can we go off the record until he comes?

THE PROCEEDINGS OFFICER: We can go off the record if that's okay.

MR. BEASLEY: Sure.

THE PROCEEDINGS OFFICER: All right. Off record at 1:25 p.m., Eastern.

(Off the record.)

MR. SHERIDAN: Thank you.

THE PROCEEDINGS OFFICER: All right. Stand by. We're back on the record at 1:26 p.m., Eastern.

MR. SHERIDAN: Madam Court Reporter, can you read me back, like the last, I guess, passage you have?

THE PROCEEDINGS OFFICER: Sure.

All right. Stand by for read back.

(Readback as requested.)

MR. SHERIDAN: Okay.

BY MR. SHERIDAN:

Q You mentioned that Angela Nastase came up to you at an event with President Pines and told us that we were doing bad things. Do you remember that?

A Yes.

Q Can you explain what -- did she explain what she meant by that?

A No.

Q Okay. Did you know what she was referring to?
A I assumed it was the Title IX proceeding that she had seen as well. The DFSL head, Matt Supple, had also made a comment to me about us doing bad things. But I was never made aware of any of those complaints and what they were.
Q Okay. Did you follow up with her at all about that?
A No.
Q Did you have any other discussions with anybody at the University about what bad things you were doing?
A No.
Q Okay. Did you ever -- were you ever contacted by the Office of Student Conduct about any issues with John Doe?
A No. Besides the --
Q Were --
A -- proceeding. But --
Q Besides -- I'm sorry?
A The expulsion document.
Q Okay. But that was a Title IX proceeding, correct?
A Yes.
Q Were you ever contacted separate from the

Title IX proceeding by the Office of Student Conduct about any issues that you had with John Doe?

A Not to my recollection.

Q Okay. Sorry. Just going through my notes here.

MR. SHERIDAN: Okay. Can we be put in a breakout room with Ms. Bolyard please, just so I can talk to her for about five minutes and then we can come back -- I think I'm done, but I just want to confirm with Emily.

THE PROCEEDINGS OFFICER: Sure. I'll take us off record, if that's okay?

MR. SHERIDAN: Yes.

THE PROCEEDINGS OFFICER: Okay. Off record at 1:29 p.m., Eastern.

(Off the record.)

THE PROCEEDINGS OFFICER: All right. We're back on the record at 1:33 p.m., Eastern.

MR. SHERIDAN: Okay. I do not have any further questions. Thank you, Defendant Three

THE PROCEEDINGS OFFICER: Does anyone else have any questions?

MR. BEASLEY: I don't have any questions. I don't know if Jack does.

Mr. North, do you have any questions?

MR. NORTH: Well, let Jack answer first but --

MR. CONDLIFFE: Not now. No.

MR. NORTH: Okay. All right. I just have a very brief redirect.

FURTHER EXAMINATION

BY MR. NORTH:

Q All right. [redacted] I'm just going to ask you few questions -- few follow-up questions to what Mr. Sheridan asked you during his questioning. You mentioned when Mr. Sheridan was asking you questions a -- an expulsion document. What do you mean by that?

A It's the document that Title IX found to not be of sound evidence that was sent to me and [redacted] in March 2022. It was something on the basis of sex and we were trying to get -- he was trying to get us expelled.

Q All right. I'm just going to refer you to, I think we're on Exhibit I. Let me know if you can see this.

A Yes.

(Exhibit I marked for identification.)

BY MR. NORTH:

Q Okay. Is this the document you're referring to?

A Yes.


Remote Legal Court Reporting
646.461.3400 info@remotelegal.com

Q Okay.

A It's the Mandatory Dismissal (indiscernible - audio disruption) expulsion.

Q Okay. All right. I just want to make sure I understand your perspective what in this document gives the -- gives you the understanding that John Doe was trying to get you expelled?

A Formal Complaint and Mandatory Dismissal. So, formal complaints -- and I have to (indiscernible - audio disruption) in there, but my understanding was that if the complaint went through we would have been expelled from the university.

Q I'm sorry. You kind of broke up there. Could you repeat your answer?

A My understanding was that if the complaint was accepted, that we have -- would have been expelled from the University.

Q Okay. Where does it say that in this letter? Feel free to take your time.

A It may not say that. That was just the understanding I had and -- and --

Q Did you get that understanding from anywhere other than this document?

A No.

Q Okay. Would it surprise you to learn that

Mandatory Dismissal refers to the University dismissing the complaint and not dismissing you from college?

A No. I know that. But the formal complaint should have gone through. That -- my understanding was that if it did go through, but I -- I know that Mandatory Dismissal means the complaint has been dismissed.

Q Okay. All right. Did you speak to anyone -- just on that point -- did you speak to anyone about that understanding of a formal complaint that gave you the impression that if it went through, you would have been expelled?

A Me and [redacted] spoke about it together.

Q Okay. Do you speak with anyone else about it?

A No.

Q All right. Thank you. I'm referring you back to Exhibit A.

MR. CONDLIFFE: Everyone, I have to go now. But, you know, Ben Beasley is. I'm not really needed for Ben to do his -- to do the job representing [redacted] right now. So it's nice to see everyone.

MR. BEASLEY: All right. Thank you.

THE WITNESS: Thank you.

MR. NORTH: You as well, Jack.

MR. BEASLEY: I'll call you later.

BY MR. NORTH:

Q All right. I'd like you -- I'd like to refer you to page 9.

MR. BEASLEY: Of Exhibit A?

MR. NORTH: Yes. That's right.

MR. BEASLEY: Okay. I didn't catch that.

BY MR. NORTH:

Q In this text from Melanie Turner -- well, let's go ahead and read it, it says:

Hi Ben it's Melanie and Defendant Three we wanted to fill you in on what has happened so far on our end so basically we had a Zoom call with PSA's advisor who's also an attorney and she basically just said that Kurt really can't do anything in terms of kicking him off the team but you guys have grounds to ask him to leave the team and see what happens from there. If you're interested in setting up a call with her also she said that she's willing to talk with you guys her law background was really helpful.

I read that correctly; is that right?

A Yes.

Q Okay. The PSA's advisor that that text refers to, is that Cortney Fisher?

A Yes.

Q Okay. After reading this text, is it fair to


Remote Legal Court Reporting
646.461.3400 info@remotelegal.com

say that Cortney Fisher gave you and Melanie the impression that you guys had or the team had grounds to ask John Doe to leave the team?
A Unofficially, they can do whatever they want. Yes.
Q So that's a "yes" to my question?
A Yes.
Q Okay. Thank you. Now, you testified earlier in response to Mr. Sheridan's questions about the survivors that came to PSA. Do you recall testifying about that?
A Yes.
Q Okay. Mr. Sheridan ask you "if the female survivors had been allegedly assaulted by male students," and you said, "yes." Do you remember that?
A Yes.
Q Okay. The male survivor that we've been talking about, was he alleged to have been assaulted by another male student?
A I don't recall.
Q Okay. When did you say that you're -- that you got a new phone?
A Thanksgiving this past year, November.
Q Okay. And you said you restored it from a backup, correct?

A Yes.

Q Okay. And that backup contained your text messages, right?

A Yes.

Q Okay. So you still have access to those text messages, in other words?

A No. The setting was automatically on for delete within (indiscernible - audio disruption) so the text messages were deleted before, without my knowledge.

Q Okay. You referenced a text that you sent to Jane Roe on the anniversary of her being assaulted. How do you recall what you said in the message?

A I can't remember if it was on Snapchat or text, but I believe I just said I was thinking about her and sent a heart.

Q When was the last time you reviewed that message?

A I've never reviewed that message.

Q Okay. You testified earlier that the setting on your phone was for messages to be -- to be deleted after one year, correct?

A 30 days.

Q It's your testimony that text messages on your phone are set to be deleted after 30 days, not one year?

A Yes. However, before I got a new phone, it

was -- they were indefinite.

Q I understand.

MR. NORTH: All right. That's all the questions I have.

Now, Ben, I'm going to have to leave the deposition open. Perhaps you and I can confer after reviewing the transcript.

MR. SHERIDAN: Can I just -- I had one follow-up. Sorry.

MR. NORTH: No. No. Sorry. Sorry, Patrick. Go ahead.

MR. SHERIDAN: Okay.

FURTHER EXAMINATION

BY MR. SHERIDAN:

Q So, Defendant Three on -- when I asked you a question about that text exchange with the Club Lacrosse President Ben, you -- I thought you said that the idea to remove him from the team was something that you and Club Lacrosse discussed without any involvement from the University, correct?

A Upon further, I believe we also discussed it with Cortney.

Q Okay. When did you discuss that with Cortney Fisher?

A When we met after the -- the removal letter

came through.
Q What removal letter are you referring to?
A The expulsion I don't know what to call it, but --
Q The Title IX complaint against you, is that --
A That's correct.
Q Okay. And what did Ms. Fisher say to you?
A I don't recall explicitly what she said.
Q Okay. What was -- I guess -- if you don't recall specifically, do you recall generally what was said?
A She read over the complaint, said that there's nothing for us to do now. And it sounds like, based on the text, that she also said, you know, if they want to (indiscernible - audio disruption) him themselves, you know, they have all the power in the world to.
Q Okay. Did she recommend that he be removed from the team?
A No.
Q Okay. Did she advocate for him being removed from the team?
A No.
Q Okay. She just simply said that Club Lacrosse, if they want to remove somebody from the team, they have the ability to do that?

A Correct.
Q Okay. Just like if PSA wanted to remove somebody from its organization for whatever reason, it could do that, correct?
A Correct. We did.
Q Okay. Who did you remove from PSA?
A We removed someone on the executive board for accusations.
Q Okay. Who was that?
A As far -- I can't remember his name.
Q Okay. Accusations of sexual misconduct.
A Correct.
Q Okay.
MR. SHERIDAN: Okay. Nothing further.
MR. NORTH: All right. I don't have anything further.
MR. BEASLEY: Okay. Just a couple of -- well, not -- no questions. Two things. Ben, I mean, you and I had a -- and Jack had a discussion about keeping the deposition -- this deposition open. I think our position remains unchanged on that.
I think in terms of setting up any discussions you want to have about this, my recommendation would be that if there are documents you believe you did not get, that you believe Defendant Three

has, maybe just send an email to Jack and I and let's -- we'll talk about that, but you know -- and I've got some ideas on how we can address this, but let me talk to Jack and [redacted] first. Does that sound good?

MR. NORTH: Yeah. That's fine. I'll send you an email.

MR. BEASLEY: I just -- I mean, I need to know what documents you're claiming we have not produced before we can have addressed, whether or not we didn't produce anything. And I'm not agreeing that we didn't, but if you could just let me know.

MR. NORTH: Yeah. No. I get it.

MR. BEASLEY: Okay. All right.

MR. NORTH: I guess.

MR. BEASLEY: Okay. Very good.

Well, on the last thing, [redacted]y, you and I talked about this yesterday. You understand you have the right to read and review the transcript and assign it or to waive it. I'd recommend you waive the reading, but it's up to you if you want to read and sign.

THE WITNESS: I'll waive it.

MR. BEASLEY: Okay. So she will waive the reading of the transcript.

THE PROCEEDINGS OFFICER: Sure.

All right. Thank you. I just need to

collect orders on the record.

Mr. North, the certified transcript is included in your order. Would you like this transcript to be produced?

MR. NORTH: Yes, please. Thank you.

THE PROCEEDINGS OFFICER: Mr. Beasley, are you purchasing a copy of the transcript?

MR. BEASLEY: I am not, but would you mind emailing me after we're done in case. I do need to order one?

THE PROCEEDINGS OFFICER: Sure thing.

Mr. Sheridan, are you purchasing a copy of the transcript?

MR. SHERIDAN: Yes. Just E-Trans, please.

THE PROCEEDINGS OFFICER: All right. Sure thing.

With that, we are now off the record at 1:47 p.m., Eastern.

(Proceedings concluded at 1:47 p.m., ET)

(Read and Sign waived.)

* * * * *

# CERTIFICATE OF PROCEEDINGS OFFICER

I, Olivia Wilson, hereby certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That the proceedings were recorded by me and thereafter formatted into a full, true, and correct transcript of same;

I further certify that I am neither counsel for nor related to any parties to said action, nor in any way interested in the outcome thereof.

DATED, this 9th day of July, 2024.

Olivia Wilson
Certification, #CER-1600
Proceedings Officer